## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEAH GARRETT,<br><br>                    Plaintiff,<br><br>          v.<br><br>CITY UNIVERSITY OF NEW YORK,<br><br>                    Defendant. | **COMPLAINT**<br><br>Civil Case No.:<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Leah Garrett ("Plaintiff" or "Dr. Garrett"), by and through her undersigned counsel, for her complaint against Defendant City University of New York, including CUNY Hunter College (together, "Defendant," "CUNY Hunter" or the "College"),[1] hereby alleges as follows:

### PRELIMINARY STATEMENT

1.    CUNY Hunter holds itself out as a champion of tolerance. Its administrators are required, pursuant to university policies, to investigate and resolve promptly any complaints of harassment and discrimination, and to ensure public order on campus. The College prides itself on its commitment to providing an environment where students can learn, professors can research and teach, and all members of the community are free to engage in a civil exchange of ideas and benefit from a diversity of perspectives.

---

[1] Under New York law, CUNY Hunter—one of the senior colleges within the City University of New York system ("CUNY")—is not recognized as a legally cognizable identity separate from CUNY. Accordingly, all allegations and claims against CUNY Hunter College are treated as allegations and claims against CUNY. *See e.g., Hongmian Gong v. City Univ. of N.Y.,* 2019 U.S. Dist. LEXIS 31374, at *6-7 (S.D.N.Y. Feb. 27, 2019). All references herein to CUNY Hunter, which is defined to include CUNY and CUNY Hunter College, should be construed as references to the Defendant.

2.      Despite CUNY Hunter's precepts, it has betrayed these ideals as to Plaintiff, who is Jewish and serves as the Chair in Jewish Studies and Director of Hebrew and Jewish Studies at CUNY Hunter.  Instead of ensuring a workplace free from discrimination and harassment as required by Title VII of the Civil Rights Act, the College has allowed antisemitism to fester, subjecting Plaintiff to relentless hostility and unequal treatment because of her Jewish identity.

3.      When Plaintiff was hired as the inaugural Director of the Center for Jewish Studies, she was assured that the College would work collaboratively with her to tackle any incidents of antisemitism she brought to its attention.

4.      However, CUNY Hunter broke these promises in two critical ways.  First, the Office of Diversity and Compliance (the "ODC") completely abdicated its responsibility to combat antisemitism, failing to take any meaningful steps to address the growing hostility on campus. Second, despite Plaintiff submitting dozens of reports documenting incidents of antisemitism, CUNY Hunter refused to collaborate with her or take substantive and remedial action to address the pervasive discrimination.

5.      As a result, Plaintiff was left to navigate an increasingly hostile work environment and forced to shoulder the additional burden of acting as the sole academic advocate for Jewish students and faculty.  Overwhelmed by a deluge of pleas for assistance, Plaintiff was compelled to dedicate significant time and effort well beyond the scope of her employment agreement, further affecting her conditions of employment.

6.      CUNY Hunter's failure to take action to combat antisemitism on campus is not new.  Prior to more recent investigations by the Office of Civil Rights and New York Governor Kathy Hochul's office, which found that CUNY Hunter failed to take adequate action to address antisemitism on campus, an independent investigation dating back to 2016 revealed that CUNY

Hunter demonstrators openly chanted slogans such as "Jews out of CUNY" and "Death to Jews," without facing consequences.

7.      While antisemitism had long plagued CUNY Hunter, nothing could have prepared Plaintiff for the tidal wave of hatred that engulfed the campus in the aftermath of Hamas's brutal attack on Israel on October 7, 2023.  Classrooms, hallways, and common areas were transformed into platforms for antisemitic rhetoric, with students and faculty openly directing their anger and prejudice at Israelis, Zionists, and Jews.  As Zionism[2] is a core part of Plaintiff's identity, this hostility was inherently targeted at her, creating an environment that profoundly undermined her ability to perform her work.

8.      Regularly, Plaintiff faced an onslaught of antisemitic protests conducted in blatant defiance of CUNY Hunter's policies governing demonstrations.  Protestors thronged the lobby, blocked entrances to elevators and escalators, and forced Plaintiff to navigate through hostile crowds as they chanted slogans that are threatening to Jews.  Protesters displayed signs with disturbing and violent imagery, such as Jewish symbols dripping with blood, while demanding the expulsion of Zionists from CUNY Hunter.   Using megaphones, the protesters often amplified their hateful rhetoric, which reverberated through classrooms, hallways, and offices, spreading an atmosphere of fear and intimidation that affected Plaintiff's ability to work.

9.      The campus-wide antisemitic protests filtered very quickly into CUNY Hunter's Faculty Senate, where Plaintiff had regularly attended meetings to shape policies critical to her teaching and the programs and centers that she runs.  The Faculty Senate meetings were overtaken

---

[2] The Anti-Defamation League defines "Zionism" as a "movement for the self-determination and statehood for the Jewish people in their ancestral homeland, the land of Israel."  It also describes Zionism as "big tent movement that includes those across the spectrum from progressives, moderates and conservatives and those who are apolitical," noting "[t]here are Zionists who are critical of Israeli policies, just as there are Zionists who rarely voice disagreement with the Israeli government." *See* https://www.adl.org/resources/backgrounder/zionism

by protesters shouting vitriolic chants and demanding the implementation of anti-Israel agendas, in direct violation of Faculty Senate rules. Despite her obligation to uphold order, the Faculty Senate Chair—who was highly critical of Israel's actions—refused to act, and the administration failed to take any measures to address the disruptions. The atmosphere grew so hostile that Plaintiff no longer felt welcome or safe to attend meetings. Consequently, Plaintiff was deprived of the opportunity to shape policies, which significantly compromised her work.

10. In addition to the relentless demonstrations, Plaintiff was forced to endure a work environment where antisemitic graffiti, flyers, posters, and stickers were plastered on walls, scattered across surfaces, and circulated widely on social media—often in violation of CUNY Hunter policy. These messages included among other things, accusations that Jews elevate themselves above others and that Jews fabricated the reports of mass rape and murder by Hamas. Despite Plaintiff's repeated complaints to administrators, CUNY Hunter took no meaningful action. In one shocking incident, when Plaintiff reported swastikas drawn over the faces of Jewish hostages taken by Hamas, she was told by administrators that removing them "was not that simple." The swastikas remained on campus for more than five hours before they were finally removed—only after Plaintiff told CUNY Hunter that she would remove the swastikas herself if the administration failed to act.

11. By turning a blind eye to the antisemitic protests and hateful materials circulating on campus, CUNY Hunter signaled to students and faculty that they could harass Jews with impunity. As a result, students and faculty targeted Plaintiff, whose Jewish and Zionist identity made her a visible figure on campus and a preferred target of their animosity. In one instance, a faculty member defamed Plaintiff by telling others that Plaintiff was pretending to be Jewish to profit off of wealthy Jews. Plaintiff filed a complaint with the ODC, but it was dropped for "lack

of evidence," despite multiple witnesses corroborating the incident.  In another instance, a mass email was sent to the CUNY Hunter community featuring Plaintiff's picture, and inviting anti-Israel groups to target her.  Plaintiff pled with administrators to provide her with security so she could continue hosting her in-person Jewish programs on campus.  But CUNY Hunter failed to provide security, forcing her to conduct her programming online.

12.    In a continued pattern of marginalizing Plaintiff and the Jewish community, CUNY Hunter flatly rejected a request to light a menorah on Hanukkah—a cherished Jewish tradition on campus for more than a decade.  The decision was made presumably to avoid inflaming antisemitic students and faculty.  But instead of addressing the pervasive antisemitism permeating the campus, the administration chose to capitulate to it.  By silencing the Jewish community, the administration effectively punished the victims while empowering their oppressors, thus trampling their fundamental right to free expression.

13.    In stark contrast, when anti-Israel groups sought to screen the virulently antisemitic film *Israelism*, President Kirschner went beyond merely permitting the screening—her office actively sponsored it, despite Plaintiff's express warning about its inflammatory impact on the Jewish community.   The screening not only deeply upset the Jewish community, it also emboldened antisemitic students and faculty, who seized the moment to escalate their harassment of the already battered Jewish community.  The College's decision to allow the screening naturally deepened the climate of fear and intimidation for Plaintiff.

14.    The toxic environment nurtured by CUNY Hunter's deliberate indifference to Plaintiff's plight grew so threatening that she felt compelled to hide her Jewish identity.  Plaintiff stopped wearing her Star of David jewelry publicly and began wearing a cap pulled low over her face to avoid being recognized as the Chair of the Center for Jewish Studies.  Like many of her

Jewish colleagues, Plaintiff removed her name from her office door, and had it scrubbed from online school directories so she could not be found. The intimidation permeating Plaintiff's workplace was undeniable, yet CUNY Hunter did nothing to address it.

15.    Rather than address the rampant antisemitism on campus, CUNY Hunter justified its inaction by falsely claiming that the harassment constituted "political speech." But the administration knew full well that— celebrating the rape, torture, and murder of Jewish civilians by Hamas, calling for the expulsion of Zionist Jews from campus, accusing Jews of being racist, advocating for violence against Jews, and allowing swastikas to remain on campus—were not political discourse. These were nothing short of targeted acts of anti-Jewish harassment. Moreover, the use of the word "Zionists" by students and faculty was a thinly-veiled code for "Jews," as evidenced by examples where they explicitly targeted all Jews regardless of whether they identified as Zionists.

16.    The hostile environment at CUNY Hunter caused Plaintiff profound emotional distress, including nightmares, panic attacks, and extreme anxiety. Having exhausted all other means to effectuate change at CUNY Hunter, Plaintiff brings this lawsuit to hold CUNY Hunter accountable for: (i) creating a hostile work environment and discriminating against Plaintiff in violation of Title VII of the Civil Rights Act of 1964; (ii) breaching the terms of Plaintiff's Employment Agreement by refusing to enforce CUNY Hunter's internal policies on harassment, discrimination, and public order, which are incorporated by reference into Plaintiff's Employment Agreement; by forcing Plaintiff to shoulder a burden that exceeds the "workload" defined in her Employment Agreement; and by failing to address her reports of antisemitism as CUNY Hunter had promised to do as part of her employment, and in connection with her agreement to serve as Director of Jewish Studies; (iii) acting negligently with respect to the supervision and retention of

administrators who were responsible for addressing all harassment and disruptions of public order on campus but were asleep at the wheel when it came to antisemitism; and (iv) negligently inflicting emotional distress on Plaintiff.

## ADMINISTRATIVE PROCEDURES

17.     Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), an administrative pre-requisite to filing an action under Title VII of the Civil Rights Act of 1964 on September 30, 2024.  Plaintiff received a notice of her Right to Sue on November 12, 2024.  Plaintiff has complied with all prerequisites to filing this action.

## VENUE AND JURISDICTION

18.     The Court has subject matter jurisdiction over this matter pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f), which states:  "[e]ach United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this title."

