```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   -------------------------------x

 3   LEAH GARRETT,

 4                  Plaintiff,              New York, N.Y.

 5              v.                          24 Civ. 9710 (VSB)(RWL)

 6   CITY UNIVERSITY OF NEW YORK,

 7                  Defendant.

 8   -------------------------------x        Conference

 9                                           April 24, 2025

10

11   Before:

12                     HON. ROBERT W. LEHRBURGER,

13                                           U.S. Magistrate Judge

14

15                          APPEARANCES

16

17   ALSTON & BIRD, LLP
          Attorneys for Plaintiff
18   BY:  ALAN M. MENDELSOHN
          SETH M. COHEN
19        ZIPORAH REICH

20

21   LETITIA JAMES
          Attorney General of the State of New York
     BY:  SHAINA SCHWARTZ
22        ALLISA WRIGHT
          Assistant Attorneys General

23

24   Also Present:

25   Dr. Leah Garrett
```

1           THE DEPUTY CLERK:  Good morning, parties.  We are

2     here for a case management conference.  It is Leah Garrett v.

3     City University of New York, 24 Civ. 9710.

4           Parties, please state your name for the record,

5     starting with plaintiff.

6           MR. MENDELSOHN:  Good morning, your Honor.  This is

7     Alan Mendelsohn, from Alston & Bird, on behalf of the

8     plaintiff.

9           MR. COHEN:  Your Honor, Seth Cohen, Alston & Bird, as

10    well, on behalf of the plaintiff.

11          MS. REICH:  And Ziporah Reich, on behalf of the

12    plaintiff.

13          THE COURT:  All right.  Good morning.

14          MS. SCHWARTZ:  Good morning, your Honor.  Shaina

15    Schwartz, with the Office of the Attorney General, for the

16    defendant, CUNY.

17          MS. WRIGHT:  Good morning.  Allisa Wright, also from

18    the Office of the Attorney General, for the defendant, CUNY.

19          THE COURT:  All right.  Good morning, all.

20          I thought it made sense to bring us in in person to

21    talk about the request for a stay, possibly wondering if we

22    might resolve it today without the need for more formal motion

23    practice.  So I would like to hear a little bit about that

24    from you.

25          I have read the *Gartenberg* decision, and one thing I

1    am curious about on the merits is that it did seem to me here

2    a lot of the complaint went towards what *Gartenberg* determined

3    was political speech and would not be actionable, and that in

4    that case, they focused -- or Judge Liman focused,

5    particularly on -- or Cronan, sorry, Cronan, particularly on

6    the incident where the students were in the library and,

7    because that seemed to involve actual confinement, something

8    of a physical threat.  And then, if I remember correctly,

9    there was something in addition that was external to that, and

10    I can't remember if it was some of the signage or not;

11    whereas, here, I didn't get a sense of whether there was a

12    similar distinction between some of the conduct or words or

13    actions compared to *Gartenberg*.

14         So I would just like to hear a little bit about that

15    from the plaintiff's view.

16         MR. MENDELSOHN:  Sure, your Honor.

17         So in the *Gartenberg* case, you are right that the

18    Court did focus -- I mean, the complaint really did focus

19    primarily on one incident, on one day, at the library there.

20    But the Court in *Gartenberg* analyzed a whole slew of what it

21    classified as slogans and vandalism that it believed did not

22    constitute, at least for the pleading stage, pure speech.  And

23    thus, these types of slogans and vandalism could support, in

24    that case, a Title VI claim.

25         Many of those types of slogans and conduct are the

1  same types of slogans and conduct that are alleged here.

2  Various phrases like "From the River to the Sea," "Globalize

3  the Intifada," these types of slogans, while Cooper Union,

4  much like CUNY does here, argued that they were pure speech,

5  the Court in *Gartenberg* found that those types of slogans

6  actually went beyond pure speech and could support a hostile

7  work environment -- a hostile education environment on the

8  basis that those types of slogans and other types of vandalism

9  that were on campus could plausibly, for the purposes of a

10  complaint at the pleading stage, all allegations accepted as

11  true, support a finding that there was a threat to Jews on

12  campus, that there was -- there were concerns about safety,

13  that these types of slogans and vandalism were threatening in

14  nature towards Jews, that this is not pure political speech.

15  Because the nature of the speech, of the vandalism and the

16  slogans, was directed not at, like, you know, pro-Israel,

17  anti-Israel, pro-Palestine, anti-Palestine, but rather against

18  Jews.

19          And the same is true here.  In fact, we have conduct

20  here that goes well beyond that.

21          THE COURT:  And just before you go on, just remind

22  me, in *Gartenberg* were the slogans -- because I did read it,

23  but I read it a few weeks ago, actually in connection with

24  something else, I believe, but then thought of it in

25  connection with  this case, obviously.  But remind me, the

1    slogans that were discussed and the judge discussed, were

2    those the ones that were chanted as the students were in the

3    library or did it go beyond that to slogans appearing on

4    signage or being chanted elsewhere?

5            MR. MENDELSOHN:  Your Honor, I believe they were

6    primarily slogans that were at the -- that were being used in

7    connection with that demonstration at the library, you know.

