**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------------  x
    LEAH GARRETT,                               :
                                                :
                    Plaintiff,                  :      24 Civ. 9710 (VSB)
                                                :
            v.                                  :
                                                :
    CITY UNIVERSITY OF NEW YORK,                :
                                                :
                    Defendant.                  :
                                                :
                                                :
------------------------------------------------------------------  x
```

## STATEMENT OF INTEREST
## OF THE UNITED STATES OF AMERICA

HARMEET K. DHILLON
Assistant Attorney General
KAREN D. WOODARD
Chief
MEREDITH L. BURRELL
Principal Deputy Chief
JENNIFER M. SWEDISH
Deputy Chief
EJAZ H. BALUCH, JR.
Senior Trial Attorney

Employment Litigation Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street, NE
Washington, DC  20530

JAY CLAYTON
United States Attorney for the
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-2699

RACHAEL DOUD
Assistant United States Attorney
— Of Counsel —

## TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ...................................................................................1

INTEREST OF THE UNITED STATES ......................................................................2

BACKGROUND .........................................................................................................4

    I.      Protests at CUNY Hunter Following the October 7, 2023 Hamas Attack..............4

    II.     CUNY Hunter's Policies Regulating Campus Disruption.......................................6

    III.    Prior Findings of Antisemitism on Campus...........................................................7

    IV.    The Instant Action..................................................................................................7

ARGUMENT ...............................................................................................................8

    I.      The First Amendment Does Not Prevent CUNY Hunter from Regulating
            Material Campus Disruptions That May Contribute to a Hostile Work
            Environment under Title VII ..................................................................................8

            A.    <u>Universities May Prohibit Material Campus Disruptions, which
                  Do Not Qualify as Protected Speech, Consistent with the First
                  Amendment.</u>....................................................................................................9

            B.    <u>CUNY Hunter Had the Ability Consistent with the First Amendment to
                  Prohibit Material Campus Disruptions That Dr. Garrett Alleges
                  Contributed to a Hostile Work Environment.</u> ...............................................13

            C.    <u>To the Extent Certain Alleged Protest Activity Is Protected Speech,
                  CUNY Hunter Could Have Enforced Content-Neutral Time, Place, and
                  Manner Regulations to Prevent the Disruptions at Issue.</u> ...........................16

    II.     Whether Dr. Garrett Sufficiently Pled a Plausible Hostile Work Environment
            Claim Requires Looking at All of the Circumstances Rather Than Only Certain
             Categories of Allegations......................................................................................17

CONCLUSION...........................................................................................................20

# TABLE OF AUTHORITIES

**CASES**                                                                        **PAGE(s)**

*Banks v. Gen. Motors, LLC,*
    81 F.4th 242 (2d Cir. 2023) ...................................................................... 18, 19

*Bentley v. AutoZoners, LLC,*
    935 F.3d 76 (2d Cir. 2019)............................................................................ 13

*Bhattacharya v. Murray,*
    93 F.4th 675, *cert. denied*, 145 S. Ct. 443 (2024)........................................... 11

*Brooklyn Center for Independence of the Disabled v. Bloomberg,*
    980 F. Supp. 2d 588 (S.D.N.Y. 2013)............................................................. 3

*Cheng v. United States,*
    132 F.4th 655 (2d Cir. 2025) ......................................................................... 4

*Cox v. Warwick Valley Cent. Sch. Dist.,*
    654 F.3d 267 (2d Cir. 2011)........................................................................... 9

*Disability Rts. New York v. City of New York,*
    No. 22-CV-04493 (ER), 2023 WL 6308574 (S.D.N.Y. Sept. 28, 2023).......................... 3

*Gartenberg v. Cooper Union for the Advancement of Science and Art,*
    No. 24 CIV 2669 (JPC), --- F.Supp.3d ----,
    2025 WL 401109 (S.D.N.Y. Feb. 5, 2025)................................................... *passim*

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ..................................................................................... 14

*Harris v. Forklift Sys., Inc.,*
    510 U.S. 17 (1993)........................................................................................ 17

*Healy v. James,*
    408 U.S. 169 (1972)............................................................................. 9, 14, 16

*Kaytor v. Elec. Boat Corp.,*
    609 F.3d 537 (2d Cir. 2010)........................................................................... 17

*Leibovitz v. N.Y.C. Transit Authority,*
    252 F.3d 179 (2d Cir. 2001)...................................................................... 19, 20

*Morse v. Frederick*,
    551 U.S. 393 (2007)................................................................................. 9

*Perry v. Ethan Allen, Inc.*,
    115 F.3d 143 (2d Cir. 1997)................................................................ 17, 18

*Saxe v. State Coll. Area Sch. Dist.*,
    240 F.3d 200 (3d Cir. 2001)..................................................................... 11

*Students for Justice in Palestine at University of Houston v. Abbott*,
    756 F. Supp. 3d 410 (W.D. Tex. 2024).................................................... 12

*Summa v. Hofstra Univ.*,
    708 F.3d 115 (2d Cir. 2013)..................................................................... 13

*T.E. v. Pine Bush Cent. Sch. Dist.*,
    58 F. Supp. 3d 332 (S.D.N.Y. 2014).......................................................... 3

*Tinker v. Des Moines Indep. Cmty. School Dist.*,
    393 U.S. 503 (1969)........................................................................ *passim*

*University of Maryland Students for Justice in Palestine v. Board of Regents of University System of Maryland*,
No. CV 24-2683 PJM, 2024 WL 4361863 (D. Md. Oct. 1, 2024) ........................................ 12, 15

## STATUTES

28 U.S.C. § 517.............................................................................. 1, 2

42 U.S.C. § 2000e........................................................................... 1, 2

## REGULATIONS

*Additional Measures to Combat Anti-Semitism*,
    Exec. Order No. 14188, § 2, 90 Fed. Reg. 8,847 (Jan. 29, 2025)........................................ 3

The United States, by its attorneys Harmeet K. Dhillon, Assistant Attorney General for Civil Rights for the United States Department of Justice, and Jay Clayton, United States Attorney for the Southern District of New York, respectfully submit this Statement of Interest, pursuant to 28 U.S.C. § 517, to address the motion of defendant City University of New York to dismiss the claims of plaintiff Leah Garrett under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, for failure to state a claim.