19.     The Court has supplemental jurisdiction over Plaintiff's related c o m m o n l a w  claims pursuant to 28 U.S.C. § 1367(a).

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because Defendant CUNY Hunter is located in New York, New York, within the Southern District of New York and a substantial part of the events or omissions giving rise to this action, including the unlawful practices alleged herein, occurred in this District.

## PARTIES AND RELEVANT NON-PARTIES

21.     Plaintiff Dr. Leah Garrett is the Larry A. and Klara Silverstein Chair in Jewish Studies and Director of Hebrew and Jewish Studies at CUNY Hunter.  Plaintiff is a citizen of the United States and resides in New York.  At all relevant times, Plaintiff met the definition of

"employee" under Title VII. The terms of Plaintiff's appointment at CUNY Hunter are set forth in a letter agreement between Plaintiff and CUNY Hunter dated July 31, 2017 (the "Employment Agreement"), which has subsequently been renewed.

22.    Defendant CUNY Hunter is one of twenty-five campuses within the City University of New York ("CUNY") public university system in New York City. Its principal place of business is in New York, New York. At all relevant times, CUNY Hunter met the definition of "employer" under Title VII.

23.    Several CUNY Hunter deans and administrators are referenced throughout this Complaint but are not parties to this action. President Ann Kirschner served as the Interim President of CUNY Hunter, from approximately June 2023 to June 2024. Dean John Rose is the Dean of Diversity and Compliance and is therefore responsible for the Office of Diversity and Compliance. Manoj Pardasani was the Interim Provost and is now the permanent Provost and Vice President of Academic Affairs. Dean Andrew J. Polsky was the Dean of the School of Arts and Sciences until approximately July 2024.

## FACTUAL BACKGROUND

## I.    TITLE VII PROTECTS PLAINTIFF FROM ANTISEMITISM.

24.    Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate against someone because of their race, color, religion, sex or national origin. Employers are also prohibited from allowing harassment of an employee on the basis of the employee's protected class to reach a pervasive and severe level so as to create a hostile work environment.

25.    Title VII protects Plaintiff from discrimination and harassment on the basis of her Jewish identity, and thus protects her from antisemitism at her place of employment.

26.    The United States Department of State issued a press statement on November 4, 2022, adopting the International Holocaust Remembrance Alliance's working definition of antisemitism:   "The United States unequivocally condemns antisemitism and views the International Holocaust Remembrance Alliance (IHRA) Working Definition of Antisemitism as integral to the fight to eliminate this scourge.  It is widely accepted and used throughout the world by governments, international organizations, religious and sports entities, and other civil society organizations, which sends a powerful message of solidarity against antisemitism.  Bipartisan U.S. administrations have embraced and used the IHRA Working Definition of Antisemitism, inclusive of its examples, as a policy tool."[3]

27.    The IRHA's working definition of antisemitism states as follows:

Manifestations might include the targeting of the state of Israel, conceived as a Jewish collectivity.  However, criticism of Israel similar to that leveled against any other country cannot be regarded as antisemitic.  Antisemitism frequently charges Jews with conspiring to harm humanity, and it is often used to blame Jews for "why things go wrong." It is expressed in speech, writing, visual forms and action, and employs sinister stereotypes and negative character traits.

Contemporary examples of antisemitism in public life, the media, schools, the workplace, and in the religious sphere could, taking into account the overall context, include, but are not limited to:

- Calling for, aiding, or justifying the killing or harming of Jews in the name of a radical ideology or an extremist view of religion.

- Making mendacious, dehumanizing, demonizing, or stereotypical allegations about Jews as such or the power of Jews as collective — such as, especially but not exclusively, the myth about a world Jewish conspiracy or of Jews controlling the media, economy, government or other societal institutions.

- Accusing Jews as a people of being responsible for real or imagined wrongdoing committed by a single Jewish person or group, or even for acts committed by non-Jews.

---

[3]    https://www.state.gov/the-international-holocaust-remembrance-alliance-working-definition-of-%20antisemitism/

- Denying the fact, scope, mechanisms (*e.g.* gas chambers) or intentionality of the genocide of the Jewish people at the hands of National Socialist Germany and its supporters and accomplices during World War II (the Holocaust

- Accusing the Jews as a people, or Israel as a state, of inventing or exaggerating the Holocaust.

- Accusing Jewish citizens of being more loyal to Israel, or to the alleged priorities of Jews worldwide, than to the interests of their own nations.

- Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor.

- Applying double standards by requiring of it a behavior not expected or demanded of any other democratic nation.

- Using the symbols and images associated with classic antisemitism (e.g., claims of Jews killing Jesus or blood libel) to characterize Israel or Israelis.

- Drawing comparisons of contemporary Israeli policy to that of the Nazis.

- Holding Jews collectively responsible for actions of the state of Israel.[4]

28.     Chants and slogans that have been popularized after October 7, 2023, including at CUNY Hunter, such as "from the river to the sea, Palestine will be free," are calls for violence against Jews and the annihilation of the Jewish state of Israel and are therefore within the scope of the IRHA's working definition of antisemitism.

## II.     CUNY HUNTER HOLDS ITSELF OUT AS A CHAMPION OF TOLERANCE.

29.     CUNY was established to provide a public first-rate education to all students, regardless of means or background.  CUNY Hunter is one of twenty-five campuses within the CUNY system.

30.     CUNY prides itself on its commitment to diversity and tolerance.   CUNY Hunter's Office of Diversity and Compliance states on its webpage that "Hunter is committed to a policy of equal employment and equal access in its educational programs and activities.  Diversity,

---

[4] https://www.state.gov/defining-antisemitism/

inclusion, and an environment free from discrimination are central to the mission of the Office of Diversity and Compliance." It also describes the ODC as follows:

**ABOUT**

**DIVERSITY AND COMPLIANCE**

Our office supports and enhances Hunter College's commitment to diversity, providing expert advice and leadership to departments, faculty and staff in their efforts to recruit and retain a diverse workforce and ensure an environment free from discrimination and harassment.

31.    The ODC also describes certain strategic initiatives for enhancing diversity and inclusion:

**STRATEGIC INITIATIVES**

Hunter College's Faculty Diversity Strategic Plan aims to enhance diversity and inclusion across its academic community, emphasizing recruitment, retention, and campus climate to foster a more robust educational environment aligned with its historical commitment to student success and societal leadership.

Hunter College's Faculty Diversity Strategic Plan - Action Plan Chart outlines comprehensive strategies to enhance recruitment efforts by establishing partnerships with diverse institutions, ensuring inclusive job descriptions, supporting diverse search committees, and promoting successful diversity initiatives. The plan also emphasizes retention through innovative mentoring programs, orientation initiatives, and fostering a supportive campus climate through dialogue and collaborative diversity initiatives across academic departments and campus-wide offices.

32.    John Rose is CUNY Hunter's ODC Dean and is charged with running it. According to CUNY Hunter's website, "John Rose is responsible for developing and implementing a college-wide program to recruit individuals from underrepresented groups as faculty, senior administrators and staff. He also works closely with student groups to address diversity issues on campus and is

responsible for investigating employee complaints involving alleged discrimination based on protected status."

33.     The Office of Human Resources at CUNY Hunter likewise emphasizes the importance of diversity:  "The Office of Human Resources fosters efficiency, open communication, and teamwork in an environment that values success.  It provides many benefits and services that help Hunter College attract, retain, and inspire a highly qualified and diverse workforce."

34.     The CUNY Hunter Faculty Handbook states that "Hunter College is a highly diverse environment both intellectually and culturally."

35.     In certain circumstances, CUNY has offered "Safe Zone Training" to provide educational resources regarding the struggles faced by particular minority groups.

## III.    CUNY HUNTER IS OBLIGATED TO INVESTIGATE AND RESOLVE COMPLAINTS OF ANTISEMITIC HARASSMENT.

36.     CUNY Hunter has adopted several policies related to diversity.  Its Faculty Handbook states as follows:

> **Office of Diversity and Compliance**
>
> Hunter is committed to a policy of equal employment and equal access in its educational programs and activities. Diversity, inclusion, and an environment free from discrimination are central to our mission.
>
> It is the policy of Hunter to recruit, employ, retain, promote, and provide benefits to employees (including paid and unpaid interns) and to admit and provide services for students without regard to race, color, creed, national origin, ethnicity, ancestry, religion, age, sex (including pregnancy, childbirth and related conditions), sexual orientation, gender, gender identity, marital status, partnership status, disability, genetic information, alienage, citizenship, military or veteran status, status as a victim of domestic violence/stalking/sex offenses, unemployment status, or any other legally prohibited basis in accordance with federal, state and city laws.
>
> It is also the Hunter's policy to provide reasonable accommodations when appropriate to individuals with disabilities, individuals observing religious practices, employees who have pregnancy or childbirth-related medical conditions, or employees who are victims of domestic violence/stalking/sex offenses.

37.    The webpage for CUNY Hunter's ODC describes the procedures students, faculty, staff and applicants for employment may follow to escalate concerns related to discrimination and harassment:



38.    The ODC states on its website that "Hunter College seeks to address all instances of harassment or discrimination as promptly as possible," and that "[t]he Office of Diversity and Compliance will make every effort to promptly investigate and resolve complaints of discrimination or harassment."

39.    The policies regarding harassment likewise emphasize the need for prompt resolution of complaints, and encourage faculty and staff to intervene if they observe instances of harassment:

**Harassment**                                                                      ∧

Harassment on the basis of race, color, national or ethnic origin, religion, age, sexual orientation, gender identity, marital status, disability, genetic predisposition or carrier status, alienage, citizenship, military or veteran status, or status as victim of domestic violence is a form of prohibited discrimination.

- Individuals who believe they have been harassed or discriminated against often find it useful to participate in counseling. Students who wish to receive such counseling services should contact Hunter College's Office of Counseling and Wellness Services at 212-772-4918. Faculty and staff who wish to receive such counseling services should contact Corporate Counseling Associates at 800-833-8707.
- In certain cases, students who believe they are victims of harassment or discrimination may also find it useful to participate in academic services, such as tutoring programs on campus. Where appropriate, Hunter College will provide these services. Students who wish to inquire about the availability of academic services should contact Hunter College's Division of Student Services at 212-772-4882.
- Where appropriate, Hunter College may also provide or recommend counseling to individuals who are found to have engaged in harassment or discrimination.
- Hunter College seeks to address all instances of harassment or discrimination as promptly as possible. Therefore, in addition to the requirements set forth in CUNY's Policies and Procedures on Equal Opportunity and Non-Discrimination and Sexual Misconduct, **all** staff who observe incidents they believe constitute harassment are encouraged to report the incident to their immediate supervisors. If appropriate, supervisory staff and faculty members are also encouraged to intervene to address the harassment. In all cases, supervisory staff and faculty members will report the incident to the appropriate authority.

40.     In addition to the aforementioned policies and procedures, CUNY has a Policy on Equal Opportunity and Non-Discrimination, which addresses the procedures for reporting incidents of harassment and discrimination.  These aforementioned policies and procedures are referred to collectively herein as the "Harassment and Discrimination Policies."