8    Whether they were on signage or verbally spoken, that was in

9    connection with the same sort of demonstration.

10            And in fact, in our case, we are alleging both

11    speech—you know, slogans, vandalism—as well as conduct that

12    spans the period of from around October 7, 2023 to the

13    present; whereas, in *Cooper Union*, the case was really

14    primarily focused on this one demonstration.  So we would

15    argue that the nature of the content we have alleged is

16    actually at least as, if not more, severe and pervasive in the

17    sense that it spans such a long period of time and was ongoing

18    as opposed to just focused on one incident.

19            And I would also emphasize that --

20            THE COURT:  Let me just challenge that for just a

21    second.

22            I thought that a good deal of alleged sayings and

23    chanting and protesting that was taking place was acknowledged

24    by the Court.  That was a lot of what was political speech.

25    What made it different in the context of *Gartenberg* was the

1  fact that the students were in the library, confined, and it

2  could be viewed as more of a direct personal threat as opposed

3  to a general threat.  And if I remember correctly, the

4  district judge in *Gartenberg* made that distinction and said

5  that a general sort of sense of threat isn't actionable, but

6  that it had to be something more directed and personal.

7       Do I have that wrong?

8       MR. MENDELSOHN:  Well, I think the Court in

9  *Gartenberg* noted, for the purposes of a pleading stage, that

10  the types of slogans and vandalism could be threatening

11  towards those who viewed it.  And we would argue the same to

12  be true here.

13       But we also have conduct here, and I think that is an

14  important point.  We have allegations with respect to

15  Dr. Garrett herself.  She was doxxed.

16       THE COURT:  Yeah, I saw that mentioned.  So tell me

17  what that involved.  Is it detailed in the complaint?

18       MR. MENDELSOHN:  It is detailed in the complaint,

19  your Honor, and it involved a mass e-mail that went around,

20  sent by what we allege was a student organization.

21       THE COURT:  And what do you mean by "mass e-mail"?

22  Was it a general e-mail to everybody?  Did it single out the

23  professor?

24       MR. MENDELSOHN:  It was sent through a mass

25  distribution list.  I don't -- I don't know.  I don't have the

exact distribution list.  But it was a mass distribution list

of people on campus, you know, on-campus students and --

THE COURT:  And did the content of it single out the

professor?

MR. MENDELSOHN:  The content specifically singled out

Dr. Garrett, you know, in her role as the Director of Jewish

Studies.  And we alleged in the complaint how, you know,

because of her title and her role as the Director of Jewish

Studies, that she was sort of a highly visible Jewish figure

on campus.  And this incident with the doxxing is a very good

example.  But it is not just the e-mail that went --

THE COURT:  Okay.  Well, I was going to say the -- an

e-mail going out isn't really doxxing.  Was there a reaction

to that that led to a lot of e-mail directed specifically to

the professor?

MR. MENDELSOHN:  There was the e-mail, and there is

also a social media post that also followed that included

photographs of her.

We detail in the complaint how Dr. Garrett has had a

career teaching for a very long time and has seldom canceled

classes.  She felt compelled to cancel class in reaction to

some of these threats.  She raised them to the university and

alleges that they did not take any action following this

incident with the mass e-mails and the photographs.

There is also conduct that was -- there was a

1    physical assault of a Jewish student on campus.  I believe

2    that is the incident with the individual who was sort of

3    demonstrating, holding an Israeli flag, and it was forcibly

4    taken from him.

5          And then there are other incidents of conduct on

6    campus, sort of occupation of the main -- this is a

7    vertical -- they call it a vertical campus, meaning it is one

8    building.  And so if the lobby or the main entrance to the

9    building is occupied by a loud demonstration with bullhorns

10   and so forth, that sort of emanates throughout the campus and

11   we alleged here that our client's classes were disrupted by

12   this kind of loud protesting on an incessant basis.

13         THE COURT:  Okay.

14         All right.  As I am going through issues, I will go

15   back and forth.

16         So what does CUNY want to say about what you just

17   heard in response to my questions, perhaps?

18         MS. SCHWARTZ:  Well, your Honor, first, we would like

19   to point out that your Honor is absolutely right; that the

20   Court's decision in *Gartenberg* makes a very significant

21   distinction between physically threatening conduct, the

22   incident in the library specifically, and that was the

23   incident that allowed the claim to proceed.

24         Here, there is no incident that has such physically

25   threatening allegations.  There is nothing like that in this

1    complaint.  And that is what the judge determined was going to

2    allow the claim to proceed.  It was physically threatening,

3    humiliating conduct.

4         THE COURT:  Well, humiliating is different than

5    physically threatening.  And "humiliating" suggests

6    potentially just verbiage, although it could be conduct in

7    addition to verbiage.

8         I am not sure that the Court made the distinction,

9    specifically, physical versus nonphysical.  I think he was

10   being careful to not make that decision precisely because, as

11   we know, conduct itself is considered a form of speech in a

12   sense, or speech is considered a form of conduct, however you

13   want to look at it, and you have got to look at them together.

14        But I understand the point that, again, as you were

15   picking up on from what I was saying, there was an emphasis

16   there, certainly, on that one incident, and it was maybe the

17   combination of things that were happening together.