## PRELIMINARY STATEMENT

Plaintiff Leah Garrett, who is Jewish and serves as the Chair in Jewish Studies and Director of Hebrew at the City University of New York's Hunter College ("CUNY Hunter"), alleges that "[i]nstead of ensuring a workplace free from discrimination and harassment as required by Title VII of the Civil Rights Act, the College has allowed antisemitism to fester, subjecting Plaintiff to relentless hostility and unequal treatment because of her Jewish identity." Compl. ¶ 2, ECF No. 1. Specifically, Dr. Garrett alleges, among other things, that in the wake of the attack on Israel by Hamas on October 7, 2023, CUNY Hunter allowed protests that were hostile to Jews and that violated CUNY Hunter's policies governing demonstrations to proliferate, including instances where protestors "blocked entrances to elevators and escalators, and forced [Dr. Garrett] to navigate through hostile crowds." *Id.* ¶¶ 7–11. Dr. Garrett also asserts, *inter alia*, that CUNY Hunter failed to take prompt action despite her complaints about antisemitic vandalism, including posters that were defaced with "swastikas drawn over the faces of Jewish hostages taken by Hamas." *Id.* ¶ 10. Dr. Garrett alleges that, by failing to adequately

respond to these and other incidents, CUNY Hunter violated Title VII by fostering a hostile work environment based on her Jewish identity. *Id.* ¶¶ 113–26.[1]

CUNY Hunter moved to dismiss the complaint, arguing, among other things, that "the vast majority [of the conduct Dr. Garrett alleges] consists of advocacy or First Amendment protected political speech directed at the community at large and not targeted at Plaintiff, and thus cannot support a hostile work environment claim." Def.'s Mem. Supp. Mot. Dismiss, ECF No. 12, at 2.

The United States respectfully submits this Statement of Interest to address the application of Title VII's prohibition of discrimination based on race, religion, and national origin to activity on college campuses that is alleged to have created an actionable hostile work environment against employees. The United States expresses no view on any factual dispute before the Court, nor on any legal question presented other than this issue.

## INTEREST OF THE UNITED STATES

The United States' authority to file this Statement of Interest stems from 28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United States in a suit pending in a court of the United States . . .." The United States has a strong interest in eradicating employment discrimination, which includes ensuring the correct interpretation and application of Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. § 2000e *et seq.*, with respect to claims alleging discrimination because of an individual's religion or national origin. Moreover,

---

[1] Plaintiff's complaint originally asserted state law claims for breach of contract, negligence, and negligent infliction of emotional distress. Compl. ¶¶ 127-48. However, in response to CUNY's motion to dismiss the state law claims on Eleventh Amendment grounds, Plaintiff states that she "intends to voluntarily dismiss her state[-]law claims, and reserves the right to pursue those claims in the New York State Court of Claims." Pl.'s Mem. Opp. Mot. to Dismiss, ECF No. 22, at 4 n.2. The United States expresses no view on these claims.

the Attorney General is charged with enforcing Title VII where, as here, the employer is a state or local "government, governmental agency, or political subdivision." *Id.* § 2000e-5(f)(1). The United States frequently files Statements of Interest in cases concerning the applicability and interpretation of federal law in which it has enforcement interests. *See, e.g.*, *T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 352 (S.D.N.Y. 2014) (noting filing of U.S. Statement of Interest in action asserting that school district was deliberately indifferent to antisemitic harassment under Title VI of the Civil Rights Act of 1964); *see also, e.g.*, *Disability Rts. New York v. City of New York*, No. 22-CV-04493 (ER), 2023 WL 6308574, at *3 (S.D.N.Y. Sept. 28, 2023) (noting U.S. Statement of Interest filed in Americans with Disabilities Act action regarding sidewalk accessibility); *Brooklyn Center for Independence of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 641 n.9 (S.D.N.Y. 2013) (noting U.S. Statement of Interest filed in Americans with Disabilities Act challenge to municipal emergency planning procedures).

The United States further has an enforcement interest arising from the President's January 29, 2025, Executive Order entitled Additional Measures to Combat Anti-Semitism, Section 2 of which provides: "It shall be the policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." Exec. Order No. 14188, § 2, 90 Fed. Reg. 8,847 (Jan. 29, 2025).