41.     The Harassment and Discrimination Policies are incorporated expressly by reference into Plaintiff's Employment Agreement, which states that "[t]he terms and conditions of employment are those of CUNY's Bylaws and Manual of General Policy and the collective bargaining agreement between the University and the Professional Staff Congress (PSC), the labor union that represents the faculty."  Policy 6.02 of the Manual of General Policy is the Policy on Equal Opportunity and Non-Discrimination. The Policy on Equal Opportunity and Non-

14

Discrimination defines "Prohibited Conduct" to include discrimination and harassment, which in turn are defined as follows:

**Prohibited Conduct Defined**

**Discrimination** is treating an individual differently or less favorably because of his or her protected characteristics—such as race, color, religion, sex, gender, national origin, or any of the other bases prohibited by this Policy.

**Harassment** is a form of discrimination that consists of unwelcome conduct based on a protected characteristic that has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating, hostile or abusive work or academic environment. Such conduct can be spoken, written, visual, and/or physical. This policy covers prohibited harassment based on all protected characteristics other than sex. Sex-based harassment and sexual violence are covered by CUNY's Policy on Sexual Misconduct.

It also emphasizes CUNY's commitment to the prompt addressing of discrimination complaints: "The City University of New York is committed to addressing discrimination and retaliation complaints promptly, consistently and fairly. There shall be a Chief Diversity Officer at every college or unit of the University, who shall be responsible for, among other things, addressing discrimination and retaliation complaints under this Policy. There shall be procedures for making and investigating such complaints, which shall be applicable at each unit of the University."

42.    The "Complaint Procedures Under the City University of New York's Policy on Equal Opportunity and Non-Discrimination" include the following excerpts:

a)    <u>Preliminary Review</u>:  "Individuals who believe they have experienced discrimination and/or retaliation should promptly contact the Chief Diversity Officer at their location to discuss their concerns, with or without filing a complaint. Following the discussion, the Chief Diversity Officer will inform the complainant of the options available. These include seeking informal resolution of the issues the complainant has encountered or the college conducting a full investigation. Based on the facts of the

complaint, the Chief Diversity Officer may also advise the complainant that his or her situation is more suitable for resolution by another entity within the University."

b)    Filing a Complaint:    "Following the discussion with the Chief Diversity Officer, individuals who wish to pursue a complaint of discrimination and/or retaliation should be provided with a copy of the University's complaint form.  Complaints should be made in writing whenever possible, including in cases where the complainant is seeking an informal resolution."

c)    Informal Resolution:    "Individuals who believe they have been discriminated or retaliated against may choose to resolve their complaints informally.  Informal resolution is a process whereby parties can participate in a search for fair and workable solutions. . . .  The Chief Diversity Officer will determine if informal resolution is appropriate in light of the nature of the complaint.  Informal resolution requires the consent of both the complainant and the respondent and suspends the complaint process for up to thirty (30) calendar days, which can be extended upon consent of both parties, at the discretion of the Chief Diversity Officer. . . .  If no informal resolution of a complaint is reached, the complainant may request that the Chief Diversity Officer conduct a full investigation of the complaint."

d)    Investigation:    "A full investigation of a complaint may commence when it is warranted after a review of the complaint, or after informal resolution has failed."

e)    Timeframe:    "While some complaints may require extensive investigation, whenever possible, the investigation of a complaint should be completed within sixty (60) calendar days of the receipt of the complaint."

f)     <u>Report of Findings</u>:     "Promptly following the completion of the investigation, the Chief Diversity Officer will report his or her findings to the President. . . .  Following such report, the President will review the complaint investigation report and, when warranted by the facts, authorize such action as he or she deems necessary to properly correct the effects of or to prevent further harm to an affected party or others similarly situated. . . .  The complainant and the respondent should be apprised in writing of the outcome and action, if any, taken as a result of the complaint."

43.     The Manual of General Policy (incorporated by reference into Plaintiff's Employment Agreement) also contains a policy on the "Maintenance of Public Order" (the "Public Order Policy").  The Public Order Policy includes several rules, including the following, and describes penalties for students and faculty who violate the rules:

a)     "A member of the academic community shall not intentionally obstruct and/or forcibly prevent others from the exercise of their rights.  Nor shall he interfere with the institution's educational processes or facilities, or the rights of those who wish to avail themselves of any of the institution's instructional, personal, administrative, recreational, and community services."

b)     "Unauthorized occupancy of University/college facilities or blocking access to or from such areas is prohibited.  Permission from appropriate college authorities must be obtained for removal, relocation, and use of University/college equipment and/or supplies."

c)     "Each member of the academic community or an invited guest has the right to advocate his position without having to fear abuse, physical, verbal, or otherwise, from others supporting conflicting points of view.  Members of the academic community and

other persons on the college grounds shall not use language or take actions reasonably likely to provoke or encourage physical violence by demonstrators, those demonstrated against, or spectators."

     d)    "Disorderly or indecent conduct on University/college-owned or controlled property is prohibited."

44.    The Public Order Policy also states that "[a]ny organization which authorized the conduct prohibited under substantive rules 1-11 shall have its permission to operate on campus rescinded."

45.    In a notice to all students, faculty and staff published on CUNY Hunter's website on August 28, 2024, entitled "Free Expression and Our Inclusive Environment at Hunter College," CUNY Hunter states as follows:

> Even as we may express differing viewpoints, we commit to doing so with equal measures of care, candor, and respect, mindful that freedom of expression and dissent exist in the context of civil rights guaranteeing that none of us may be excluded from the benefits of our educational environment on account of our identities. Protest or demonstration may proceed so long as neither force nor the threat of force is used, and so long as the college's processes for functioning as an educational institution are not interrupted.

The notice further states that "[t]hese principles are codified in the CUNY Rules and Regulations for Maintenance of Public Order," highlighting the following provision from the Public Order Policy: "Each member of the academic community or an invited guest has the right to advocate their position without having to fear abuse, physical, verbal, or otherwise, from others supporting conflicting points of view."

## IV.    CUNY HUNTER HAS A HISTORY OF ANTISEMITSM ON CAMPUS.

46.    Despite the significant Jewish population at CUNY Hunter,[5] Jewish students and

---

[5] As of 2023, Jewish students at CUNY Hunter comprised approximately 1,500 of the 16,549 or 9.1% of undergraduate students, and 1,000 of the 5,714 or 17.5% of graduate students.

faculty at CUNY have been harassed on campus for many years without any meaningful consequences or enforcement of the College's Harassment and Discrimination Policies. On March 6, 2016, then Chancellor James B. Milliken commissioned an investigation into antisemitism on campus, which was led by the Honorable Barbara S. Jones, a former judge in the United States District Court for the Southern District of New York, and well-known attorney Paul Shechtman. The investigation concluded that there was evidence of multiple antisemitic incidents, including a 2015 rally at CUNY Hunter where students chanted, among other things, "Jews Out of CUNY" and "Death to Jews."

47.     In May 2017, CUNY ignited a national controversy by inviting anti-Israel activist Linda Sarsour, who had a reputation for making virulent antisemitic statements, to speak at the graduation ceremony for its School of Public Health and Health Policy. Holocaust survivors, among others, urged the College to reconsider, but their pleas were ignored. Ms. Sarsour predictably made anti-Israel statements in her speech and later blamed the "Jewish media" for her reputation.

## V.     CUNY HUNTER HIRES PLAINTIFF PROMISING THAT SHE WILL PLAY A CRITICAL ROLE IN COMBATTING PERSISTENT ANTISEMITISM ON CAMPUS.

48.     In 2018, Plaintiff joined the CUNY Hunter faculty and was named inaugural Director of the Jewish Studies Center. Then-President Jennifer Raab expressed a strong commitment to addressing antisemitism on campus, and CUNY Hunter assured Plaintiff that her role would include teaching, programming, and working with the College to address antisemitism by responding to her reports and implementing her recommendations. Accordingly, Plaintiff's Employment Agreement states that Plaintiff was hired to serve in two roles: (1) Full Professor with tenure in the Department of Classical and Oriental Studies, and (2) Director of the Jewish

Studies Center and Jewish Studies Program.  Plaintiff was hired not only to serve as a faculty member, but also to fulfill the role that she discussed with then-President Raab prior to entering into her Employment Agreement.

49.    However, in the wake of the October 7, 2023 Hamas attack, CUNY Hunter—now under the leadership of President Kirschner—reneged on the promise that CUNY Hunter would work with Plaintiff to fight antisemitism.  CUNY Hunter systematically ignored Plaintiff's reports of antisemitism, dismissed her recommendations, and failed to collaborate with her in any meaningful way.  The College and ODC entirely abdicated their responsibilities, leaving antisemitism to fester unchecked.  This not only rendered Plaintiff unable to fulfill the Director role for which she was hired, but also subjected her to a virulently hostile work environment.

50.    Adding insult to injury, CUNY Hunter audaciously used Plaintiff as the public face of its supposed efforts to address antisemitism, attempting to deflect criticism and public scrutiny of its failures.  For instance, in the wake of Governor Hochul's investigation of antisemitism at CUNY in January 2024, the CUNY Hunter Office of Communications published and circulated widely two articles about the work Plaintiff was doing to fight antisemitism.  Plaintiff was not consulted or asked to provide consent in advance.  CUNY Hunter's distribution of these articles obscured the fact that, in reality, CUNY Hunter administrators repeatedly obstructed Plaintiff's efforts while refusing to take any substantive action themselves.

## VI.    ANTISEMITISM AT CUNY HUNTER REACHES NEW HEIGHTS FOLLOWING THE HAMAS TERROR ATTACK ON OCTOBER 7, 2023.

51.    The toxicity of the antisemitic atmosphere at CUNY Hunter became dramatically worse[6] immediately after the October 7, 2023 terror attack on Israel, in which Hamas terrorists

---

[6] There were additional incidents of antisemitism at CUNY Hunter between the time Plaintiff joined the faculty and October 7, 2023.  For example, on or around May 20, 2021, a group of CUNY Hunter students, alumni, faculty, student groups, and "allied non-CUNY organizations" publicized and sent to the CUNY

brutally killed, raped, and tortured 1,200 men, women and children, and took over 240 hostages. On campus, this became a rallying call for pro-Hamas, anti-Jewish harassment, yet CUNY Hunter took no meaningful steps to contain it.

       *1.   Antisemitic Materials*

52.     Beginning just days after October 7th, Plaintiff saw and reported to CUNY Hunter leadership the presence of antisemitic stickers, posters, fliers and graffiti, including swastikas, throughout the CUNY Hunter campus, and requested that they be removed.  To her shock and dismay, CUNY Hunter was often dismissive and offered only delayed and unsatisfactory responses.