18        MS. SCHWARTZ:  That is correct, your Honor.  And the

19   motion -- the Court's decision on the motion for

20   reconsideration actually makes this expressly clear.  The

21   plaintiff -- despite the fact that her claim was allowed to

22   proceed, plaintiff actually moved for reconsideration, urging

23   the Court to declassify the class of conduct that he

24   determined was protected speech and nonactionable as

25   discriminatory harassment.

1          The Court made clear that that conduct, the speech,

2     the conduct that was intended to further political debate and

3     was delivered in, you know, an ordinary course of

4     communication, an expected course of communication, was

5     protected speech.  And that included protests.  It included

6     flyers that, you know, used some of the terms.  It was not

7     about the terms.  It was not about what was said.  It was

8     about the manner that it was said and whether it was

9     physically threatening, humiliating.  That was the distinction

10    that he drew.

11         Because there were flyers in *Gartenberg*.  I believe

12    there -- there were flyers in *Gartenberg*, and there was an

13    open letter -- there were several open letters in the school

14    newspaper.  And all of the content there was similar to the

15    content that is alleged here.  But it was determined to be

16    protected free speech and nonactionable discriminatory

17    harassment because it was intended to further the debate on

18    the topic of the Israeli-Palestinian conflict and was not --

19    and was delivered in an ordinary communication that one would

20    expect.

21         And Judge Cronan also expressly noted in several

22    different places in both decisions that this speech could be

23    hurtful and that, you know, it would have an impact on many

24    people.  But despite that, he was very concerned with the

25    constitutional ramifications of schools being required to

1   quell or stifle speech, even when it is unwelcome or, you

2   know, hurtful speech.  But it is still protected if it is

3   intended to further a debate on a political topic and

4   delivered in, you know, the ordinary course.

5          THE COURT:  Would a distinction be, though, that

6   there are incidents in this case that specifically targeted

7   the professor?

8          MS. SCHWARTZ:  Your Honor, I think there is where the

9   hostile work environment framework comes into play.  It would

10  be -- you know, there is sort of the consideration of some of

11  this conduct that is protests and public-facing.  There is a

12  lot of discussion in defendant's brief about, you know,

13  soapbox protests and those types of things being protected.

14  And then if there are, you know, one or two allegations about

15  plaintiffs specifically, then you look at that in the

16  framework of, you know, the hostile work environment, and they

17  are not nearly as severe or continuous as what would normally

18  reach a hostile work environment and would sustain a hostile

19  work environment claim, even at the motion to dismiss stage.

20         THE COURT:  All right.

21         Okay.  Anything else you want to say on that subject?

22         MS. SCHWARTZ:  No.

23         THE COURT:  Okay.

24         MR. MENDELSOHN:  Your Honor --

25         THE COURT:  Yes.

1          MR. MENDELSOHN:  -- I would add --

2          THE COURT:  Yes.

3          MR. MENDELSOHN:  -- I think, your Honor, you touched

4     on something very critical, which is what the Court in

5     *Gartenberg* held with respect to whether there needs to be a

6     physical threat.  And I have the language here from the

7     decision in front of me, which is that it found -- so, the

8     Court in *Gartenberg* really distinguished between conduct that

9     was sort of pure speech on matters of public concern, which

10    would be things like, you know, "Free Palestine."  I think we

11    can all agree that, of course, on a college campus, you can

12    say "Free Palestine" and, you know, and you can't be found --

13    the university can't be found liable for not taking any kind

14    of action against that.

15          But it distinguished between sort of pure speech,

16    which it found did not support a Title VI claim, and conduct

17    that could be, quote, "physically threatening or humiliating

18    to the protected class."  That is the language, "physically

19    threatening or humiliating."  And it, in fact, included as

20    conduct that could support a Title VI claim, that could

21    support a Title VI claim, the very same type of vandalism and

22    slogans that are alleged here.

23          And so, yes, the case in *Gartenberg* did focus on the

24    incident at the library, which, of course, made major news and

25    was a very dramatic event.  Here we have multiple instances of

1    things similar to that, but we also have a slew of allegations

2    of slogans and vandalism.  We have swastikas that our client

3    found drawn over the faces of hostage posters, posters that

4    were posted around campus.  The Court in *Gartenberg* actually

5    specifically talked about --

6         THE COURT:  And but those, if I recall correctly,

7    were taken down within five hours?

8         MR. MENDELSOHN:  They were covered --

9         THE COURT:  Ah, covered.

10        MR. MENDELSOHN:  -- I believe within five hours, only

11   after a series of e-mails which reflect the handwringing that

12   was going on over CUNY over the simple issue of whether to

13   take down swastikas that were put up on its campus.  And in

14   fact, the allegation in the complaint is that CUNY, when our

15   client reached out about this issue, told our client that it

16   was not that simple to take them down or to cover them.

17        THE COURT:  Okay.

18        A couple of questions going to some of the other

19   considerations for a stay:

20        So, as I understand it, plaintiffs are saying that

21   they are withdrawing the state law claims.  Is that right?