## BACKGROUND[2]

Plaintiff Dr. Leah Garrett is the Larry A. and Klara Silverstein Chair in Jewish Studies and Director of Hebrew and Jewish Studies at CUNY Hunter. Compl. ¶ 21. CUNY Hunter is one of twenty-five campuses within the City University of New York public university system in New York City. *Id.* ¶ 22.

### I.    Protests at CUNY Hunter Following the October 7, 2023 Hamas Attack

On October 12, 2023, following the Hamas terrorist attacks in Israel, a group of students organized a "Rally for Palestine" on CUNY Hunter's campus. *Id.* ¶ 55. They announced the rally on social media in advance. *Id.* The rally included a march through the CUNY Hunter building and ended at the entrance. *Id.* During the march, protestors called for violence against Jews and the destruction of the Jewish state. *Id.* Plaintiff alleges that CUNY Hunter did not take any action to control or otherwise manage this disruption on campus, despite having advance notice of it. *Id.*

During subsequent protests at CUNY Hunter, protestors "often crowded campus entrances." *Id.* ¶ 63. Dr. Garrett, upon seeing the entrance blocked, was forced "to turn back from campus and return home." *Id.* Protests also took place inside the lobby of CUNY Hunter's main building and in the main public spaces on higher floors. *Id.* During the protests, students often used megaphones, disrupting instruction in "every classroom and office on campus." *Id.* According to the complaint, protestors spread "hostile" messages, including calling for the "expulsion of Israelis" from campus. *Id.* Protestors also held signs with "imagery directed at Jewish individuals, including depictions of blood dripping from the Star of David and other

---

[2] This Statement of Interest assumes the truth of the allegations in the Complaint (ECF No. 1) as required at the motion to dismiss stage. *Cheng v. United States*, 132 F.4th 655, 658 (2d Cir. 2025).

Jewish symbols." *Id.* Due to the protests, Dr. Garrett "felt compelled to assess the campus environment" before deciding whether to come to work. *Id.*

The protests later spread to CUNY Hunter Senate Administrative Committee (the "Faculty Senate") meetings. *Id.* ¶ 64. The Faculty Senate is the "principal governance body" of CUNY Hunter, and it shapes CUNY Hunter policy. *Id.* Dr. Garrett regularly attended Faculty Senate meetings because she is a member of the faculty. *Id.* After October 7, 2023, protestors "overt[ook]" the meetings, "leading antisemitic chants," in violation of Faculty Senate rules. *Id.* Nevertheless, the Chair of the Faculty Senate "failed to take any action" to stop the protestors' "improper disruption" of the meetings. *Id.* Nor did CUNY Hunter take any "action to restore order." *Id.* Based on the "pervasive hostility toward Jews" at Faculty Senate meetings, Dr. Garrett stopped attending. *Id.* ¶ 65.

According to the complaint, the protests also disrupted an on-campus screening of the film *Israelism* in the fall of 2023. *Id.* ¶¶ 72–73. During a post-screening panel discussion about the film, protestors attending the discussion "continuous[ly] harass[ed] and jeer[ed]" a rabbi participating in the panel. *Id.* ¶ 73. Some yelled at the rabbi to "shut up," while others asked him questions that "were antisemitic in nature." *Id.* At one point, a protestor ran onto the stage, "grabbed the microphone from the rabbi's hand, and gave an antisemitic speech" to attendees. *Id.* ¶ 74. CUNY Hunter security then escorted the rabbi from the event for his safety while protestors "continued to hurl abuse at him." *Id.* This behavior violated CUNY Hunter's policies. *Id.* ¶¶ 73–75. But even though CUNY Hunter's president and two college deans attended the event, none of them tried to stop the protestor who grabbed the microphone from the rabbi or any of the other protestors. *Id.*

As alleged in the complaint, protests continued during the winter of 2023 to 2024. In February 2024, Dr. Garrett shared with CUNY Hunter administrators a complaint she received from a student about "anti-Jewish protests" that took place in the lobby of CUNY Hunter's main building. *Id.* ¶ 86. She urged them to act, but administrators initially ignored her. *Id.* She followed up, reporting that she "could hear the protests from her 13th-floor office" and that they were "creating an intimidating and threatening environment." *Id.* Later that same month, a protest took place near CUNY Hunter's main entrance, in violation of CUNY Hunter's policy on the "Maintenance of Public Order." *Id.* ¶¶ 43, 88. Protestors used megaphones and chanted for the "eradication of the Jewish state and the elimination of Jews within its borders." *Id.* ¶ 88. They also "targeted Hunter Hillel," a Jewish student organization on campus. *Id.* Their chants included, "Hillel, Hillel, what do you say, how many killers did you feed today?" and "Hillel can go to Hell." *Id.* ¶¶ 88, 98. Dr. Garrett reported the protest to CUNY Hunter administrators, but the administrators took no action. *Id.* ¶ 88. Dr. Garrett and many Jewish students left campus because of these protests. *Id.* The next day, a dean announced that CUNY Hunter would not take action in response to the protests targeting Hillel. *Id.* ¶ 90.