53.     On October 11, 2023, Plaintiff received an email from a CUNY Hunter student notifying her of disturbing antisemitic social media posts by CUNY4Palestine, including a post "debunking" mass rape by Hamas on October 7th:

---

Hunter leadership a letter, demanding a broad "ban" on "all former and current Israeli army associations on campus," including banning and terminating "invitations to or reservations by the Israeli military, its members, and/or affiliates."  The letter stated: "They do not make our campus or our students feel safe." On June 10, 2021, the Professional Staff Congress (PSC), the labor union that represents the CUNY faculty, issued a resolution denying the right of Israel to exist and calling for divestment from Israel.  Incidents like these led the New York City Council to hold a day-long hearing on or around June 30, 2022, on the surge of antisemitism on CUNY's campuses.  After the City Council delayed the hearing to accommodate his schedule, CUNY Chancellor Felix Matos Rodriguez announced his last-minute decision not to attend the hearing.



54.    In another CUNY4Palistine social media post a student brought to Plaintiff's attention on October 11, 2023, the group claimed that Hamas was a resistance organization, not a terrorist organization, blaming "corporate media" for inappropriately labeling Hamas as terrorists:



55.     On October 12, 2023, a group of student agitators organized a "Rally for Palestine" on campus.  They announced their plans on social media, including a march through the CUNY Hunter building, culminating in a protest at the entrance.  Despite prior notice and the protest's clear violation of CUNY Hunter policies, administrators, including Dean Rose, took no action to stop it or ensure the safety of Jewish students and faculty.  The protesters' chants called for violence against Jews and the destruction of the Jewish state, violating the school's Harassment and Discrimination Policies.

56.     On November 17, 2023, several student clubs signed and publicized an open letter praising the October 7th Hamas terror attack as an "act of resistance."  The letter, shared by PSAHunterCollege, declared, "Zionism has no place at an academic institution."  The same clubs posted antisemitic messages on social media, including calls to "Globalize the Intifada" and "escalate by any means necessary."  Despite these blatant violations of CUNY Hunter policies,

and multiple complaints raised by at least one student to CUNY Hunter administrators, no action was taken against the clubs or their members.

57.    On December 11, 2023, Plaintiff reported additional antisemitic stickers on campus to CUNY Hunter administrators.  The stickers were not removed.  And when Plaintiff contacted the Facilities Department directly, she was given the run-around and told that their removal first required Dean Rose's authorization.

58.    Plaintiff was forced to endure such hostility in her workplace on a regular basis. CUNY Hunter's failure to take all appropriate action to prevent the violation of CUNY Hunter policies lead to a demonstrably unsafe work environment for Plaintiff.

59.    On November 10, 2023, Plaintiff reported to CUNY Hunter that antisemitic fliers were being distributed in support of the antisemitic Boycott, Divestment and Sanctions ("BDS") movement against Israel.  The fliers claimed that "Israel is a state built to put Jews over all others," "it will not stop unless we stop it," and "when we fight we win."  Plaintiff was told by the Senior Associate Dean of Faculty and Academic Affairs, Caroline Gelman, that Dean Rose stated that the fliers could not be removed.  Plaintiff then raised the issue to President Kirschner, followed by an email to the provost and Dean Polsky, in which she explained that Jewish faculty and students "feel like we are in the 1930s again and that we are very much alone" at CUNY Hunter.  Below is a photograph of one of these fliers:



60.     On November 13, 2023, Plaintiff was shocked to discover that there were swastikas drawn on the faces of Jewish hostages taken by Hamas.  To see on CUNY Hunter's campus a symbol that represents the darkest era in modern world history and Adolf Hitler's and the Nazi-regime's stated goal of eradicating Jews from existence, was sickening to Plaintiff and caused her to fear for her safety.  She made multiple requests to President Kirschner, Dean Rose, Interim Provost Manoj Pardasani, and Dean Polsky, to have the swastikas removed, explaining:  "it's hard to put into words how profoundly terrifying it is to walk into Hunter and see swastikas on public display.  Can anyone do anything now?"  Plaintiff pleaded with the administration at least to cover the swastikas in the event they were unable to remove them immediately.  She continued:  "Can someone also please let me know that you received this?  I haven't heard from anyone—just Joe

[in security] who I telephoned." Interim Vice President for Administration Gustavo Ordóñez, one of several CUNY Hunter administrators on the email exchange with Plaintiff, at one point interjected that removing or covering the swastikas was "not that simple," citing bureaucratic and/or legal obstacles he claimed prevented CUNY Hunter from doing so. It was not until Plaintiff informed CUNY Hunter that she would take down the swastikas herself that CUNY Hunter—five hours after the swastikas were initially reported—finally covered the swastikas.

61.     As far as Plaintiff is aware, CUNY Hunter took no steps to determine who was responsible for displaying swastikas on CUNY Hunter's campus. It was a clear signal to the anti-Jewish instigators on campus that the most blatant acts of antisemitism would go unpunished, causing Plaintiff to fear for her safety.

62.     On November 17, 2023, several CUNY Hunter student clubs signed an open letter praising the terror attack against Israel as an "act of resistance." The statement was posted on social media by PSAHunterCollege with the accompanying comment, "Zionism has no place at an academic institution." In addition, the clubs posted antisemitic content on their social media accounts, including calling to "Globalize the Intifada" and to "escalate by "any means necessary." The groups also posted similar content on CUNY Hunter's bulletin boards reserved for club events. Despite numerous complaints to CUNY Hunter, the school took no action to prevent these clubs from publishing the most offensive antisemitic slurs.

### 2. Antisemitic Protests

63.     Amid the anti-Jewish posters, stickers, and graffiti defacing the walls and littering the floors of CUNY Hunter, Plaintiff endured constant harassing protests. The protests often crowded campus entrances, forcing Plaintiff to turn back from campus and return home. They also took place inside the main Hunter building's lobby and in the main public spaces on the upper

floors. During these protests, groups of students, acting in a mob-like fashion, often used megaphones designed to broadcast hostile messages that reverberated through every classroom and office on campus. At least one student was physically assaulted, as his pro-Israel sign was forcibly taken from him. The protestors displayed signs with alarming imagery directed at Jewish individuals, including depictions of blood dripping from the Star of David and other Jewish symbols. Protestors shouted their demands for CUNY Hunter to sever ties with Israeli businesses, in violation of state law, and called for the expulsion of Israelis and all student or faculty members who support of the state of Israel. The environment became so hostile on campus that Plaintiff felt compelled to assess the campus environment before daring to show up for work.

   3. *Faculty Senate Hijacked by Anti-Jewish Agendas*

64.     The Hunter College Senate Administrative Committee (the "Faculty Senate") is the principal governance body of CUNY Hunter, which has authority to shape CUNY Hunter policy, and is comprised of administrators, faculty and students. As a member of the CUNY Hunter faculty, Plaintiff regularly attended Faculty Senate meetings. After the October 7th attack, Faculty Senate meetings were overtaken by anti-Israel protesters, leading antisemitic chants, in violation of the rules of the Faculty Senate. The Chair of the Faculty Senate, Sarah Chinn failed to take any action to stop the improper disruption and CUNY Hunter took no action to restore order.

65.     The pervasive hostility toward Jews at Faculty Senate meetings left Plaintiff feeling unwelcome and unsafe, compelling her to refrain from attending. As a result, she was excluded from participating in critical policy-making discussions that directly affected the conditions of her employment.

### 4.  *Faculty Antisemitism Goes Unpunished*

66.    In the spring of 2023 Plaintiff raised serious concerns regarding faculty antisemitism to the CUNY Hunter administration.  The allegations were not taken seriously by the administration, and ultimately, Dean Rose failed to take action without any satisfactory explanation later in 2023.   This was after President Raab – a strong advocate against antisemitism – stepped down as President of CUNY Hunter, and was replaced by President Kirschner.

67.    In the spring of 2023, a sociology professor, Michaela Soyer, told two Hunter faculty members during the search for a prospective faculty candidate in Jewish Studies that Plaintiff "is pretending to be a Jew so she can sell her books," and that she "sells her books at synagogues with rich Jews," invoking an age-old antisemitic trope.  When Plaintiff later ran into the previous Chair of Sociology, Erica Chito-Childs, and told her about Ms. Soyer's antisemitic statements, Ms. Chito-Childs told Plaintiff that Ms. Soyer had been making antisemitic comments for years without consequence.  Plaintiff reported the comments to Dean Polsky, who informed her by email that, "[t]his is not the first time" that sociology professor "has made remarks that strongly suggest antisemitism."  Plaintiff then submitted a formal complaint about Professor Soyer to Dean Rose.  However, Dean Rose failed to interview Professor Soyer until months after the complaint was submitted.  When Plaintiff followed-up on the status of the complaint, Dean Rose told her that the investigation was being dropped for lack of evidence.

### 5.  *ODC's Abdication of its Duties Forces Plaintiff to Fill in the Gap*

68.    CUNY Hunter's ODC is tasked with addressing discrimination and harassment on campus, ensuring a safe and inclusive environment for all students and faculty.  However, the ODC completely failed in its responsibilities, neglecting to take meaningful action against the rampant antisemitism that permeated the campus.  This abdication of duty left Jewish students without

support or protection, forcing Plaintiff—as the Director of the Jewish Studies Center and Jewish Studies Program—to shoulder the burden of being the sole academic advocate for Jewish students. The magnitude of this responsibility far exceeded what was represented to her when she accepted her position at CUNY Hunter, leaving her to confront systemic antisemitism without the institutional support she had been led to expect.

69.     The extent of the ODC's failure became painfully clear to Plaintiff as she was inundated on a regular basis with pleas from desperate students seeking her help after experiencing targeted harassment.  In one instance, a Jewish student came to Plaintiff for support after an adjunct lecturer in the history department harassed her during a lecture on World War II.  During the lecture, the adjunct professor said:  "Could you imagine harboring such pure hatred for a certain group of people you just want to wipe them off the face of the earth?"  He then turned to the Jewish student and asked if she had anything to say about the "genocide in Gaza."  The student confided in Plaintiff that she felt targeted, harassed, and too afraid to attend classes.  Plaintiff promptly reported the incident to the Chair of the History Department, Dean Rose, Dean Polsky, and others, and was placated with promises of an investigation.  However, when Plaintiff followed up with Dean Polsky, she was told that CUNY Hunter had decided to use the incident as a "teaching moment" for the lecturer.  No disciplinary action was taken, and the adjunct lecturer continued to teach at CUNY Hunter.

70.     In another instance, a student informed Plaintiff that the History Club, which the student had founded, had been taken over by anti-Israel students and the club was promoting the works of known antisemitic writers.  Plaintiff reached out to the History Department on the student's behalf, only to be told that the club had been encouraged to engage in "civil debate," and that it was the student's responsibility to educate others.  The student, feeling unsupported and

unsafe, ultimately finished her studies remotely and chose not to attend graduation in person due to fear of further harassment.