22        MR. MENDELSOHN:  That is right, your Honor.

23        It was our understanding that CUNY could consent to

24   federal jurisdiction, at least for certain of the -- or all of

25   the causes of action, but it is clear they will not be and we

1   intend to withdraw those claims.

2          THE COURT:  Okay.  And you would be seeking to

3   withdraw them involuntarily without prejudice or with

4   prejudice?

5          MR. MENDELSOHN:  Well, we would withdraw them without

6   prejudice, but we reserve our rights to file them in the Court

7   of Claims.

8          THE COURT:  Okay.  And so I will hear directly from

9   CUNY.

10         I assume it is correct, you are not agreeing to

11  voluntary withdrawal of those claims?

12         MS. SCHWARTZ:  That is correct, your Honor.

13         THE COURT:  Okay.

14         MS. SCHWARTZ:  I am sorry.  I am not sure I

15  understand the question, your Honor.  I apologize.

16         THE COURT:  Well, I mean, there is voluntary

17  dismissal and involuntary dismissal of claims.  And I am

18  forgetting exactly at what posture we are and whether it can

19  be done voluntarily, with -- or unilaterally, I should say, or

20  whether it is at a point that requires consent.

21         MS. SCHWARTZ:  Yes, sure.  We consent to them

22  withdrawing the claims.

23         THE COURT:  Okay.

24         All right.  But again, I will leave -- that

25  ultimately is going to be left to the district judge.  But it

1    seems that the -- my point being that it sounds like if those

2    go out, things will be narrowed.  We will be focused on one

3    major claim.

4          Why would it be such a burden on CUNY to comply --

5    start complying with discovery?

6          MS. SCHWARTZ:  Well, your Honor, as is evidenced by

7    the fact that we have had such a lengthy discussion——and as the

8    Court in *Gartenberg* demonstrated——plaintiff has alleged

9    numerous instances of purported harassment that we believe

10   would fall within the ambit of *Gartenberg*'s protected speech,

11   specifically, all of it.

12         But even if the Court allows some of plaintiff's

13   claims to proceed as discriminatory harassment, there would be

14   a majority, if not all, of claims that would fall within the

15   protected speech outlined by *Gartenberg*.

16         And in *Gartenberg*, I think there were at least a

17   dozen allegations, only three or four of which were --

18   proceeded as discriminatory harassment.  And we anticipate, if

19   the Court does not dismiss the claim entirely, the Court could

20   at least significantly narrow the scope of discovery with the

21   motion to dismiss, you know, insisting that a number or most,

22   if not all, of these claims are protected speech, and that

23   would significantly narrow the scope of discovery.

24         It would be incredibly burdensome to go through

25   discovery where certain -- many of these instances -- if the

1    claim was not dismissed entirely, many of these instances

2    would not be actionable and therefore would not really need to

3    be the subject of discovery.

4         THE COURT:  But has CUNY done any assessment, though,

5    actually sort of what scope of documentation would really be

6    involved?  Obviously, there could be depositions down the line,

7    and certainly if the number of incidents are narrowed to

8    something in particular, you would have fewer depositions or

9    more targeted depositions.  But in arguing burden, a party

10   usually has to provide some substantiation for what that

11   burden is and really entails.

12        Of course, you don't have their document requests at

13   this point, so you don't know, but you can sort of gauge

14   really what would be involved.  And the plaintiffs referred to

15   the fact there has been investigation, and so presumably

16   documentation has been collected for that, which would

17   facilitate making discovery less burdensome.

18        What is your reaction to that?

19        MS. SCHWARTZ:  You know, your Honor, plaintiff's

20   letter was a little vague on the point of what investigation

21   she is referring to.

22        THE COURT:  Okay.

23        MS. SCHWARTZ:  But even if there is an investigation,

24   if she has something specific in mind which was not referenced

25   in the letter specifically, it wouldn't necessarily mean that

1    it was relevant or responsive, particularly after the Court

2    goes through the *Gartenberg* framework.  It could be about an

3    incident that is no longer considered actionable and therefore

4    would not be relevant or responsive.

5         And even there, there would have to be, I would

6    presume -- again, without knowing what investigation she is

7    specifically referring to, there would be other incidents that

8    I would presume she would want e-mail discovery on.  The

9    collection could be various different custodians based on

10   who -- which incidents are determined to be actionable, who

11   was there, who was responsible.  You know, some of the

12   incidents are alleged to be about different people.  So there

13   could be a wider range of date range, potentially custodian

14   collections.  You know, it is hard to say without seeing their

15   discovery requests, as we haven't gotten into yet.

16        But it is not a typical hostile work environment

17   claim where there is sort of one perpetrator who is

18   responsible for the alleged conduct and it is a more targeted

19   form of -- it is a more targeted, narrow discovery.  Here we

20   have -- you know, we have incidents that are alleged by

21   students.  There are incidents with no alleged perpetrator

22   whatsoever.  There are, you know, various different

23   allegations that are sort of very different and far-reaching

24   and would require sort of different discovery as opposed to a

25   more narrow, tailored discovery.  And if you eliminate some of

1    the incidents as being actionable harassment, that would narrow

2    the scope of discovery and be more efficient for all the

3    parties.