## II.    CUNY Hunter's Policies Regulating Campus Disruption

At the time the protests occurred in 2023 and 2024, CUNY Hunter had several policies addressing campus disruption. CUNY Hunter's "Manual of General Policy" includes a policy on the "Maintenance of Public Order" (the "Public Order Policy"), referenced above. *Id.* ¶ 43. The Public Order Policy prohibits, among other things: "interfer[ing]" with CUNY Hunter's "educational processes or facilities"; "[u]nauthorized occupancy" of CUNY Hunter's "facilities or blocking access to or from such areas"; engaging in "abuse, physical, verbal, or otherwise," against any "member of the academic community or an invited guest" who holds "conflicting

points of view"; and "[d]isorderly . . . conduct" on CUNY Hunter-"owned or controlled property." *Id.*

In August 2024, CUNY Hunter sent all students, faculty, and staff a notice entitled "Free Expression and Our Inclusive Environment at Hunter College." *Id.* ¶ 45. Among other things, the notice stated that "[p]rotest or demonstration may proceed" as long as "neither force nor the threat of force is used," and CUNY Hunter's functions were "not interrupted." *Id.* The notice also referenced the Public Order Policy. *Id.* Specifically, it highlighted the prohibition on engaging in "abuse, physical, verbal, or otherwise," against any "member of the academic community or an invited guest" who holds "conflicting points of view." *Id.*

### III.    Prior Findings of Antisemitism on Campus

Several years before the recent protests began, in March 2016, CUNY Hunter's then-Chancellor commissioned an investigation into antisemitism on CUNY Hunter's campus. *Id.* ¶ 46. The Honorable Barbara S. Jones, a former Judge of this Court, and Paul Shechtman, an attorney, co-led the investigation. *Id.* The investigation found evidence of multiple antisemitic incidents, including that at a 2015 rally, students chanted "Jews out of CUNY" and "Death to Jews," among other things. *Id.* Rally attendees did not face any consequences. *Id.* ¶ 6.

### IV.    The Instant Action

Dr. Garrett filed this action against the City University of New York in December 2024. In Count I of her complaint, she asserts a discrimination claim based on her religion, national origin, or both, under Title VII. *Id.* ¶¶ 113–26. She alleges that CUNY Hunter subjected her to a hostile work environment, "permeated with discriminatory intimidation, ridicule, and insult that is so severe and pervasive as to alter the conditions of Plaintiff's employment, because she is Jewish." *Id.* ¶ 117. CUNY Hunter moved to dismiss the complaint, maintaining that Dr. Garrett

has not sufficiently pled her hostile work environment claim. Def.'s Mem. Supp. Mot. Dismiss 4–19.

## ARGUMENT

Under Title VII, employers have a duty to take appropriate remedial action to remedy a hostile work environment and can be held liable for failing to do so. In its Memorandum of Law, CUNY Hunter attempts to evade this duty, contending that the duty is inapplicable because the alleged antisemitic harassment Dr. Garrett alleges implicates the First Amendment rights of students. But material campus disruptions are not protected speech and universities can, consistent with the First Amendment, take steps to prohibit such disruptions, and in particular threatening conduct. Universities may also regulate protected speech using content-neutral time, place, and manner regulations. Accordingly, CUNY Hunter may not simply rely on the First Amendment to avoid any scrutiny of whether it is liable under Title VII for its failure to prevent the disruptions that Dr. Garrett contends contributed to a hostile work environment.

In addition, the correct standard for evaluating whether an employee sufficiently pled a plausible hostile work environment claim requires examination of all the circumstances the employee alleges. CUNY Hunter invites the Court to commit error by urging it to categorically exclude certain categories of allegations from its consideration of the sufficiency of Dr. Garrett's pleading.

### I. The First Amendment Does Not Prevent CUNY Hunter from Regulating Material Campus Disruptions That May Contribute to a Hostile Work Environment under Title VII

Universities have authority, consistent with the First Amendment, to prohibit material campus disruptions that amount to impermissible conduct rather than protected speech. Similarly, universities may enforce reasonable regulations related to the time, place, and manner of student speech, even if such speech is protected under the First Amendment. CUNY Hunter

could have prevented or mitigated the campus disruptions that Dr. Garrett alleges contributed to

a hostile work environment by enforcing such restrictions consistent with the First Amendment.

Indeed, it already had policies prohibiting the kinds of disruptions at issue in this case but

allegedly failed to enforce them.  CUNY Hunter thus is not, as its motion claims, shielded by the

First Amendment from liability under Title VII for a hostile work environment.

A.  Universities May Prohibit Material Campus Disruptions, which Do Not Qualify as Protected Speech, Consistent with the First Amendment.

Though it is well-settled that students "do not shed their constitutional rights to freedom

of speech or expression at the schoolhouse gate," it is also well-settled that their First

Amendment rights have limits in school settings. *Cox v. Warwick Valley Cent. Sch. Dist.*, 654

F.3d 267, 272 (2d Cir. 2011) (quoting *Morse v. Frederick*, 551 U.S. 393, 396–97 (2007))*.* In

*Healy v. James*, for example, the Court observed that, while First Amendment protections apply

with equal "force on college campuses" as the "community at large," universities retain the

"comprehensive authority" to "prescribe and control conduct" on campuses.  408 U.S. 169, 180

(1972). "As a general rule," student speech in school is not protected under the First Amendment

if it would "materially and substantially interfere with the requirements of appropriate discipline

in the operation of the school." *Cox*, 654 F.3d at 272 (quoting *Tinker v. Des Moines Indep. Cmty.*

*School Dist.*, 393 U.S. 503, 509 (1969)); *see also Morse*, 551 U.S. at 403 (student expression is

not protected if it would "materially and substantially disrupt the work and discipline of the

school" (quoting *Tinker*, 393 U.S. at 513)).