71.     Not only did the ODC abdicate its core responsibility of identifying and addressing discrimination and harassment on campus—forcing Plaintiff to take on responsibilities that should have been handled by the ODC—but it (along with other CUNY Hunter administrators) consistently ignored Plaintiff when she brought incidents of discrimination and harassment to their attention.  It has become clear that CUNY Hunter administrators will address antisemitism only when confronted with significant external pressure.  For example, CUNY Hunter failed to respond when a student asked administrators to address student groups that were harassing Jews on campus, until the external pressure of Governor Hochul's initiation of an investigation led Dean Rose to abruptly and belatedly respond to the student's original email.

      *6.  The Screening of "Israelism"*

72.     In the fall of 2023 a group of anti-Israel, anti-Zionist, and antisemitic students and faculty members planned a screening of the virulently antisemitic film *Israelism*, which, among other things, falsely claims that Jews use antisemitism as a tool to silence pro-Palestinian voices. At a time when antisemitism at CUNY Hunter had reached a fever pitch, with students and faculty increasingly demonizing Israel and the Jewish community, Plaintiff was deeply concerned that allowing this film to be shown would fuel the growing wave of antisemitism on campus, which was already creating a toxic environment.  She conveyed these concerns directly to President Kirschner.

73.     Despite these warnings, President Kirschner not only insisted on allowing the film to be shown, but also had her office sponsor it, providing a tacit endorsement of it.  Plaintiff urged President Kirschner to balance the presentation by having a pro-Israel speaker knowledgeable of

the issues participate in any post-screening discussion.  In an effort seemingly to appease Plaintiff,

President Kirschner invited a local rabbi as the spokesperson.  As it turned out, despite being an

invited guest on campus, the rabbi experienced the same hostile mentality that Jewish students and

faculty experienced on an every-day basis.  The film was screened as planned on December 5,

2024, to a full auditorium of over one hundred attendees.  President Kirschner, Dean Rose and

Dean Polsky were in attendance.  During the panel discussion following the film, the rabbi was

subjected to continuous harassment and jeering by the audience.  Some students in the audience

yelled at the rabbi to "shut up," while others demanded he answer questions that were antisemitic

in nature.  Neither President Kirschner nor Dean Rose or Dean Polsky attempted to stop the

outrageous behavior, which violated CUNY Hunter's policies.  It was a scene that should be

unimaginable on a college campus in the United States.

74.     At one point, during the question period, Professor Sarah Chinn demanded that the

rabbi answer a question submitted by a student, which asked why the Israeli Defense Forces killed

its own people on October 7th.   When the rabbi said he could not answer the question because it

falsely accused Israel of conducting the October 7th attack, Professor Chinn inexplicably

demanded that the rabbi answer the question.  The student who had written the question then ran

onto the stage, grabbed the microphone from the rabbi's hand, and gave an antisemitic speech to

rousing applause from the audience.  The rabbi was led away from the room for his safety with

security by his side as the crowd continued to hurl abuse at him.   The College's most senior

administrators, all of whom were in attendance, did nothing to stop the most heinous treatment of

a guest speaker on campus.

75.     For her part in fomenting the mob attack on the rabbi and driving him out of the

event in violation of the Harassment and Discrimination Policies, Professor Chinn should have

faced discipline as Dean Rose told Plaintiff.  But at CUNY Hunter, where antisemitic behavior is tolerated and allowed to fester, Professor Chin was allowed to maintain her position and there was no discipline of any kind.

       *7.  Menorah Lighting*

76.     In November 2023, as the CUNY Hunter Jewish community was reeling from the events of October 7th and the oppressive antisemitism on campus, several Jewish groups, including Plaintiff, requested permission to display two electric Hanukkah menorahs at locations on and in front of the CUNY Hunter campus.  The request should have been non-controversial as a Hanukkah menorah had been prominent on campus every year for well over a decade.  During this challenging time, a menorah lighting presented an important opportunity for the Jewish community on campus to come together and celebrate a Jewish holiday and culture.  Shockingly, Dean Rose of the ODC rejected the request and stated that "the caselaw does not obligate the government to allow the display of a menorah."

77.     CUNY Hunter's refusal to permit the menorah lighting on campus, stands in stark contrast to its permission of the screening of *Israelism*.  While anti-Jewish political hate speech was allowed to fester, CUNY Hunter refused to allow the presence of the menorah, the universally accepted symbol of the celebration of a Jewish holiday.  Remarkably, the menorah is a common symbol publicly displayed in many private and public spaces in the United States.  Yet, CUNY Hunter foisted the silencing of Jewish cultural expression, at the same time it allowed antisemitism to flourish.

78.     The administration's double standard became even more apparent when, in April 2024, Muslim students and faculty were granted permission to hold a Ramadan event for over 300

people on campus.  This glaring double standard caused Plaintiff to feel marginalized and unwelcome due to her Jewish identity.

### 8.  *CUNY Hunter Disregards Plaintiff's Safety Concerns*

79.    On October 18, 2023, Plaintiff awoke to a torrent of urgent messages from alarmed Jewish students, warning that a "Day of Rage" was planned to take place on campus that day. Plaintiff, who had a Jewish program scheduled for that afternoon, was gripped with fear for her safety.  Plaintiff sent an email at 6:29 a.m. to President Kirschner with the subject line "Urgent Request for Today."  Her message read:  "I awoke to a number of emails/texts that today is going to be a 'Hezbollah Day of Rage' over Gaza. Since we are doing a Jewish event today, can we please have security there?"  CUNY Hunter agreed to provide security.

80.    But in typical CUNY Hunter fashion, Plaintiff's urgent plea for protection was met with inaction.  Contrary to CUNY Hunter's assurances, no security was provided for the event.

81.    As part of her professional responsibilities, Plaintiff organizes and conducts a monthly lunchtime speaker series featuring guest speakers on topics relevant to the Jewish community and Israel.  These events were designed to foster a sense of community and engagement on campus through in-person interaction.  However, due to the danger of the hostile environment for Jews on campus, Plaintiff repeatedly requested that CUNY Hunter provide security for her events until the campus was deemed safe.  But Plaintiff was once again abandoned by an administration that consistently failed to meet its obligation to ensure a safe, non-hostile, work environment for her to work in.  Left with no alternative, Plaintiff was forced to transition her programming to Zoom—a move that fundamentally undermined the in-person connection and community-building these events were intended to achieve.

82.    Concerned about her increasingly hostile work environment, Plaintiff pleaded repeatedly with the administration to establish a task force dedicated to combating antisemitism. Instead, CUNY Hunter unveiled a "Task Force on Civility and Controversy"—a hollow gesture that all but ignored antisemitism. By equating the need for civility with the violent discrimination faced by Jews, the administration trivialized Plaintiff's suffering.

## VII.    GOVERNOR HOCHUL ORDERS AN INDEPENDENT INVESTIGATION OF ANTISEMITISM ON CUNY CAMPUSES.

83.    As a result of the rampant antisemitism infecting CUNY campuses, including CUNY Hunter, on October 31, 2023, Governor Hochul appointed Judge Jonathan Lippman, former Chief Justice of the New York State Court of Appeals, to conduct an independent investigation around antisemitism at CUNY, including whether CUNY's policies and procedures regarding antisemitism and discrimination were adequately addressing the wave of antisemitism on campus (the "Lippman Review"). The investigation was set to evaluate the following:

- Campus environment, including an assessment of attitudes and perspectives of antisemitism on various CUNY campuses.
- Current University policies, procedures, and systems of investigating antisemitism complaints.
- Consistency of treatment by the University in handling of antisemitism complaints and all other types of discrimination.
- Appropriate balance of free speech rights with protection of students' right to receive education free of antisemitic threats, intimidation, or discrimination.

84.    By the time Governor Hochul announced this investigation, Plaintiff was frustrated by CUNY Hunter's failure to respond to the concerns she raised, and felt she had exhausted the available avenues for effectuating change internally. Upon learning of Governor Hochul's announcement, Plaintiff decided that providing information to the investigators on a confidential basis could help effectuate the changes she sought. Accordingly, Plaintiff contacted individuals

within Governor Hochul's administration to schedule an interview.  On December 11, 2023, Plaintiff spoke with individuals in the Hochul administration about the antisemitism at Hunter and Plaintiff's full-time, failed attempts to get the CUNY Hunter administration to address it.  During that process, Plaintiff provided relevant information and documents concerning antisemitism at CUNY Hunter. Although Plaintiff stated during this meeting that she was providing this information on a confidential basis, she was surprised to later learn that Governor Hochul's staff shared with CUNY Hunter administrators the fact that Plaintiff met with them, and the information she provided.  Following winter break, when antisemitism and CUNY Hunter administrators' indifference towards it persisted, Plaintiff solicited another meeting in May 2024, this time with lawyers conducting the Lippman Review

85.    The Lippman Review was ongoing from around October 2023 until Justice Lippman issued his report on September 23, 2024.   As set forth herein, the Lippman Review was not the first investigation into the antisemitic environment at CUNY Hunter given the investigation by Barbara Jones and Paul Shechtman years before.  In the face of these investigations and while they were ongoing, however, the CUNY Hunter administration failed to take the necessary steps to quell, arrest and reverse the hostile environment that they allowed to persist.  As demonstrated by the incidents that followed during the remainder of 2023 and throughout 2024, antisemitism remained rampant on campus, unchecked and unabated, despite the scrutiny of the pending Lippman Review.

## VIII.   CUNY HUNTER'S INDIFFERENCE TOWARDS ANTISEMITISM ON CAMPUS CONTINUES INTO 2024.

### 1.   Disruptive Protests in 2024

86.    As the Spring 2024 semester unfolded, anti-Jewish protests at CUNY Hunter escalated, further intensifying the hostile environment.  On February 8, 2024, Plaintiff elevated a

student's complaint about a protest taking place in the lobby of the main Hunter building to CUNY Hunter administrators, urging them to take action.  When her initial plea was ignored, Plaintiff followed up with another email, informing administrators that she could hear the protests from her 13th-floor office and emphasizing how they were creating an intimidating and threatening environment.

87.     On February 23, 2024, Dean Polsky provided a shockingly non-committal response, suggesting only that it "may be possible to have Public Safety remove certain flyers/posters that are clearly antisemitic."  To make matters worse, Dean Polsky proposed that Plaintiff herself compile a list of terms to be considered antisemitic, once again shifting the burden of addressing campus-wide antisemitism onto Plaintiff's shoulders.  Exhausted and appalled by the administration's refusal to take responsibility, Plaintiff responded that such tasks were the duty of Dean Rose and the ODC, not hers.  This lackluster response epitomized the administration's indifference and left Plaintiff to confront the pervasive hostility on campus with no institutional support.

88.     On February 28, 2024, an anti-Israel protest took place with megaphones by the main entrance to CUNY Hunter in violation of the school's Public Order Policy.  Amid chants calling for the eradication of the Jewish state and the elimination of Jews within its borders, protesters targeted Hunter Hillel—a student organization dedicated to fostering a Jewish community on campus—with hateful slogans such as, "Hillel, Hillel, what do you say, how many killers did you feed today?"  Plaintiff promptly reported these events to the administrators, who, predictably, took no action.  Fearing for her safety in the face of such hostility, Plaintiff and many Jewish students felt compelled to leave the campus.