4         THE COURT:  Knocking it back to plaintiff, what

5    investigation was being referred to?

6         MR. MENDELSOHN:  The Lippman report is an example of

7    one of the investigations that was done.

8         THE COURT:  That is one of the historical ones?

9         MR. MENDELSOHN:  That is one of the historical ones.

10        But, your Honor --

11        THE COURT:  Were you referring to a current

12   investigation or a recent investigation that would be

13   material -- that would have been in regard to the time frame

14   of the incidents at issue?

15        MR. MENDELSOHN:  The Lippman report is the most

16   recent report.  And it actually -- I took a look at it the

17   other day, and it does specifically reference documents that

18   was -- that were, sorry, provided to Judge Lippman and his

19   team in connection with that investigation.

20        THE COURT:  But, again, does any of that -- what year

21   was that issued?

22        MR. MENDELSOHN:  I believe it was issued last year,

23   2024.

24        THE COURT:  Okay.  So it would have covered the time

25   period that included the --

```
 1                MR. MENDELSOHN:  Absolutely --

 2                THE COURT:  -- incidents at issue.

 3                MR. MENDELSOHN:  Absolutely.  I think it was highly

 4      focused on the period after October 7.

 5                THE COURT:  Okay.

 6                MR. MENDELSOHN:  But, your Honor, I just want to take

 7      a step -- I know we are focused on the discovery piece and we

 8      are not here today to argue the motion to dismiss --

 9                THE COURT:  Right.

10                MR. MENDELSOHN:  -- but I do, if you permit --

11                THE COURT:  Sure.

12                MR. MENDELSOHN:  -- there is one thing Ms. Schwartz

13      said that I find very concerning with respect to the

14      Gartenberg decision and sort of framework here.

15                So, if I understand correctly, what Ms. Schwartz and

16      the Attorney General's office seems to be advancing here, is

17      that if a university, hypothetically -- I understand there are

18      allegations that swastikas were taken down after a certain

19      period of time.  But if, hypothetically, there are swastikas

20      up around campus, there are students harassing Hillel, which

21      is just a student -- just a Jewish organization, it doesn't --

22                THE COURT:  And just remind me, what was the

23      harassment of Hillel?  I just don't remember.

24                MR. MENDELSOHN:  There were demonstrators chanting at

25      Hillel things along the lines of "you are feeding killers" and
```

1  things like that, and "aiding genocide," things of that

2  nature.  I don't have the exact allegations in front of me,

3  but it is of that nature, essentially accusing Hillel of

4  somehow being complicit in what they call a genocide.

5          But Hillel is just as -- you know, it is just a

6  Jewish organization.  It is not a pro-Israel or anti-Palestine

7  or pro-Zionist -- it is not any of those things.  It is just a

8  Jewish organization.  And this is exactly that line that the

9  judge drew in *Gartenberg* between things that are targeting

10  Jews, right, and things that are just -- that are sort of

11  political speech.

12          And if Ms. Schwartz and the Attorney General's

13  office's position is credited, I think, your Honor, what that

14  would mean is that if a university has swastikas proliferated

15  around campus, people harassing Jews, people with yarmulkes

16  maybe walking around, just going up to them and harassing them

17  and saying, "you are supporting genocide," harassing Hillel—at

18  CUNY, we alleged that there was an incident with a rabbi who

19  was sort of chased out of an event because he was advocating

20  his viewpoint—if CUNY's position is right, then that would

21  mean that no university could ever be held liable for a

22  hostile education environment claim or a hostile work

23  environment claim based on, like, mass distribution of

24  swastikas simply because it is their view that that is somehow

25  pure speech.

1          That is totally wrong.  It is not consistent with the

2    holding in *Gartenberg*.  The *Gartenberg* decision specifically

3    classifies that type of conduct, swastikas, as not being pure

4    speech.

5          THE COURT:  Well, it might.  There was the -- in the

6    bathroom, there had been a swastika drawn, right?

7          MR. MENDELSOHN:  There -- no, I think it was -- there

8    was something written in the bathroom in the font of *Mein*

9    *Kampf*.

10         THE COURT:  Ah, okay.

11         MR. MENDELSOHN:  I am not entirely sure what that

12   means, but I guess in German-looking font or something of that

13   nature.  But, but if -- but, your Honor, Ms. Schwartz just

14   said that all -- she said all of the conduct in this complaint

15   is pure speech.  That is just wrong.

16         THE COURT:  Okay.  All right.

17         MR. MENDELSOHN:  All right.  Now, moving on to the

18   issue of the scope of this discovery, this is a very simple

19   case.  Okay?  This is not a complex case with, you know, major

20   corporations on either side.  CUNY is the named defendant, but

21   we are not going to be seeking discovery from every CUNY

22   school.  It is really -- it is CUNY Hunter.  It is a limited

23   time period——October 2023 to the present.

24         THE COURT:  Well, is it?  Because in your complaint,

25   you cite a good deal -- or not necessarily percentage-wise of

1    the complaint, but there is certainly a description and

2    allegations about the history of antisemitism and

3    investigations from the past.