In *Gartenberg v. Cooper Union for the Advancement of Science and Art*, Judge Cronan

addressed and rejected the same argument CUNY Hunter makes here: that the First Amendment

precludes hostile environment claims based on incidents involving the exercise of political

speech. *Gartenberg*, No. 24 CIV. 2669 (JPC), --- F.Supp.3d ----, 2025 WL 401109, at *7

(S.D.N.Y. Feb. 5, 2025). In *Gartenberg*, the plaintiffs, Jewish students at Cooper Union, alleged that the school failed to appropriately respond to antisemitic harassment, especially in connection with a protest on October 25, 2023, and alleged, *inter alia*, that they suffered a hostile educational environment based on their national origin under Title VI of the Civil Rights Act. *Id.* at *2–*5. Cooper Union moved to dismiss, arguing, among other things, that the plaintiffs' "hostile environment claims are based largely on protected political speech by pro-Palestinian members of its community, and are therefore foreclosed by the First Amendment." *Id.* at *7. The court denied Cooper Union's motion to dismiss the Title VI claim, holding that, while some of the conduct detailed in the complaint did implicate "pure speech on matters of public concern," the plaintiffs "allege[d] sufficient facts to establish an actionably hostile educational environment based on instances of harassment that are not constitutionally protected in this context." *Id.* at *6, *14.[3]

Specifically, in describing the allegations, the court in *Gartenberg* explained that one alleged protest "began as a peaceful, public protest concerning the Israeli-Palestinian conflict," but protestors eventually "forced their way past campus security guards" and into one campus building, where they "obstructed the hallway" and "disrupted classes," before "descend[ing] on the hallway surrounding the library," while continuing to chant slogans. *Id.* at *15 (quotation marks omitted). Protestors "attempted to force their way into the library" where "a group of Jewish students had taken refuge," "banging on and rattling the library doors." *Id.* at *4. Some of the Jewish students in the library attempted to call the New York Police Department for help, but when the police arrived, the university president allegedly told them to stand down. *Id.* at *3,

---

[3] Whether a complaint plausibly alleges that an educational environment was actionably hostile under Title VI is governed by Title VII's standard for a severe or pervasive hostile work environment jurisprudence. *Id.* at *14.

*15, *18. Cooper Union staff "suggested that the Jewish students hide in the windowless upstairs portion of the library out of the demonstrators' sight or escape the library through the back exit, offers that the Jewish students declined." *Id.* at *4 (brackets and quotation marks omitted). Ultimately, "some of the Jewish students who had been stuck in the library were escorted out by campus security guards" after "the demonstrators left of their own accord." *Id*.

The court in *Gartenberg* concluded that the circumstances involving protestors' behavior at the library went "beyond . . . instances of pure political speech" and was "conduct" that was "'entirely outside the ambit of the free speech clause'" of the First Amendment. *Id.* at *15–16 (quoting *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 (3d Cir. 2001)); *see also Bhattacharya v. Murray*, 93 F.4th 675, 681, 686 (4th Cir. 2024) (affirming summary judgment for medical school in First Amendment challenge to student discipline based on, among other things, "confrontational conduct" towards dean and "abrasive, interruptive exchanges" with faculty, including at a faculty panel), *cert. denied*, 145 S. Ct. 443 (2024).

The *Gartenberg* court contrasted this conduct with other actions of the protestors at the library and other speech, which it concluded were protected by the First Amendment. For example, the court highlighted allegations of protestors demonstrating on the sidewalk next to a campus building while chanting slogans, distributing fliers, publishing articles in the student-run newspaper, writing an alumni letter, erecting an art display, and organizing a speech. *Id.* at *14. Although the student plaintiffs alleged that these activities, which "related to the ongoing Israeli-Palestinian conflict and touched upon topics like Zionism, colonialism, and racism," constituted harassment, the court concluded that such activities fell within the scope of "pure speech on matters of public concern" under the First Amendment. *Id.* at *15. The student plaintiffs did not allege that these messages "were intended to target particular Jewish students," nor did the

messages fall under any First Amendment exceptions, such as "true threats, incitement, fighting words," or "obscenity." *Id.* By contrast, the court found it plausible that the protestors' conduct in the campus building during the October 25, 2023, protest "was physically threatening or humiliating to the Jewish students huddled inside the library." *Id.*

Courts in other districts addressing the scope of First Amendment rights in the context of protests after October 7, 2023, have likewise distinguished between pure political speech, which is protected by the First Amendment, and disruptive, threatening, or harassing conduct, which is not. In *University of Maryland Students for Justice in Palestine v. Board of Regents of University System of Maryland*, No. CV 24-2683 PJM, 2024 WL 4361863, at *8, *14 (D. Md. Oct. 1, 2024) ("*SJP Maryland*"), the court preliminarily enjoined the university's cancellation of a student group's event to "commemorate Gaza War dead, to decry what it terms Israeli 'genocide,' and to promote multiple aspects of Palestinian life and culture." The court noted that there was "no suggestion" that "Jewish students will be threatened or harassed or otherwise impeded from attending classes, or that any buildings will be occupied, an encampment established, or property destruction contemplated" such as would bring the protest outside the scope of First Amendment protection. *Id.* at *9. And in *Students for Justice in Palestine at University of Houston v. Abbott*, 756 F. Supp. 3d 410, 414 (W.D. Tex. 2024) ("*SJP Houston*"), a student group challenged, under the First Amendment, Texas universities' policy prohibiting antisemitism, which defined antisemitism to include, in pertinent part, making any statements "[d]enying the Jewish people their right to self-determination" or "[d]rawing comparisons of contemporary Israeli policy to that of the Nazis." The court was unpersuaded by the universities' claim that the First Amendment permitted the policy because the prohibited speech would constitute a material disruption, reasoning that the prohibited speech amounted only to "a kind of expression that is a

hallmark of university activity." *Id.* at 426.