89.    Later that day, President Kirschner addressed the escalating hostility in a communication to the Executive Director of CUNY Hunter Hillel.  She admitted:  "The protests today reached a new level of aggression by targeting Hillel.  At my request, we asked the students to desist, but as you would have guessed, they did not.  We have some recordings and will pursue whether these were actionable.  Whether or not I can take action, please know that I am deeply concerned and offer my sorrow for the disruption and the personal targeting of Jewish students."  When Plaintiff learned of this response, she was outraged.  Instead of taking decisive action to protect the Jewish community and enforce CUNY Hunter's policies, the President did little more than express "sorrow" while passively disclaiming her power to investigate or discipline the individuals responsible.

90.    The administration's lack of action became even more glaring the next day when Dean Rose announced that, pursuant to his interpretation of CUNY Hunter's policies, the February 28 protests targeting Hillel did not meet the school's definition of intimidation and no action would be taken against the protestors.  This response encapsulated the administration's ongoing indifference to antisemitism, ignorance of the harm suffered by the Jewish community and refusal to hold the perpetrators accountable for their escalating aggression.

*2.    Cancelled Classes Due to "Day of Rage"*

91.    On May 5, 2024, Plaintiff alerted President Kirschner, Dean Rose, and other CUNY Hunter administrators to an upcoming "Day of Rage for Gaza" demonstration scheduled to take place on campus the following day, May 6, 2024.  Plaintiff expressed grave concerns about her safety as well as the safety of Jewish students and faculty on campus.  The event was widely publicized, with a flyer circulating across campus that left no doubt about its inflammatory and potentially dangerous nature.

92.     Instead of addressing the threat by shutting down the "Day of Rage" or implementing robust security measures to protect the campus community, the administration announced the suspension of educational activities from 3:00 p.m. that day, effectively prioritizing the demonstrators' "Day of Rage" over the institution's academic mission.  While Plaintiff's class was scheduled earlier in the day and therefore not officially canceled, she was left with no choice but to cancel it herself.

3.   *CUNY Hunter's Belated and Inadequate Response to Plaintiff's December 2023 Letter to Governor Hochul's Office*

93.     On March 1, 2024, Interim Provost Pardasani informed Plaintiff that CUNY Hunter had received a copy of Plaintiff's December 22, 2023, letter to Governor Hochul's Office, which outlined her concerns about the administration's failure to address antisemitism on campus. Although CUNY Hunter had received the letter on January 4, 2024, it took two months for administrators to acknowledge it—two months during which antisemitism continued to plague the campus unchecked.  While the Provost extended an offer to meet and discuss Plaintiff's recommendations, given the administration's repeated failure to respond to Plaintiff's prior communications, the invitation seemed designed more to give the appearance of concern than to genuinely address the pressing issues she had raised.

94.     On March 20, 2024, CUNY Hunter informed Plaintiff that it would treat her letter to Governor Hochul's Office as a formal complaint and investigate the allegations under its Harassment and Discrimination Policies.  In doing so, CUNY Hunter effectively admitted that prior to this time, the College had never treated Plaintiff's numerous reports of antisemitism as a formal complaint of any kind.  This acknowledgment made clear to Plaintiff that the administration had consistently failed to take her reports of harassment and intimidation seriously.

95.    CUNY Hunter's response was a self-serving attempt to deflect criticism in light of the Lippman Review, offering hollow assurances that it was addressing antisemitism on campus. The administration pointed to superficial measures, such as a review of policies and the launch of an online complaint portal, while claiming compliance with the Lippman Review. These measures were little more than platitudes, having no significant impact on combating antisemitism.

96.    Moreover, CUNY Hunter offered a litany of excuses to address Plaintiff's specific complaints. None of these excuses justified the failure of CUNY Hunter to investigate the people or groups responsible for the perpetration of antisemitic conduct on campus as raised in Plaintiff's December 2023 letter to the Governor's office. CUNY Hunter's response was dismissive of each of Plaintiff's concerns. For example:

- CUNY Hunter excused its failure to remove posters and graffiti constituting hate speech, claiming it is "required to follow proper protocols and wait for the NYPD to arrive and assess the situation before the College is able to remove the graffiti." Without stating whether the College ever conducted any investigation or attempted to identify the individuals responsible, CUNY Hunter stated that "[u]nfortunately, at this time, we have not been able to identify those individuals who were responsible for the graffiti that is referred to in your Letter of Concern," and "[t]here is no ongoing investigation into that matter."

- CUNY Hunter dismissed Plaintiff's concerns about antisemitic faculty members, including pro-Hamas social media posts, stating that faculty members have the right "to determine which causes they wish to support," and telling Plaintiff that her complaint about these faculty members was "based on a perceived lack of support for positions and initiatives that you value." CUNY Hunter proceeded to tout a

statement issued by CUNY administrators in support of the Jewish community after October 7th, without identifying any actions taken by College administrators to address the bigotry against Jews on campus that unfolded in the weeks and months following October 7th.

- In response to Plaintiff notifying CUNY Hunter administrators that faculty members had asked her to remove their office numbers from CUNY listings because they were worried about being attacked, CUNY Hunter's letter stated that "Hunter College promptly complied with your requests to remove office numbers from online listings," but did not identify any other steps taken to address faculty members' safety concerns.

With respect to several of Plaintiff's concerns, CUNY Hunter shifted the burden improperly to Plaintiff to provide evidence.

97.    Remarkably, the letter also claimed that "[t]o date, neither Hunter College's Office of Public Safety, nor its administration has received reports from Hunter College Jewish faculty, requesting heightened public safety measures," and that "[t]o date, Hunter College has not received reports of acts of violence or harassment towards any member of our community while on campus, as it relates to this issue."  These statements are patently false and ignore the many emails Plaintiff sent to CUNY Hunter administrators raising physical safety concerns and her request for additional safety measures.  All of these requests were ignored.

### 4. Additional Antisemitic Incidents Involving CUNY Hunter Faculty and Students

98.    On March 14, 2024, a CUNY Hunter student organization called "Not in Our Name," which self-identifies as anti-Zionist, sent a "demand" email to CUNY Hunter administrators regarding the February 28, 2024, protest where they chanted slogans such as "Hillel

can go to Hell."   The email (sent anonymously) included false and defamatory allegations about Plaintiff, claiming:  "It is extremely troubling that the Hunter Director of Hebrew and Jewish Studies potentially disseminated decontextualized clips of students speaking to racist Zionist networks, to deliberately portray them as antisemites."   The group also published photographs of Plaintiff on social media.  Fearing for her safety, Plaintiff informed President Kirschner and Dean Rose, and stated:  "Because of the email I received this morning in which I have been identified in a way that could make me unsafe, I've been forced to cancel my class today."   She added:  "In my twenty years of teaching, I've only ever canceled a class once before, due to sickness.  It is devastating to me that I have to cancel my class because I feel unsafe due to the hostile environment your administration has failed to remediate."   Despite the gravity of the situation, no action was taken to protect Plaintiff's safety or that of her students and colleagues.

99.    On March 20, 2024, a CUNY Hunter student sent an email to a Jewish professor containing explicitly antisemitic rhetoric, stating, "I believe that real Satan worshipers are better than [Jews], more moral."   The professor reported the incident to administrators, but to Plaintiff's knowledge, no action was taken against the perpetrator.  This incident heightened Plaintiff's fears that individuals with extreme antisemitic views, potentially willing to act violently, were on campus and that CUNY Hunter would fail to protect her or other members of the Jewish community.

100.    Plaintiff's advocacy led CUNY Hunter to secure $50,000 per year in funding for the Jewish Studies Center over the past three years from the New York City Council to combat antisemitism.  Despite this funding, antisemitism persisted unchecked.  In quarterly reports on the funding, Plaintiff documented a spike in antisemitic incidents, often making it unsafe to hold Jewish programming on campus.  She reported having to request security for events and noted that

participants were deeply upset by the regular presence of antisemitic graffiti and stickers. In another report, Plaintiff described the constant and overwhelming rise in antisemitism at CUNY Hunter since October 7, 2023, stating that the situation had become "terrible" and unmanageable.

## IX. CUNY ENTERED A RESOLUTION AGREEMENT WITH THE U.S. DEPARTMENT OF EDUCATION.

101.    On June 17, 2024, the U.S. Department of Education's Office for Civil Rights ("OCR") issued a press release, announcing that CUNY had entered into a Resolution Agreement to resolve nine pending complaints against CUNY and several CUNY colleges and schools, including CUNY Hunter. The announcement stated that, "[b]ecause OCR identified concerns regarding systemwide fulfillment of CUNY's federal nondiscrimination obligations, CUNY committed to resolve all nine complaints to ensure every one of the 25 CUNY campuses protects all students against shared ancestry discrimination that violates Title VI without further delay." Among other complaints against CUNY, the OCR Settlement Agreement resolved a complaint against CUNY Hunter concerning "harassment of students based on national origin (shared Jewish ancestry) in academic year 2020-2021." The press release summarized the conclusions of OCR's investigation of CUNY Hunter—including its failure to adequately respond to antisemitic incidents, or to "redress any hostile environment"—as follows:

> With respect to the earliest filed complaint against Hunter, OCR's investigation confirmed that students and faculty disrupted two different sessions of a required college course in 2021 by commandeering the scheduled course discussion to use the class time to call for the decolonization of Palestine. Several students expressed that the disruption made them fearful and at least one student left class early. A Jewish student testified that when Jewish students spoke or tried to speak, others told them they should be listening, not speaking.

> OCR's investigation also confirmed that Hunter concluded – without interviewing any students who were present during the Zoom sessions – that the class disruption did not deny access to education at Hunter. OCR determined that Hunter could not have adequately evaluated what occurred in the sessions and whether it created a hostile environment for Jewish students without interviewing affected students.

OCR's investigation also yielded no evidence that Hunter took any action to communicate to affected students the results of its investigation or that it took actions to redress any hostile environment students may have experienced.

102.    Pursuant to the Resolution Agreement, CUNY agreed to undertake certain remedial measures, including supplementing and/or re-opening investigations of antisemitic incidents, and providing further training programs on discrimination and harassment.  Despite the undertakings in the Resolution Agreement, the measures purportedly implemented by CUNY are insufficient and overly broad, failing to address the core issues effectively.  The agreement's provisions for supplementing and re-opening investigations and providing additional training programs do not ensure that antisemitism will be adequately addressed.  The training programs lack specificity regarding the depth and scope required to combat antisemitism effectively.  Furthermore, there is a critical concern that the individuals responsible for reviewing complaints—those who previously ignored or inadequately addressed these issues—remain in positions of authority.

103.    Indeed, the events that have transpired at CUNY Hunter since it entered into the Resolution Agreement demonstrate that CUNY Hunter still refuses to take action to address the rampant antisemitism on its campus.