4          Doesn't that substantially add to the time period that

5    might be the subject of discovery?

6          MR. MENDELSOHN:  I think that the history is in the

7    complaint for the reason of contextualizing the core of the

8    complaint.

9          Obviously, you know, conduct that took place long

10   before Dr. Garrett arrived on campus is not going to be the

11   focal point of our claims.  And, you know, we can meet and

12   confer.  We haven't met.  Obviously, this is all very

13   premature for that reason, among many others --

14         THE COURT:  Okay.

15         MR. MENDELSOHN:  -- but we could meet and confer

16   about a reasonable time period.  But this is not going to be,

17   you know, "let's get every document that has anything to do

18   with antisemitism from 2015 to the present" just because there

19   is allegations that go back.

20         Now, there are a small number of CUNY administrators,

21   deans, and faculty members, who are sort of identified

22   specifically in the complaint.  You know, this would

23   represent -- obviously, we reserve our right to take a look at

24   who the custodians should be, but you can tell from the

25   complaint that this is not a long list of individuals with

1    relevant documents.  We do not think there is going to be a

2    massive record here.  It is going to be largely looking at the

3    e-mails that relate to the concerns that Dr. Garrett raised,

4    you know, that relate to antisemitism, what is being done to

5    address it in the period after October 7, you know, documents

6    of that nature.

7        And, you know, I think that, both because of the

8    limited time period, the limited number of custodians, the

9    discovery here is quite limited.

10        And then, of course, there is the point that you

11    touched on earlier, that CUNY is -- you know, obviously we are

12    not CUNY.  We don't know exactly what has been done to round

13    up documents that relate to this stuff.  But we -- obviously,

14    they have been the subject of a number of investigations,

15    including by the Department of Education, Judge~Lippman, and

16    other things over time.  The Judge Lippman review was ordered

17    by the Governor of New York.

18        But these things presumably meant that -- and the

19    Lippman report is public, and you can see that he received

20    documents in connection with it, that the documents that were

21    gathered from CUNY Hunter that relate to the Lippman report

22    would be an example of a very easy category of documents for

23    them to organize and produce.  So we do not think discovery

24    here is going to be onerous at all.

25        And again, it goes back to the burden.  The burden is

1    on CUNY to show that there is good cause.  And obviously, we

2    don't even have discovery served, so it is all hypothetical.

3    It is all speculative.  And the notion that this is somehow a

4    massive burden is just not -- it is clear from the complaint

5    that that is not true.

6            THE COURT:  Okay.

7            Anything you want to respond to on CUNY's side?

8            MS. SCHWARTZ:  Your Honor, if I may?

9            THE COURT:  Sure.

10           MS. SCHWARTZ:  First, as you can imagine, I would

11   like to dispute the characterization of CUNY's arguments.  They

12   are laid out in our motion to dismiss.  I don't feel as though

13   we need to rehash them here.

14           But I would like to point out that this is not a

15   referendum on a history of antisemitism at CUNY.  This is a

16   hostile work environment claim pursuant to Title VII.  This is

17   a specific plaintiff who has alleged certain acts of

18   discrimination, discriminatory harassment, have caused her to

19   be subjected to a hostile work environment.  There are a

20   specific number of complaints of alleged conduct in the

21   complaint that form the basis of her hostile work environment

22   claim, and that could be entirely eliminated or significantly

23   narrowed pursuant to the motion to dismiss, and that is the

24   consideration on a stay of discovery.  It would be burdensome

25   for CUNY to respond to allegations and conduct discovery on

1   allegations that ultimately no longer are part of the case, are

2   determined not to be actionable.

3          Moreover, there is no prejudice to plaintiff.  This

4   case has only been pending for a few months.  A stay of

5   discovery would only -- the motion is going to be fully

6   briefed in a matter of a few weeks.  This stay would be only

7   for the short period of time for the Court to determine the

8   motion to dismiss.  And there -- the case law is clear, that a

9   brief, short period of time while a motion to dismiss is

10  pending is not prejudice.  And so, therefore, there is no

11  prejudice here.  And that lends in favor of a stay where

12  discovery would otherwise -- could otherwise be narrowed or

13  entirely eliminated.

14         THE COURT:  And you have led into one of the other

15  factors.

16         And let me ask plaintiff, why would plaintiff be

17  prejudiced?