As these cases illustrate, the key question is whether the conduct at issue involves material campus disruptions—such as obstructing hallways or entrances, disruptions to classes and libraries, "physically threatening or humiliating" conduct, and vandalism—which falls outside the scope of First Amendment protection. *Gartenberg*, 2025 WL 401109, at *14–17.

> B.  <u>CUNY Hunter Had the Ability Consistent with the First Amendment to Prohibit Material Campus Disruptions That Dr. Garrett Alleges Contributed to a Hostile Work Environment.</u>

Consistent with the First Amendment, CUNY Hunter remained empowered to enforce reasonable regulations related to the time, place, and manner of protestor conduct to prevent material campus disruptions. Indeed, Title VII requires employers to take "appropriate remedial action" to remedy a hostile work environment and imposes liability for failing to do so. *See Bentley v. AutoZoners, LLC*, 935 F.3d 76, 92 (2d Cir. 2019) (quoting *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013)). Dr. Garrett alleges that CUNY Hunter failed to take action—including enforcing its existing policy—to remedy a hostile work environment created by material campus disruptions. CUNY Hunter cannot rely on the First Amendment to excuse its duty under Title VII to take appropriate remedial action.[4]

The conduct at issue in this case goes far beyond the "silent, passive expression of opinion" or viewpoints causing "discomfort and unpleasantness" that the Supreme Court has found to be protected political speech. *See Tinker*, 393 U.S. at 504, 508–09 (holding that school's prohibition of students wearing black armbands to protest American involvement in the Vietnam war was improper because there was no indication of a disruption). Rather, according to

---

[4] This duty attaches when an employer knew, or should have known, about the conduct alleged to create a hostile work environment. *See Bentley*, 953 F.3d at 92. At least at this stage of the proceedings, CUNY Hunter does not assert that it lacked notice of Dr. Garrett's allegations.

the complaint, CUNY protesters "blocked entrances to elevators and escalators" and "forced Plaintiff to navigate through hostile crowds as they chanted slogans that are threatening to Jews." Compl. ¶ 8.  They often used megaphones so that their messages could be heard in "every classroom and office on campus." *Id.* ¶ 63. They "overt[ook]" Faculty Senate Meetings. *Id.* ¶ 64. And they yelled and jeered at a rabbi taking part in a panel discussion, eventually interrupting the panel altogether, physically taking the microphone from the rabbi, and requiring the rabbi to be escorted from the room "for his safety." *Id.* ¶¶ 73–74.

Unlike the permitted speech in *Tinker*, the conduct alleged in this case constituted "disorder [and] disturbance" and "interfere[d]" with CUNY Hunter's "work" and with "the rights of other students to be secure and let alone." *Tinker*, 393 U.S. at 508. Prohibiting the disruptive conduct would not have been based on an "undifferentiated fear or apprehension of disturbance," *id.*, but on CUNY Hunter's own experience witnessing the disruptive conduct that occurred repeatedly over the course of months after October 7, 2023. *See Healy*, 408 U.S. at 189 ("Associational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education."); *Grayned v. City of Rockford*, 408 U.S. 104, 117–18 (1972) (observing that the Court in *Tinker* never "suggested that students, teachers, or anyone else has an absolute constitutional right to use all parts of a school building or its immediate environs for [their] unlimited expressive purposes").

The impermissible conduct alleged here has certain parallels to the conduct the Court found actionable under Title VI in *Gartenberg*. In *Gartenberg*, protesters allegedly went inside a campus building, disrupted classes, and chanted in the hallway. *Gartenberg*, 2025 WL 401109, at *15. Here, similarly, protesters allegedly marched through the CUNY Hunter building,

14

chanted in the lobby, and marched through the building's main public spaces on higher floors. Compl. ¶¶ 55, 63. The protestors in *Gartenberg* allegedly obstructed the hallway, 2025 WL 401109, at *15, while here, protestors allegedly blocked campus entrances, forcing Dr. Garrett to turn around and return home, Compl. ¶ 63. Protestors in *Gartenberg* allegedly held signs and chanted slogans at Jewish students inside the campus library, 2025 WL 401109, at *15, while here, protestors allegedly targeted chants at Hunter Hillel, a Jewish student organization, during a protest on CUNY Hunter's campus. Compl. ¶¶ 88, 98.