## X.    ANTISEMITIC HARASSMENT AT CUNY HUNTER PERSISTS.

104.    Plaintiff commenced a year-long sabbatical in September 2024.  She had planned to spend much of this time writing a new book from her office at CUNY Hunter.  However, persistent reports from colleagues and students confirmed that antisemitism continued to thrive unchecked on campus.  Fearful for her safety, Plaintiff was forced to retreat from her campus office to her home to work in isolation, severed from the academic environment critical to her productivity and professional growth and away from the library and research librarians who assist her with her work.

105.    On September 23, 2024, a report summarizing the findings of the Lippman Review

was published.  The report stated:  "My ultimate conclusion is that CUNY's current policies and

procedures for preventing and addressing antisemitism and discrimination need to be significantly

overhauled and updated in order to handle the levels of antisemitism and discrimination that exist

on CUNY's campuses today."  Among other things, the Lippman Review found that "CUNY's

Portal which is used to file complaints, fails in numerous respects."

110.    Despite the findings of multiple investigations exposing systemic failures in

addressing antisemitism, CUNY Hunter has implemented no meaningful changes.    The

administration continues to tolerate vitriolic protests and the dissemination of virulently

antisemitic materials on campus and social media.    Jewish students and faculty feel unsafe and

are compelled to hide their Jewish and Zionist identities to avoid being targeted.  Meanwhile, those

responsible for perpetuating this culture of intimidation face no consequences.

111.    The moral rot of antisemitism exists at the very top of the CUNY system and has

trickled down to its colleges, including CUNY Hunter.  This was made evident on November 24,

2024, when CUNY Chancellor Félix Matos Rodríguez was questioned by the New York City

Council about the antisemitism that is rife on CUNY campuses.    One of Plaintiff's students

testified that he had faced antisemitism at CUNY Hunter, and when he complained to Dean Rose

about it, Dean Rose tried to pressure and intimidate him not to file a complaint.  At the City Council

meeting, Chancellor Rodríguez was unable to answer the most basic questions about antisemitism

at CUNY, such as the number of complaints filed, the nature of the complaints, or whether any

students or faculty had been disciplined for antisemitic conduct.  His testimony starkly revealed

the administration's indifference to the pervasive hostility faced by Jewish members of the CUNY

community.

112.    CUNY Hunter's continued failure to address antisemitism has not only created a hostile environment, but also has deprived Plaintiff of the fundamental workplace protections she is entitled to under the law.  The administration's inaction has left Plaintiff with no assurances of safety, hindering her ability to return to campus and fulfill her professional responsibilities.

**CAUSES OF ACTION**

**COUNT I – VIOLATION OF TITLE VII**

113.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

114.    CUNY Hunter is and, at all pertinent times, was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b).

115.    Plaintiff is and, at all pertinent times, was an employee of CUNY Hunter.

116.    CUNY Hunter has failed to address a surge of antisemitism on campus.  Despite Plaintiff's repeated complaints, CUNY Hunter failed to comply with and enforce its own Harassment and Discrimination Policies.  CUNY Hunter administrators, like Dean Rose—the Dean of Diversity and Compliance, who is "responsible for investigating employee complaints involving alleged discrimination based on protected status" and promoting diversity, equity and inclusion—failed to take adequate steps to investigate and resolve these complaints.  As set forth herein, CUNY Hunter has failed to address the many incidents of antisemitic harassment reported by Plaintiff to CUNY Hunter administrators, including but not limited to the following:

- When Plaintiff repeatedly asked CUNY Hunter to take down swastikas on display on campus following October 7th, CUNY Hunter stalled for hours, claiming it was "not that simple."  Moreover, as far as Plaintiff knows, CUNY Hunter did not investigate the individuals responsible or commence any disciplinary proceedings against any person or party.

- When Plaintiff raised concerns about the "Day of Rage," CUNY Hunter took no action to protect Plaintiff or Jewish students and faculty, and instead canceled in-

person classes.  CUNY Hunter allowed the "Day of Rage" to take over CUNY Hunter's campus.

• CUNY Hunter has allowed its Faculty Senate to be overtaken by anti-Israel and antisemitic demonstrators, causing Plaintiff to feel uncomfortable and unsafe participating in these meetings and directly impacting upon her ability to administer and teach.

• CUNY Hunter has taken no action to address complaints by Plaintiff and other Jewish faculty and students regarding CUNY Hunter faculty members' antisemitic hate speech and harassment, including the antisemitic harassment of a Jewish student by a CUNY Hunter faculty member.

• CUNY Hunter rejected a request for a menorah lighting event on campus while simultaneously failing to respond to complaints of campus-wide antisemitic harassment and allowing anti-Israel and antisemitic demonstrations on campus.

• CUNY Hunter administrators have failed to provide the security requested by Plaintiff for on campus Jewish cultural events.

• Administrators took no significant action to address the safety concerns of Jewish faculty members, as communicated by Plaintiff, after Jewish faculty were forced remove their office numbers from CUNY Hunter directories and name plates next to their offices.

• CUNY Hunter has repeatedly placed the burden on Plaintiff to identify, report and address incidents of antisemitism, rather than ensuring that College administrators, including those responsible for Diversity & Inclusion, take responsibility for doing so.

• Only after learning that Plaintiff spoke with those involved in conducting the Lippman Review regarding antisemitism on campus, CUNY Hunter sent a belated letter purporting to respond to complaints Plaintiff had made months earlier.  The response did not identify any meaningful actions taken by CUNY Hunter to investigate or address her complaints.  Once again, CUNY Hunter placed the burden on Plaintiff to provide additional evidence.

117.     As a result, CUNY Hunter has become a hostile work environment, permeated with discriminatory intimidation, ridicule, and insult that is so severe and pervasive as to alter the conditions of Plaintiff's employment, because she is Jewish.  CUNY Hunter's failed leadership has required Plaintiff to take on the additional responsibility of policing antisemitic incidents when CUNY Hunter repeatedly has failed to do so.  CUNY Hunter has also created, fostered and

fomented an atmosphere where Plaintiff felt compelled to cancel class, and has feared for her own safety, and the safety of other Jewish faculty and students.  The conduct at issue is not episodic.  It has been continuous, particularly since the October 7th terror attack.

118.    In addition to the pervasive nature of the antisemitism at CUNY Hunter, several of the incidents described herein were so traumatizing for Plaintiff that those incidents alone create a hostile work environment.  Indeed, no Jewish person at CUNY Hunter should have to see swastikas, a symbol of genocide against Jews, on display when entering campus.  Nor should a faculty member be required to face antisemitic slurs by fellow faculty members without any repercussions as occurred with Plaintiff.  Nor should members of the CUNY Hunter community who believe that Israel has the right to exist as the only Jewish state be subjected to chants that— simply because they hold those views—they are not welcome at CUNY Hunter.  Perhaps even more traumatizing for Plaintiff is the fact that her employer is unbothered by the rampant antisemitism on campus and takes a harder line against a menorah lighting than an anti-Israel "Day of Rage" or swastika display.

119.    For these reasons, and others described throughout the Complaint, the antisemitism, and failure by the College to address it, is severe and pervasive, and has created an environment that a reasonable person in Plaintiff's position would find hostile and abusive.  CUNY Hunter has created an environment that Plaintiff subjectively perceives as hostile and abusive.  The hostile work environment CUNY Hunter has created has prevented and interfered with Plaintiff's ability to do her job, because she is Jewish.  As a professor, a significant part of Plaintiff's job is to teach classes and lead other educational activities on campus.  As a result of CUNY Hunter's failure to address antisemitism, Plaintiff was forced to:  cancel classes due to safety concerns; shift her on-campus work from her practice of five days per week to just the two days she taught classes (also

due to safety concerns); stop participating in Faculty Senate and other on-campus events and meetings; conduct Jewish programming events remotely instead of in person; endure disruptions to her classes; shoulder the burden of doing the work of identifying and reporting antisemitism (a responsibility abdicated by the ODC); and conduct her academic work during her sabbatical from home, where she is unable to avail herself of CUNY Hunter resources, including the CUNY Hunter library.

120.    The hostile work environment has also caused Plaintiff anxiety and emotional distress that has interfered with her ability to teach classes, write and publish scholarly work (including work on her sixth book), and participate in activities on campus. Plaintiff also suffers from anxiety based on the impact on her Jewish students and faculty colleagues.

121.    CUNY Hunter has also thwarted Plaintiff's ability to combat antisemitism, which CUNY Hunter and Plaintiff agreed would be part of her role—although not to the extent that it has become as a result of the College's dereliction of duty—when she was hired to the faculty in 2017 (and joined in 2018). As her Employment Agreement clearly states, Plaintiff was hired to serve as Director of the Jewish Studies Center and Jewish Studies Program, in addition to being hired to serve on the faculty. CUNY Hunter's representations to Plaintiff in connection with the hiring process that Plaintiff would have a role in combating antisemitism were material to Plaintiff's decision to accept a position on the faculty. By outwardly using Plaintiff and the Jewish Studies Center to performatively demonstrate CUNY Hunter's purported efforts to combat antisemitism, while thwarting Plaintiff's ability to effectively address antisemitism by ignoring and dismissing the concerns she raised and failing to take remedial action when she called on them to do so, CUNY Hunter has created a hostile work environment for Plaintiff.

122.    The work environment at CUNY Hunter is hostile towards Plaintiff because of her religion and/or ethnicity as a Jewish person, which is a protected characteristic under Title VII. CUNY Hunter prides itself on being a tolerant environment and a safe space for all students and faculty.  Yet, CUNY Hunter has treated anti-Jewish hate speech and harassment differently than other forms of hate speech and harassment.  Many of the CUNY Hunter administrators who have failed to adequately respond to antisemitism on campus have demonstrated a biased belief that any speech that is anti-Israel is somehow automatically protected speech and cannot constitute a violation of the Harassment and Discrimination Policies, buying into the refrain that anti-Zionism is not, and can never be, antisemitism.  Because Plaintiff is Jewish, and because the concerns she raised related to anti-Jewish and anti-Israel hate speech, CUNY Hunter did not treat her concerns as seriously as it should have – or as seriously as it treats other forms of hate speech – and has thus allowed the campus to become a hostile work environment for Plaintiff.

123.    CUNY Hunter knew or should have known about all incidents of antisemitism described herein.  Many, if not all, of the incidents described in the Complaint were reported to CUNY Hunter administrators, including at the highest levels of leadership.  However, they repeatedly failed to take action to address the incidents and shifted the burden to Plaintiff.

124.    Accordingly, CUNY Hunter has created a hostile work environment for Plaintiff because she is Jewish, in violation of Title VII.

125.    As a direct and proximate result of CUNY Hunter's conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.  For example, Plaintiff sought mental health counseling to address the stress, anxiety, and other psychological

challenges caused by CUNY Hunter's non-response to antisemitism on campus, and the additional burden placed upon Plaintiff by CUNY Hunter administrators.