18         MR. MENDELSOHN:  Sure, your Honor, and I will address

19  that in one moment.  I just want to react to one point --

20         THE COURT:  Yes.

21         MR. MENDELSOHN:  -- that Ms. Schwartz made that I did

22  not touch on before, which is this notion that somehow the

23  decision on the motion to dismiss—which, again, we are

24  focused now on just the Title VII claim—that somehow,

25  your Honor is going to go through and sort of weed out,

```
1    allegation by allegation, which types of allegations can
2    support.  And, obviously, there may be some line drawn.
3           But, ultimately, there is one cause of action to
4    Title VII.  That claim is either going to survive and go to
5    discovery or not.  And we are going to seek discovery related
6    to the types of conduct that can support a Title VII claim, so
7    that when we get the summary judgment, we can make those
8    arguments and lay out the evidence that supports it.  There is
9    not going to be some trimming on a granular
10   allegation-by-allegation basis.  It may be that certain
11   categories can get trimmed.  We would argue that all of the
12   conduct that supports our claims are actionable.
13          Now, the issue of the basis for the stay, it is
14   really a generic argument, right?  Like any defendant can say
15   there is a motion to dismiss pending, and therefore, you know,
16   let's hold off on discovery --
17          THE COURT:  And any plaintiff can say we are
18   prejudiced because of delay.
19          MR. MENDELSOHN:  Exactly.  There is a distinction.
20          And, first of all, on the length of time of the stay,
21   I would direct your Honor to your own decision in the *Guo v.*
22   *Yao* case that we cited in our letter.  But in that decision I
23   believe you do allude to the length of -- you know, it is
24   unknown how long -- of course, how long a decision --
25          THE COURT:  Sure.
```

1          MR. MENDELSOHN:  -- could be made.

2          But that is not the basis that -- the Courts have

3    distinguished, and I think this is a critical point, between

4    circumstances where the only prejudice is delayed recovery of

5    monetary damages and where the plaintiff alleges that he or

6    she is being harmed—okay, harmed—by ongoing conduct of the

7    defendant.  And our facts are the latter.

8          In fact, this case is really not about seeking some

9    money damages.  I mean, we are seeking money damages, but the

10   real target of the lawsuit is reform.  And our client alleges

11   that she doesn't feel safe on campus.

12         Now, obviously, these allegations have to be credited

13   and accepted as true at this stage.  But our client alleges

14   she doesn't feel comfortable on campus.  She alleges that she

15   has had to cancel an in-person speaker series that she hosts

16   related to Jewish studies, move it to Zoom.  She has had to

17   cancel class, which she has seldom done during her career.

18   She alleges that Jewish faculty have felt compelled to remove

19   their office numbers from CUNY Hunter directories and

20   nameplates from their offices.  She alleges that on numerous

21   occasions she raised concerns regarding her safety to CUNY

22   administrators, and they failed to take action.

23         So, yes, the stay of discovery would mean the case

24   sort of goes -- is on hold until there is a motion to dismiss.

25   But the unique facts here are that our client has alleged that

```
1     she is not safe in her work environment.  She is the Director

2     of Jewish Studies, she has an important role on campus, she has

3     an important role for the Jewish students and Jewish community

4     on campus, and she has alleged that she can't perform her job

5     if CUNY does not take action to address her issues that she is

6     raised.

7              So this is not sort of the run-of-the-mill, you know,

8     corporate defendant saying, we don't want to have to waste

9     money on discovery if there is going to be a motion to

10    dismiss.  This is a situation where we have an individual,

11    Dr.~Garrett, who is actually with us today --

12             THE COURT:  Oh, welcome.  Thank you for being here.

13             MR. MENDELSOHN:  -- who is seriously concerned that

14    the longer this goes on and is not remedied, that she is going

15    to have to endure what she alleges is rampant, rampant

16    antisemitism on --

17             THE COURT:  Why didn't you move for a preliminary

18    injunction of some sort?  If it was so, you know, imminent --

19    if it is so irreparable in a way that it would be that

20    prejudiced by some delay, why wouldn't you have brought a

21    motion for preliminary relief to have things happen quicker

22    and obtain relief quicker?

23             MR. MENDELSOHN:  Well, your Honor, I don't think that

24    the standard for a preliminary injunction is the same standard

25    that would apply to demonstrating prejudice --
```

1        THE COURT:  It is not.  It is not.  I agree with
2   that.
3        MR. MENDELSOHN:  And obviously the burden is on CUNY
4   to establish that there is no prejudice, and so to sort of
5   suggest that, like, you need to meet some standard for
6   preliminary injunction in order to -- or you need to be
7   seeking a preliminary injunction in order to be qualified
8   under the prejudice prong, I don't think is right.  But we
9   didn't see that -- we didn't think that that would be
10  appropriate based on the facts and the legal standards that
11  apply.
12       But I don't think in any way that should bear on the
13  Court's decision here.
14       THE COURT:  Okay.
15       Anything else from CUNY?
16       MS. SCHWARTZ:  Your Honor, I would like to respond to
17  one thing --
18       THE COURT:  Sure.
19       MS. SCHWARTZ:  -- very briefly.
20       In response to plaintiff's argument that there will
21  be no granular decision sort of eliminating or including
22  certain instances of conduct, that is exactly what the Court
23  in *Gartenberg* did.  The Court in *Gartenberg*, "many of the
24  alleged instances of harassment, for instance," and then lists
25  all the instances of purported harassment that were

1    nonactionable political speech.

2              And so too here, the Court can go through and

3    determine either that all or most of the alleged conduct is

4    nonactionable.  And the parties are entitled to understand the

5    scope of the claims before they engage in discovery, because

6    many of those claims are not going to be actionable discovery,

7    which is exactly what the Court in *Gartenberg* did.  Going

8    through discovery on those, on those alleged instances of

9    harassment are -- it is just -- it is a burden.