The material disruptions Dr. Garrett alleges go beyond the pure speech that, standing alone, *Gartenberg* concluded was protected under the First Amendment. Dr. Garrett does not simply allege that the protestors were confined to a sidewalk next to a campus building, like the protected speech in *Gartenberg*. 2025 WL 401109, at *14. Instead, certain of the protestors' messages "were intended to target particular Jewish students," *Gartenberg*, 2025 WL 401109, at *15—for instance when protestors chanted at Hunter Hillel. *See* Compl. ¶ 88; *compare SJP Maryland*, 2024 WL 4361863, at *9 (student group's anticipated event was protected speech where there was "no suggestion" that "Jewish students will be threatened or harassed" or that protestors would "impede[ ]" Jewish students "from attending classes").

In short, Dr. Garrett's allegations go beyond the realm of permissible speech under the First Amendment. They reach into impermissible conduct that CUNY Hunter may prohibit consistent with the First Amendment. Indeed, CUNY Hunter had an obligation under Title VII to prevent the impermissible conduct to the extent it caused a hostile work environment. The material disruptions Dr. Garrett alleges, therefore, may contribute to a hostile work environment under Title VII.

C.  To the Extent Certain Alleged Protest Activity Is Protected Speech, CUNY
Hunter Could Have Enforced Content-Neutral Time, Place, and Manner
Regulations to Prevent the Disruptions at Issue.

Even if some of the alleged protest activity could constitute speech protected under the

First Amendment, CUNY Hunter could have enforced content-neutral time, place, and manner

regulations to prevent disruptive effects on campus. CUNY Hunter allegedly failed to do so, and

its failure can properly be considered in evaluating whether it is liable under Title VII for any

hostile work environment caused by such disruptions.

In *Healy*, the Supreme Court recognized that universities retain the "comprehensive

authority" to "prescribe and control conduct" on campuses. 408 U.S. at 180 (quoting *Tinker*, 393

U.S. at 507). As a result, the Court held that, like in the community at large, universities remain

empowered to enforce "reasonable regulations with respect to the time, the place, and the

manner" in which students participate in "speech-related activities." *Id.* at 192–93. For example,

a university may "protect itself and its property" and require its students to "adhere to generally

accepted standards of conduct." *Id.* at 192 (citation omitted). Universities may also prohibit any

activities that "interrupt classes" or otherwise "substantially interfere with the opportunity of

other students to obtain an education." *Id.* at 189.

Similarly, in *SJP Houston*, the court struck down the university policy at issue because it

constituted "impermissible viewpoint discrimination." 756 F. Supp. 3d at 425, 427. Specifically,

it prohibited statements based on their content—any statements "[d]enying the Jewish people

their right to self-determination" or "[d]rawing comparisons of contemporary Israeli policy to

that of the Nazis." *Id*. at 414. The prohibited speech was the "kind of expression that is a

hallmark of university activity." *Id.* at 426. But the court confirmed that *Healy* would permit the

defendant universities to apply "content-neutral, time, manner, and place restrictions." *Id.* at 427.

16

Here, the kind of content-neutral time, place, and manner regulations that *Healy* contemplates were present and in effect at CUNY Hunter via its Public Order Policy. *See* Compl. ¶¶ 43, 88. Dr. Garrett alleges that the college simply failed to enforce the policy. *See* Compl. ¶¶ 16, 88, 128–29. Indeed, CUNY Hunter's policies prohibit disorderly conduct; interference with facilities, including unauthorized occupancy of those facilities or blocking access to and from them; interference with educational processes; and physical or verbal abuse against any member of the academic community or an invited guest. *Id.* ¶ 43. These prohibitions in CUNY Hunter's Public Order Policy appear on their face to be content-neutral time, place, and manner place restrictions that CUNY Hunter could have enforced and thereby prevented some or all the harassment Dr. Garrett alleges.

## II. Whether Dr. Garrett Sufficiently Pled a Plausible Hostile Work Environment Claim Requires Looking at All of the Circumstances Rather Than Only Certain Categories of Allegations

For the reasons discussed above, CUNY Hunter cannot avoid scrutiny of whether it took appropriate remedial action by simply invoking the First Amendment. CUNY Hunter also argues that the complaint should be dismissed based on an unduly narrow conception of the allegations that are relevant.

When evaluating the sufficiency of Dr. Garrett's hostile work environment claim, the Court should look at "*all* the circumstances" of "whether [the] environment is 'hostile' or 'abusive.'" *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)) (emphasis in *Kaytor*). One of the "critical inquiries" when examining a hostile work environment claim "must be the *environment*." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (emphasis in original; quotation marks omitted). Allegations about the "general work atmosphere," in addition to those about "specific hostility

directed toward the plaintiff," are "important factor[s] in evaluating the claim." *Banks v. Gen.*
*Motors, LLC*, 81 F.4th 242, 262 (2d Cir. 2023) (quoting *Perry*, 115 F.3d at 149).