126.    Plaintiff has exhausted all administrative remedies and fulfilled all conditions precedent necessary to the maintenance of this claim.

<u>**COUNT II – BREACH OF CONTRACT**</u>

127.    Plaintiff and CUNY Hunter entered into an agreement governing the terms of Plaintiff's employment at CUNY Hunter, the terms of which are set forth in a July 31, 2017 letter from CUNY Hunter to Plaintiff.   The Employment Agreement is a valid agreement between Plaintiff and CUNY Hunter, pursuant to which CUNY Hunter made an offer of employment and compensation, and Plaintiff accepted the offer by serving on the faculty at CUNY Hunter and fulfilling all of her responsibilities in that role, including those described in the Employment Agreement.   The Employment Agreement was subsequently renewed, and Plaintiff remains an employee of CUNY Hunter as of the time of this filing.

128.    The Employment Agreement defines Plaintiff's "Workload":  "Under the current union contract, CUNY faculty members have an annual 21-credit-hour workload, but, as long as you are Director, you will receive reassigned time such that you will have no teaching for the Spring 2018 semester, two courses (6 credit hours) for the 2018-2019 academic year and a three course load (9 credit hours) each year thereafter."  It also states that "[t]he terms and conditions of employment are those of CUNY's Bylaws and Manual of General Policy and the collective bargaining agreement between the University and the Professional Staff Congress (PSC), the labor union that represents the faculty."  Among the policies contained in CUNY's Bylaws and Manual of General Policy, which in turn incorporates the Harassment and Discrimination Policies, including the Policy on Equal Opportunity and Non-Discrimination, are the procedures for

addressing harassment and discrimination complaints, and the Public Order Policy. Accordingly, there is a valid contract between Plaintiff and CUNY Hunter, pursuant to which CUNY Hunter agreed as to Plaintiff's workload and agreed to abide by all of the aforementioned policies and procedures. Moreover, even if the Employment Agreement did not incorporate the Harassment and Discrimination Policies (which it does), the Harassment and Discrimination Policies themselves constitute an offer by CUNY Hunter to abide by those policies, which Plaintiff accepted by joining the faculty and teaching courses at CUNY Hunter.

129.    CUNY Hunter failed adequately and promptly to address and resolve Plaintiff's complaints of harassment and discrimination pursuant to her Employment Agreement and the Harassment and Discrimination Policies incorporated therein. CUNY Hunter also failed to ensure "Public Order," as it agreed to do pursuant to the Employment Agreement and Public Order Policy incorporated therein. CUNY Hunter's failure to adequately respond to the incidents identified herein, and its failure to enforce its policies to restore order on campus, constitutes a breach of Plaintiff's Employment Agreement.

130.    Although Plaintiff understood she would play some role in combating antisemitism on campus when she was hired, she never agreed to fulfill the responsibilities of the ODC. That is precisely what Plaintiff was forced to do as a result of CUNY Hunter's abdication of responsibility. By Dean Polsky's own admission, Plaintiff was the only person tracking and reporting incidents of antisemitism. The work Plaintiff was forced to do—including acting as the liaison between the Jewish community at CUNY Hunter and the administrators, reporting incidents of antisemitism to administrators, and following up repeatedly with administrators when they were non-responsive—far exceeded her "workload" as defined in the Employment Agreement. Plaintiff was not compensated for any this additional work. Accordingly, by foisting

additional work on Plaintiff in excess of her agreed "workload," CUNY Hunter breached the Employment Agreement.

131.    Plaintiff and CUNY Hunter also formed a valid agreement regarding her position as Director of the Jewish Studies Center and Jewish Studies Program, both orally and in the Employment Agreement itself.  Plaintiff discussed this role with then-President Raab prior to executing her Employment Agreement with CUNY Hunter.  Specifically, they discussed that Plaintiff would be involved in working with the College to address antisemitism, and that the College would work collaboratively with her in addressing antisemitism.  The opportunity to serve in this capacity was material to Plaintiff's decision to enter into the Employment Agreement and join CUNY Hunter, as combating antisemitism was something Plaintiff was passionate about.  It was on this basis that Plaintiff entered into the Employment Agreement, which expressly acknowledges that Plaintiff would serve as Director of the Jewish Studies Center and Jewish Studies Program.  The Employment Agreement also provides for separate compensation for her roles as faculty member, and as Director of the Jewish Studies Center and Jewish Studies Program.  Plaintiff's discussions with President Raab regarding her Director role before signing the Employment Agreement, and the Employment Agreement itself, together constitute a valid agreement between CUNY Hunter and Plaintiff containing all material terms concerning this role.  Plaintiff performed under this agreement, satisfying her responsibilities as Director, including by creating Jewish programing, organizing yearly visits for students to the Holocaust museum in Washington, D.C., and raising concerns about antisemitism to CUNY Hunter administrators.  However, CUNY Hunter breached its agreement with Plaintiff by refusing to collaborate with Plaintiff, despite her submission of numerous reports of antisemitism.   CUNY Hunter also

breached its agreement with Plaintiff by failing to provide the necessary support for Plaintiff to address these incidents.

132.    Plaintiff suffered direct and consequential damages as a result of CUNY Hunter's breaches.  Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.  Moreover, as a result of CUNY Hunter's breaches, Plaintiff was unable to dedicate as much time to writing scholarly articles and books, and has therefore suffered economic damages based on lost opportunities in an amount to be proven at trial.

## COUNT III – NEGLIGENCE, NEGLIGENT SUPERVISION AND  NEGLIGENT RETENTION

133.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

134.    CUNY Hunter and its administrators and faculty, including Plaintiff, were and are in an employer-employee relationship.

135.    CUNY Hunter owes a duty of reasonable care in the hiring, supervision and retention of its employees.

136.    CUNY Hunter breached that duty of care in the hiring, retention and/or supervision of Dean Rose and the entire ODC, who—despite having been tasked with the primary responsibility of creating "safe spaces" and promoting diversity, equity and inclusion—have done nothing to address surging antisemitism that has taken over CUNY Hunter following October 7th.

137.    CUNY Hunter knew, or should have known, that Dean Rose and the ODC were not adequately addressing antisemitism on campus, particularly when Plaintiff and others began making frequent complaints in the immediate aftermath of October 7th.  They likewise knew or should have known that these administrators' inaction was causing harm to Plaintiff.

138.    CUNY Hunter failed to take any remedial action against Dean Rose or anyone else in the ODC, allowing their passivity towards antisemitism on campus to continue unabated, and thus requiring Plaintiff and others to continue to endure antisemitic harassment.  CUNY Hunter also acted negligently in forcing Plaintiff to effectively do the job the ODC refused to do.

139.    CUNY Hunter knew or should have known that its negligence and breach of its duty of care would cause or had a substantial probability of causing severe emotional distress to Plaintiff, and in fact did cause her severe emotional distress.  Indeed, Plaintiff expressly raised her concerns, including her safety concerns, to CUNY Hunter administrators on multiple occasions.

140.    All of the conduct that forms the basis for this cause of action occurred on CUNY Hunter's premises.

141.    Plaintiff has been damaged in amounts to be determined at trial.

## COUNT IV – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

142.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

143.    CUNY Hunter and Plaintiff were and are in an employer-employee relationship.

144.    CUNY Hunter owes  a duty to provide its employees, including Plaintiff, with a safe place to work.

145.    CUNY Hunter breached its duty through its actions, inactions, negligence, and/or deliberate indifference and failure to protect Plaintiff, including by refusing to provide the additional security measures Plaintiff requested.  For example, on October 18, 2023, Plaintiff urgently requested that CUNY Hunter provide security for a Jewish event set to take place that day—the same day as an anti-Israel "Day of Rage" event.  CUNY Hunter failed to provide the requested security for Plaintiff's event, despite assuring her that security would be provided.

Likewise, when students organized another "Day of Rage" event on May 6, 2024, CUNY Hunter failed to provide security to ensure classes could continue safely in-person, instead opting to hold classes remotely and shut down educational activities on campus.  CUNY Hunter also failed to make good on its promise to provide security at Plaintiff's monthly speaker series, forcing Plaintiff to move these events to Zoom.  Through its failure to address antisemitism on campus, CUNY Hunter created an unreasonable risk of causing Plaintiff emotional distress.

146.    CUNY Hunter's actions and inaction have caused Plaintiff severe emotional distress, including fear for her physical safety.  Plaintiff no longer feels safe on campus, has had to cancel class, stopped attending Faculty Senate meetings, and has seen a therapist.  This distress was foreseeable based on Plaintiff's repeated complaints to CUNY Hunter about antisemitism on campus, and her fears for her safety.  Indeed, on multiple occasions, Plaintiff told CUNY Hunter in no uncertain terms that she feared for her safety.  She made that clear when she requested security be provided at certain events, which CUNY Hunter failed to provide.

147.    CUNY Hunter's breach of its duty is the actual, direct, and proximate cause of Plaintiff's injuries.  Specifically, CUNY Hunter's refusal to provide additional security measures Plaintiff requested, to take any action to enforce the Harassment and Discrimination Policies with respect to antisemitism on campus, and its inadequate response when Plaintiff identified swastikas and other severe incidents of hate speech and harassment on campus, have caused Plaintiff to fear for her safety.

148.    Plaintiff has been damaged in amounts to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against CUNY Hunter for the following relief:

A. A declaratory judgment that the actions, conduct and practices of CUNY Hunter complained of herein violate Title VII;

B. A declaratory judgment that the actions, conduct and practices of CUNY Hunter complained of herein violate Plaintiff's Employment Agreement, CUNY Hunter's Harassment and Discrimination Policies, and Plaintiff's agreement with CUNY Hunter regarding her role as Director of the Center for Jewish Studies;

C. A declaratory judgment that the actions, conduct and practices of CUNY Hunter complained of herein constitute negligence;

D. An order that CUNY Hunter engage in injunctive measures aimed at remedying the unlawful conduct described herein so that Plaintiff and other Jewish students, faculty and employees will not be subject to the same unlawful conduct;

E. An award of damages against CUNY Hunter, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all monetary and/or economic damages;

F. An award of damages against CUNY Hunter, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's emotional distress;

G. An award of punitive damages in an amount to be determined at trial;

H. Prejudgment interest on all amounts due;

I. An award of Plaintiff's reasonable attorneys' fees and costs; and

J. Such other and further relief as the Court may deem just and proper.

Dated:  December 17, 2024
New York, New York

Respectfully submitted,

*/s/ Michael C. Hefter*
Michael C. Hefter
Seth M. Cohen
Alan M. Mendelsohn
**ALSTON & BIRD LLP**
90 Park Avenue
New York, NY 10016
T: 212-210-9400
michael.hefter@alston.com
seth.cohen@alston.com
alan.mendelsohn@alston.com

Ziporah Reich
**THE LAWFARE PROJECT**
90 Park Avenue
633 Third Avenue, 21st Floor
New York, NY 10017
T: 212-339-6995
ziporah@thelawfareproject.org

*Attorneys for Plaintiff*