10             THE COURT:  Okay.

11             MR. MENDELSOHN:  Your Honor, with all due respect, I

12   again need to clarify, in the *Gartenberg* case, the Court held

13   in *Gartenberg* that allegations of pure speech, meaning "Free

14   Palestine," that type of conduct, which, again, is not the

15   basis for our claims, but even as to that type of conduct, the

16   Court held that that may properly be considered for purposes

17   of a discriminatory intent element.

18             In order to look at a Title VII claim, you have to

19   have discriminatory intent.  And the Court held that while

20   pure speech may not support the severe pervasiveness that is

21   necessary for a Title VII claim, it actually can support the

22   animus element, the motive element.

23             And so Ms. Schwartz argues that somehow a motion to

24   dismiss ruling could cut away all of a certain slew of

25   allegations -- alleged slew of allegations that are pure

1 speech.  At discovery, that stuff, even if it can't be the

2 basis for the severe and pervasive element, it can actually be

3 the basis for discriminatory intent.  And so it is still going

4 to be relevant under *Gartenberg*.

5    THE COURT:  All right.

6    All right.  So this has been very helpful, and I have

7 obviously heard a lot and gotten questions answered.

8    And now my question is, CUNY made an application for

9 a conference to discuss an intended motion for a stay.  Is

10 there any objection to my ruling now on the issue from CUNY?

11    MS. SCHWARTZ:  No, your Honor.

12    THE COURT:  Any objection from the plaintiff?

13    MR. MENDELSOHN:  No, your Honor.

14    The only thing I would raise is that obviously our

15 opposition brief is due today.  And one of the prongs of this

16 analysis, one of the three prongs, is the merits of the

17 pending motion to dismiss.  And before your Honor so far is

18 the complaint and CUNY's motion to dismiss, but not our brief.

19 And so to the extent -- I don't know, I guess I say it sort of

20 jokingly, but to the extent your Honor is inclined to rule in

21 our favor, then I suppose that we don't oppose it.  But to the

22 extent your Honor needs to consider our opposition brief, it

23 is going to be filed later today.  We would ask that you take

24 that into consideration.

25    THE COURT:  I understand.

1          All right.  Well, thank you very much.

2          So as you all have pointed out, I do have to consider

3     certain factors that include the merits and the burden and the

4     breadth of this potential discovery and prejudice to the

5     plaintiff.  And there are other things to be considered in

6     there, such as the length of the stay, etc., etc.

7          So, look, on the merits, there are arguments on both

8     sides that are robust, I think; and I think it is -- there is

9     a good chance that something gets pared down, but some things

10    are going to go forward.  So, yes, it will be potentially

11    narrowed down, but that doesn't necessarily mean that some of

12    that nonactionable content wouldn't necessarily be relevant to

13    the dispute.

14         Secondly, I am not convinced that there is a great

15    burden here and the breadth of discovery, that can be dealt

16    with during discovery.  And tied to that is the fact that it

17    is a motion that is fairly advanced, that will be fully

18    briefed by the end of May, if not sooner.  And that, to me,

19    means the extent of discovery that will occur before a motion

20    to dismiss is decided is likely not to be so great as to be a

21    huge burden that might otherwise be there.  Can't guarantee

22    that.  It depends how long the motion sits there.  But I am

23    not convinced that there is a burden.  Even CUNY pointed out

24    there is a specific claim, hostile work environment, specific

25    complaints involved, specific plaintiff that will cabin the

1    case to some degree, which also then reduces burden.

2              I also think that there is some prejudice to

3    plaintiff.  I mean, look, the timing cuts both ways.  If the

4    decision sits there a long time, it is more prejudicial to the

5    plaintiff if the stay is granted.  If it sits there a long

6    time and the stay is not granted, there is arguably greater

7    prejudice -- well, not prejudice, but burden on the defense.

8    But I think comes out in the wash that the prejudice is there

9    in a way it may not be in other cases.

10             And so, for those reasons, I am going to deny the

11   request for a stay.  You will go forward in discovery.  You

12   will meet and confer about what is reasonable.  And then if

13   there are disputes about that, they can be addressed.

14             And look, there is going to be, to some extent -- the

15   longer the motion sits there, there may be reason to hold off

16   on some discovery, depending.  But that is a decision down the

17   road.  All right?

18             Any questions?  Any questions from CUNY?

19             MS. SCHWARTZ:  No, your Honor.  Thank you.

20             THE COURT:  Okay.

21             Any questions from the plaintiff?

22             MR. MENDELSOHN:  No, your Honor.  Thank you for your

23   time today.

24             THE COURT:  All right.

25             Well, thank you for coming in.  Nice to see you.

1   Well-argued on both sides.

2           We are adjourned.  Thank you.

3           (Adjourned)

1

2                         C E R T I F I C A T E

3

4        I, Kristen J. Carannante, certify that the

5    transcript of the digital audio recording of the

6    proceedings in the above-entitled matter is a true

7    and accurate transcription.

8

9

10   Signature   /s/ *Kristen J. Carannante*
                 KRISTEN J. CARANNANTE, RPR, RMR, FCRR
11               (848) 459-3124
                 kjcarannante@gmail.com
12

13   Date:       April 30, 2025

14

15

16

17

18

19

20

21

22

23

24

25