The circumstances of an employee's work environment include conduct not directed at
the employee personally and conduct that the employee learned about secondhand. As the
Second Circuit has held, "conduct not directly targeted at or spoken to" an employee but
"purposefully taking place in her presence can nevertheless transform her work environment into
a hostile or abusive one." *Id.* (brackets and quotation marks omitted).  For instance, in *Banks v.*
*General Motors*, an employee brought a hostile work environment claim based on her race and
sex. *Id.* at 257. The plaintiff demonstrated that at the plant where she worked, there were images
of "pin-up women" and "sexually explicit silhouettes," as well as "nooses, Confederate flags,
and other racially offensive material around the plant," among other offensive material. *Id.* at
264–65. The plaintiff also established that at the plant, employees made racially derogatory
comments about other Black employees. *Id.* at 267. The racially and sexually offensive material
and comments at the plant contributed to the hostile work environment, even though they were
not direct at the employee personally. *Id.* at 264–65, 267. The Second Circuit held that the
district court erred when it ignored the derogatory comments simply because they were made
while the plaintiff employee was not present. *Id.* at 267. Whether the plaintiff employee
"personally endure[d]" racial epithets or whether those epithets were said when the employee
was "not present" was "not germane." *Id.* Harassment that the employee "learns second-hand"
can still "impact the work environment." *Id.* Ultimately, the Second Circuit concluded that there
was sufficient evidence of a hostile work environment for the employee's claim to survive
summary judgment. *Id.* at 263–69.

Here, the Court should consider all the circumstances of Dr. Garrett's work environment.

Dr. Garrett makes several allegations about the hostility of the work environment at CUNY Hunter. Considering "all the circumstances" includes considering allegations describing the "general work atmosphere" Dr. Garrett experienced, even if protestors did not target her personally. *Id.* Those circumstances include, for example, her allegations that protestors called for violence against Jews, the destruction of the Jewish state, and the "expulsion of Israelis" from campus, Compl. ¶¶ 55, 63; the fact that they held signs with "imagery directed at Jewish individuals," including "depictions of blood dripping from the Star of David and other Jewish symbols," *id.* ¶ 63; that they led antisemitic chants at Faculty Senate meetings, *id.* ¶ 64, that they interrupted a panel discussion to give an antisemitic speech, *id.* ¶¶ 73–74, and that they directed chants at Hunter Hillel, "Hillel, Hillel, what do you say, how many killers did you feed today?" and "Hillel can go to Hell," *id.* ¶¶ 88, 98.

This conduct, while "not directly targeted at or spoken to" Dr. Garrett, was "purposefully taking place in her presence" and can nevertheless "transform her work environment into a hostile or abusive one." *Banks*, 81 F.4th at 262 (brackets and quotation marks omitted). Accordingly, CUNY Hunter's contention that such conduct is of limited relevance simply because it was not directed at Dr. Garrett, Def.'s Mem. Supp. Mot. Dismiss at 8, misses the mark. And while CUNY Hunter contends that any conduct Dr. Garrett experienced secondhand cannot form the basis of her claim, *see id.*, *Banks* explicitly rejected that position, *see Banks*, 81 F.4th at 267.[5]

---

[5] CUNY Hunter cites *Leibovitz v. N.Y.C. Transit Authority*, 252 F.3d 179, 189 (2d Cir. 2001), for the proposition that "any conduct that Plaintiff fails to allege that she experienced firsthand cannot form the basis of her hostile work environment claim." Def.'s Mem. Supp. Mot. to Dismiss at 8. While the court in *Leibovitz* stated that "Title VII's prohibition against hostile work discrimination affords no claim to a person who experiences it by hearsay," *Leibovitz*, 252 F.3d at 182, the plaintiff's claims in that case centered entirely on allegations

**<u>CONCLUSION</u>**

For the reasons set forth above, in deciding CUNY Hunter's motion to dismiss, the Court should distinguish between pure speech on matters of public concern—which deserves First Amendment protections—and the types of campus disruptions that universities may permissibly prohibit, consistent with the First Amendment.  Moreover, this Court should consider the totality of circumstances Dr. Garrett alleged to decide whether she sufficiently pled a plausible hostile work environment claim.

---

stemming from "her belief that other women in other parts of her workplace were harassed" and that her employer responded inadequately to those women's complaints. *See id. Leibovitz* does not stand for the proposition that statements a plaintiff learned about secondhand can have no relevance to a hostile work environment claim.

Respectfully submitted,

Date:   May 12, 2025

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

KAREN D. WOODARD (MD Bar, no
number issued)
Chief
Employment Litigation Section
Civil Rights Division
MEREDITH L. BURRELL
Principal Deputy Chief
JENNIFER M. SWEDISH
Deputy Chief

_____/s/_____
EJAZ H. BALUCH, JR. (MD Bar No.
1612130032)
Senior Trial Attorney
Employment Litigation Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street, NE
Washington, DC  20530
Telephone: (202) 532-3834
Email: Ejaz.Baluch@usdoj.gov

JAY CLAYTON
United States Attorney
Southern District of New York

 _/s/ Rachael Doud_____
RACHAEL DOUD
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2699
Email: rachael.doud@usdoj.gov

21

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), the undersigned hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, this memorandum contains 6,043 words.


Dated:  May 12, 2025
        New York, New York

                                            Respectfully Submitted,

                                            JAY CLAYTON
                                            United States Attorney for the
                                            Southern District of New York

                                    By:     _/s/ Rachael Doud_____
                                            RACHAEL DOUD
                                            Assistant United States Attorney
                                            86 Chambers Street, Third Floor
                                            New York, New York 10007
                                            Tel.: (212) 637-2699
                                            Email: rachael.doud@usdoj.go