UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

LEAH GARRETT,                                     :
                                                  :
                              Plaintiff,          :         24-CV-9710 (VSB) (RWL)
                                                  :
              - against -                         :    **REPORT AND RECOMMENDATION**
                                                  :    **TO HON. VERNON S. BRODERICK:**
CITY UNIVERSITY OF NEW YORK,                      :    <u>**MOTION TO DISMISS (DKT. 11)**</u>
                                                  :
                              Defendant.          :
-------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

In the wake of the October 7, 2023 terrorist attack in Israel, political unrest embroiled City University of New York's ("CUNY") Hunter College ("Hunter") campus. Dr. Leah Garrett, a Jewish professor who chairs the Jewish Studies department at Hunter, asserts that events during that period perpetuated antisemitism on campus and created a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2. Presently before the Court is CUNY's motion to dismiss. For the reasons set forth below, the motion should be DENIED.

**BACKGROUND**[1]

**A.    The Parties**

CUNY is a public university system in New York City. (Compl. ¶ 22.) Hunter is a college within the CUNY system.[2] (*Id*. ¶¶ 20, 22.) For most of the relevant period, Hunter

---

[1] In accordance with the standard for assessing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court accepts as true all non-conclusory allegations in the Complaint and makes all reasonable inferences in Garrett's favor. *See Tripathy v. McKoy*, 103 F.4th 106, 113 (2d Cir. 2024). The Complaint appears at Dkt. 1.

[2] CUNY and Hunter are not distinct legal entities. (Compl. at 1 n.1.) All references herein to CUNY include Hunter.

was run by Interim President Ann Kirschner. (*Id.* ¶ 23.) Andrew J. Polsky served as Dean of Hunter's School of Arts and Sciences. (*Id.* ¶ 23.) Like many colleges and universities, "CUNY prides itself on its commitment to diversity and tolerance." (*Id.* ¶ 30.) Effectuating this mission and investigating complaints involving discrimination at Hunter are the responsibilities of its Office of Diversity and Compliance (ODC), led by Dean John Rose. (*Id.* ¶¶ 30, 32.)

Notwithstanding its stated commitment, CUNY has a checkered history of antisemitism on campus. In 2016, an investigation commissioned by then-CUNY Chancellor James B. Milliken concluded "that there was evidence of multiple antisemitic incidents, including a 2015 rally at CUNY Hunter where students chanted, among other things, 'Jews Out of CUNY' and 'Death to Jews.'" (*Id.* ¶ 46.) In 2017, CUNY invited an anti-Israel activist to speak at the graduation for one of its schools, even though Holocaust survivors, among others, urged CUNY to reconsider.[3] (*Id.* ¶ 47.) And, in June 2024, the United States Department of Education Office for Civil Rights issued a press release announcing that CUNY had entered into a Resolution Agreement to resolve several pending complaints against the university system, including one about "harassment of students based on national origin (shared Jewish ancestry) in academic year 2020-2021." (*Id.* ¶ 101.) As of 2023, Jewish students at CUNY comprised approximately 9.1% (1,500

---

[3] With the possible exception of proving intent, Garrett cannot rely on the events preceding her employment in 2017 to establish her hostile work environment claim. *See Velez v. New York City Police Pension Fund Article II*, No. 18-CV-1366, 2019 WL 1382884, at *9 (S.D.N.Y. Mar. 27, 2019) ("incidents giving rise to the hostile work environment claim must have occurred during the plaintiff's employment"); *Legrand v. New York Restaurant School/Education Management Corp.*, No. 02-CV-2249, 2004 WL 1555102, at *8 n.1 (S.D.N.Y. July 12, 2004) ("incidents occurred … before [plaintiff] was employed by [defendant] and therefore they should not be part of the hostile work environment discussion").

of 16,549) of undergraduate students, and 17.5% (1,000 of 5,714) graduate students.  (*Id*. ¶ 46 n.5.)

In July 2017, CUNY hired Garrett to serve as the Larry A. and Klara Silverstein Chair in Jewish Studies and inaugural Director of Hebrew and Jewish Studies at Hunter. (*Id*. ¶ 21.)  Garrett is Jewish and a Zionist.[4]  (*Id*. ¶¶ 2, 7.)   In her role at CUNY, Garrett teaches courses and organizes campus programming, including on antisemitism.  (*Id*. ¶ 48.)

## B.    Antisemitism At CUNY After October 7, 2023

Garrett's experience at CUNY took a turn for the worse when protests regarding the Israel-Palestine conflict became omnipresent on Hunter's campus following the tragic October 7, 2023 terrorist attack in Israel.  (*Id*. ¶ 7.)  Many of these protests were loud, disruptive, and in apparent violation of CUNY's Public Order Policy.  (*Id*. ¶ 88.)  Protestors thronged campus buildings, entrances, and even faculty senate meetings – all while CUNY administrators did little to maintain order.  (*Id*. ¶¶ 8-9, 86-90.)

At one protest, a student had his pro-Israel sign "forcibly taken from him."  (*Id*. ¶ 63.)  At another protest on February 28, 2024, protestors gathered at Hunter's main entrance equipped with megaphones and shouted "hateful slogans" that "targeted Hunter Hillel," an organization "dedicated to fostering a Jewish community on campus."  (*Id*. ¶ 88.)  Protestors chanted, "Hillel can go to Hell" and "Hillel, what do you say, how many killers did you feed today?"  (*Id*. ¶¶ 88, 98.)  Many Jewish students – and Garrett – felt compelled to leave campus.  (*Id*. ¶ 88.)  In a communication later that day to the Executive

---

[4] The Complaint explains Zionism as a big tent "movement for the self-determination and statehood for the Jewish people in their ancestral homeland, the land of Israel."   (Compl. at n.2 (internal quotations omitted).)

Director of Hunter Hillel, President Kirschner stated that "[t]he protests reached a new level of aggression by targeting Hillel" and "personal[ly] targeting Jewish students." (*Id.* ¶ 89.) President Kirschner expressed her sorrow but failed to take decisive action to protect the Jewish community, discipline the students responsible, and enforce CUNY policies. (*Id.*)

On May 6, 2024, CUNY cancelled classes after 3:00 p.m. in anticipation of a pro-Palestine "Day of Rage" protest scheduled for that day. (*Id.* ¶ 92.) Garrett felt compelled to cancel her classes that day even though they were scheduled for the morning. (*Id.*)

At the Hunter demonstrations, protestors chanted anti-Zionist slogans and displayed signs, many of which Garrett perceived as antisemitic and menacing. For instance, protestors often cheered "from the river to the sea, Palestine will be free," a reference to the land between the Jordan River and the Mediterranean Sea which includes Israel, Gaza, and the West Bank. (*Id.* ¶ 28.) Other times, protestors "called for the expulsion of Israelis and all student or faculty members who support … the state of Israel," and carried signs depicting "blood dripping from the Star of David and other Jewish symbols." (*Id.* ¶ 63.)

Garrett also was exposed to flyers, posters, stickers, open letters, and social media posts with similar content. (*Id.* ¶¶ 10, 53-57, 59, 62.) Flyers promoted the "Boycott, Divestment and Sanctions … movement against Israel." (*Id.* ¶ 59.) Student groups, such as CUNY4Palestine, posted messages on social media "debunking" Hamas violence, and urging readers to "Globalize the Intifada" and "escalate by any means necessary." (*Id.* ¶¶ 53, 56.) Several clubs "signed an open letter praising [Hamas's] terror attack as an 'act of resistance.'" (*Id.* ¶ 62.)

4

In a particularly distressing incident on campus, swastikas were graffitied on posters of Jews taken hostage by Hamas. (*Id*. ¶ 10.) Following Garrett's pleading to administrators, the swastikas were covered approximately five hours later. (*Id*. ¶ 60.) However, Garrett is not aware of any steps CUNY took to determine who was responsible for the vandalism, providing "a clear signal to the anti-Jewish instigators on campus that the most blatant acts of antisemitism would go unpunished." (*Id*. ¶ 61.)

In the fall of 2023, "a group of anti-Israel, anti-Zionist, and antisemitic students and faculty members planned a screening of" a film called *Israelism*. (*Id*. ¶ 72.) The film takes the position that "Jews use antisemitism as a tool to silence pro-Palestinian voices." (*Id*. ¶ 72.) President Kirschner sponsored the event and, with Garrett's urging, invited a rabbi to participate in the post-screening panel to provide a pro-Israel perspective. (*Id*. ¶ 73.) During the discussion, students "yelled at the rabbi to 'shut up'" and others "demanded he answer questions that were antisemitic in nature." (*Id*. ¶ 73.) Professor Sarah Chinn, for example, "demanded that the rabbi answer" a student-submitted question asking, "why the Israeli Defense Forces killed its own people on October 7th?" (*Id*. ¶ 74.) At one point, a student "grabbed the microphone from the rabbi's hand" and delivered an antisemitic speech. (*Id*. ¶ 74.) The rabbi was eventually "led away from the room for his safety with security by his side as the crowd continued to hurl abuse at him." (*Id*.) Although present at the screening and ensuing disorder, CUNY administrators "did nothing." (*Id*.)

During this period of unrest, Garrett became the "sole academic advocate for Jewish students" at Hunter experiencing antisemitism. (*Id*. ¶ 68.) One Jewish student informed Garrett that CUNY's student-run History Club was "promoting the works of known antisemitic writers." (*Id*. ¶ 70.) Another Jewish student described an incident with

a CUNY adjunct lecturer (the "Lecturer") during a class on World War II.  (*Id*. ¶ 69.)  After asking the class if they could "imagine harboring such pure hatred for a certain group of people you just want to wipe them off the face of the earth," the Lecturer singled out the Jewish student and "asked if she had anything to say about the 'genocide in Gaza.'"  (*Id*. ¶ 69.)  Garrett elevated these complaints to ODC and other CUNY administrators, but to no avail.  (*Id*. ¶¶ 69-70.)

In addition to students, faculty members – including Garrett – experienced targeted conduct and found themselves with limited recourse.  On March 14, 2024, a CUNY student group emailed school administrators falsely accusing Garrett of "potentially disseminat[ing] decontextualized clips of students speaking to racist Zionist networks, to deliberately portray them as antisemites."  (*Id*. ¶ 98.)  The group also "published photographs of Garrett on social media."  (*Id*.)  Michaela Soyer, a sociology professor at CUNY, told two coworkers that Garrett "'is pretending to be a Jew so she can sell her books,' and that she 'sells her books at synagogues with rich Jews.'"  (*Id*. ¶ 67.)  Notwithstanding Garrett's complaint to administrators and the fact that similar complaints had previously been levied against Professor Soyer, Dean Rose eventually dropped the investigation into the remarks, citing a lack of evidence.  (*Id*. ¶ 67.)  Garrett also learned about another Jewish professor who received – and reported – an antisemitic email from a student which stated, "I believe that real Satan worshipers are better than [Jews], more moral."  (*Id*. ¶ 99 (alteration in original).)   To Garrett's knowledge, no disciplinary action was taken against the sender of the email.  (*Id.*)

In November 2023, CUNY denied Jewish students' request to display two Hanukkah menorahs at Hunter, "a cherished Jewish tradition on campus for more than a

decade"; just a few months later, however, CUNY permitted a different group of students and faculty to host a large Ramadan event on campus.  (*Id.* ¶¶ 76-78.)

The Complaint further alleges that, as the political unrest and antisemitism festered on campus, President Kirschner and Dean Rose declined Garrett's multiple requests to have security at her events.  (*Id*. ¶¶ 11-12, 79-81, 120.)  On the rare occasion CUNY agreed to provide security – such as for a Jewish event held at the same time as a large anti-Israel protest – it failed to do so.  (*Id*. ¶¶ 79-80, 145.)

**C.    The Fallout**

On October 31, 2023, New York State Governor Kathy Hochul appointed former Chief Justice of the New York Court of Appeals Jonathan Lippmann to investigate antisemitism at CUNY.  (*Id.* ¶ 83.)  On December 22, 2023, Garrett sent a confidential letter to Governor Hochul's office outlining her concerns about CUNY's failure to address antisemitism.  (*Id*. ¶¶ 84, 93.)  At some point, CUNY received a copy of Garrett's letter to Governor Hochul, and on March 20, 2024, informed Garrett that CUNY would treat the letter as a formal complaint and investigate Garrett's allegations.  (*Id.* ¶¶ 93-94.)  The March 20, 2024 letter from CUNY stated, however, that "faculty members have the right 'to determine which causes they support'" and that Garrett's complaints about those members were "'based on a perceived lack of support for positions and initiatives you value.'"  (*Id*. ¶ 96.)  The letter also stated that "[t]o date," CUNY had neither "received reports from Hunter College Jewish faculty, requesting heightened public safety measures," nor had CUNY received "reports of acts of violence or harassment towards any member of our community while on campus, as it relates to this issue."  (*Id.* ¶ 97.) Those statements were false, inasmuch as Garrett had previously sent emails to CUNY

administrators raising physical safety concerns and requesting additional safety measures – all of which were ignored.  (*Id.*)

On September 23, 2024, Judge Lippman published the report summarizing his investigation.  (*Id.* ¶ 85.)  Judge Lippman's "ultimate conclusion [was] that CUNY's current policies and procedures for preventing and addressing antisemitism and discrimination need to be significantly overhauled and updated in order to handle the levels of antisemitism and discrimination that exist on CUNY's campuses today."  (*Id.* ¶ 105.)  Despite those systemic failures, CUNY "has implemented no meaningful changes" – "[t]he administration continues to tolerate vitriolic protests and the dissemination of virulently antisemitic materials on campus and social media."  (*Id.* ¶ 110.)

As a result of the events alleged in the Complaint, Garrett suffered anxiety, emotional distress, and fear for her safety, all of which impacted her ability to teach and conduct research.  (*Id.* ¶¶ 16, 120, 125.)  On various occasions, Garrett felt compelled to cancel class, leave and limit her time on campus, avoid faculty senate meetings, host Jewish events remotely, and generally had her work disrupted by campus protests.  (*See, e.g.*, *id.* ¶¶ 8, 63, 98, 119.)  Garrett stopped wearing her Star of David jewelry and wore a "cap pulled low over her face" to avoid being recognized.  (*Id.* ¶ 14.)  She and some of her other Jewish colleagues even removed their names from their office doors and CUNY's online directories.  (*Id.*)  And, by abdicating their responsibilities and failing to sufficiently address Garrett's complaints, CUNY administrators "thwarted [Garrett]'s ability to combat antisemitism."  (*Id.* ¶ 121.)

Garrett asserts a hostile work environment claim under Title VII.[5]  She seeks, *inter alia*, injunctive relief, and compensatory and punitive damages in an amount to be determined at trial.  (*Id*. at pp. 55-56.)

## PROCEDURAL HISTORY

Garrett commenced the instant lawsuit on December 17, 2024.  (Dkt. 1.)  On March 10, 2025, CUNY moved to dismiss the Complaint, supported by a memorandum of law ("Def. Mem.").  (Dkts. 11, 12.)  The motion to dismiss was referred to me for a Report and Recommendation.  (Dkt. 15.)  Garrett filed an opposing brief ("Opp.") (Dkt. 22), and CUNY filed a reply ("Reply").  (Dkt. 31.)  On April 24, 2025, the Court held a case management conference which addressed, among other things, the merits of Defendant's motion to dismiss.  (*See* Dkt. 26 ("April 24, 2025 Hearing Transcript").)  Shortly thereafter, the United States Department of Justice filed a Statement of Interest pursuant to 28 U.S.C. § 517, "to address the application of Title VII … on college campuses."  (Dkt. 28 at 2.)  The Court also received the parties' letters regarding supplemental authority.[6]  (*See* Dkts. 32, 34,

---

[5] On September 17, 2025, Garrett voluntarily dismissed three state law claims included in her Complaint without prejudice to refiling them in state court.  (Dkt. 38.)  The only remaining claim in this action is the Title VII claim.

[6] On July 22, 2025, CUNY filed a letter notifying the Court of supplemental authority consisting of three recent case decisions.  (Dkt. 32.)  CUNY's letter did not include any substantive argument about the decisions.  On July 31, 2025, Garrett filed a letter purporting to respond to CUNY's notice of supplemental authority but instead providing legal argument about the significance or lack thereof of the three decisions.  (Dkt. 34.)  On August 6, 2025, CUNY filed a letter requesting that the Court decline to consider Garrett's response.  (Dkt. 36.)  The request is granted in part.  The Court will not ignore Garrett's letter, but it will not defer to it.  The Court has reviewed the supplemental authority provided by CUNY and made its own independent assessment of those cases and their significance, or lack thereof, to the instant dispute.

36.)  On September 16, 2025, the Court heard oral argument on the motion to dismiss. (*See* Dkt. 39 ("September 16, 2025 Hearing Transcript").)

## LEGAL STANDARDS

### A.    Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss a complaint for failure to state a claim upon which relief can be granted, a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007).  A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.*  (quoting *Twombly*, 550 U.S. at 557).  In considering a motion to dismiss for failure to state a cause of action, a district court "accept[s] all material facts alleged in the complaint as true and draw[s] all reasonable inferences in the plaintiff's favor."  *Lotes Co. v. Hon Hai Precision Industry Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (internal quotations omitted).  However, this tenet is "inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  "[R]ather, the complaint's factual allegations must be enough to raise a right to relief above the speculative level ... *i.e.*, enough to make the claim plausible."  *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal quotations and brackets omitted).  A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief."  *Twombly*, 550 U.S. at 558.

**B.    Hostile Work Environment Claims Under Title VII**

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Proscribed conduct includes subjecting employees to "harassment that, while not affecting economic benefits, creates a hostile or offensive working environment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 62-68, 106 S. Ct. 2399, 2403-2406 (1986); *see also Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993) (explaining that Title VII prohibits "requiring people to work in a discriminatorily hostile or abusive environment"); *Karibian v. Columbia University*, 14 F.3d 773, 777 (2d Cir. 1994) ("it is now established law that … harassment in the workplace violates Title VII").

To state a hostile work environment claim under Title VII in this circuit, "a plaintiff must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive – that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [protected characteristic]." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (internal quotations, citation, and ellipses omitted). To hold an employer liable under Title VII, the plaintiff must also allege "a specific basis for imputing the conduct creating the hostile work environment to [their] employer.'" *Summa v. Hofstra University*, 708 F.3d 115, 124 (2d Cir. 2013) (internal quotations and citation omitted).

**C.    Title VII And The First Amendment**

Anti-discrimination laws, including Title VII, do not operate in a vacuum. As courts and commentators have recognized, these laws may run up against the First Amendment

and its protection of free expression. *See*, *e.g.*, *Saxe v. State College Area School District*, 240 F.3d 200, 209 (3d Cir. 2001) ("anti-discrimination laws are [not necessarily] categorically immune from First Amendment challenge"); *DeAngelis v. El Paso Municipal Police Officers Association*, 51 F.3d 591, 596 (5th Cir. 1995) ("Where pure expression is involved, Title VII steers into the territory of the First Amendment"); Richard Fallon, *Sexual Harassment, Content Neutrality, And The First Amendment Dog That Didn't Bark*, 1994 SUP. CT. REV. 1, 17-19 (1994) (discussing "First Amendment Boundaries" on Title VII hostile environment claims); Rodney A. Smolla and Melville B. Nimmer, *Smolla & Nimmer on Freedom of Speech* § 13:17 (while Title VII and the First Amendment "are not on an apocalyptic collision course," there will be "difficult cases" requiring distinguishing between protected and unprotected speech) (hereinafter *Smolla*).

Speech that is discriminatory, offensive, or hateful often falls within the protective ambit of the First Amendment. *Matal v. Tam*, 582 U.S. 218, 246, 137 S. Ct. 1744, 1764 (2017) ("Speech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground is hateful; but the proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate'"); *Volokh v. James*, 148 F.4th 71, 88 (2d Cir. 2025) ("the Supreme Court has consistently held that expression motivated by bias, hatred, or bigotry falls within the First Amendment's protection"); *see also Texas v. Johnson*, 491 U.S. 397, 414, 109 S. Ct. 2533 (1989) (citing cases). Conversely, pure political speech – for which the First Amendment provides the most fulsome protection – may well be considered harassing. Eugene Volokh, *Freedom of Speech and Workplace Harassment*, 39 UCLA L. REV. 1791, 1804 (1992) ("core protected speech can indeed constitute harassment"); *see Snyder v.*

*Phelps*, 562 U.S. 443, 460-61, 131 S. Ct. 1207, 1220 (2011) (political speech can "inflict great pain" on the targeted listener).

An overly capacious construction of Title VII would force employers to censor political speech to avoid civil liability and run afoul of the First Amendment.  *See New York Times Co. v. Sullivan*, 376 U.S. 254, 277, 84 S. Ct. 710, 724 (1964) (warning "fear of damage awards … may be markedly more inhibiting [of free expression] than the fear of prosecution under a criminal statute"); *Gomez v. United States*, 490 U.S. 858, 864, 109 S. Ct. 2237, 2241 (1989) (courts must avoid interpreting federal statutes in ways that "engender[] constitutional issues if a reasonable alternative interpretation poses no constitutional question").  An unduly narrow construction would undermine Title VII's vital role in eradicating invidious workplace discrimination, a compelling government interest. *Saxe*, 240 F.3d at 209.

Harmonizing the interests protected by Title VII and the First Amendment is particularly precarious in the context of higher education.  Political disagreement and protest on college campuses foster student learning, advance academic scholarship, and shape public opinion.  *See Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819, 836, 115 S. Ct. 2510, 2520, (1995) (warning against viewpoint discrimination at colleges and universities, "vital centers for the Nation's intellectual life"); *Healy v. James*, 408 U.S. 169, 180, 92 S. Ct. 2338, 2346 (1972) ("The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas'"); *Rodriguez v. Maricopa County Community College District*, 605 F.3d 703, 708-09 (9th Cir. 2010) (describing student protest as "the best tradition of higher learning" and noting "courts must defer to colleges' decisions to err on the side of academic freedom").  At the same time, Congress

13

extended Title VII protections to educational institutions, explicitly recognizing the importance of ensuring academics have an equal opportunity to advance their careers and research unencumbered by workplace discrimination.   *See University of Pennsylvania v. Equal Employment Opportunity Commission*, 493 U.S. 182, 190, 110 S. Ct. 577, 582 (1990).

In striking the right balance, courts have explained that a reasonable person – the objective measure of what conduct is severe or pervasive under *Harris* – will distinguish between speech on matters of public concern "directed to the community at large through generally accepted methods of communication," and speech that constitutes "targeted, personal harassment aimed at a particular" individual or individuals.   *Gartenberg v. Cooper Union*, 765 F. Supp.3d 245, 265 (S.D.N.Y. 2025) ("*Gartenberg I*"), *reconsideration denied*, No. 24-CV-2669, 2025 WL 602945 (S.D.N.Y. Feb. 25, 2025) ("*Gartenberg II*"); *accord Landau v. Corporation of Haverford College*, No. 24-CV-2044, 2025 WL 1796473, at *3 (E.D. Pa. June 30, 2025) (a "reasonable person should understand that … public [political] speech" is not harassment); *see also* Volokh at 1871 (distinguishing between offensive speech directed at particular individuals in a targeted manner and speech that is not so directed); *Smolla* § 13.17 ("The Court in *Harris* was speaking about speech that is severe, usually repeated many times, and sufficient to cause physical fear or humiliation. General comments on gender politics and race relations do not usually cause these reactions – at least they should not in the reasonable person who must learn to live with a degree of contrariness in social life").   The former – speech on matters of public concern directed to the community at large – is political speech to which civil liability does not attach.   *Gartenberg I*, 765 F. Supp.3d at 265; *Yelling v. St. Vincent's Health System*,

82 F.4th 1329, 1345 (11th Cir. 2023) (Brasher, J., concurring) ("the objective prong of our hostile-work-environment standard must be applied consistent with First Amendment principles").  Title VII reaches the latter – targeted personal harassment.  *Id.*  Put another way, the former would not be reasonably understood as actionable harassment, while the latter would be.

*Gartenberg*, a case similarly arising out of campus protests following October 7, 2023, is instructive.  The court began its analysis by filtering out allegations deemed to be non-actionable political speech.  *Gartenberg I*, 765 F. Supp.3d at 270-273.  Examples of such non-actionable expression included a sidewalk protest by pro-Palestinian students, a public letter from alumni supporting the Palestinian cause, pro-Palestinian student newspaper articles, an art installation advocating resistance to colonialism, a vigil to honor Palestinian martyrs, and flyers supporting the Palestinian cause distributed across campus.  *Gartenberg I*, 765 F. Supp.3d at 270-71; *Gartenberg II*, 2024 WL 602945, at *1.  On the plaintiffs' motion for reconsideration, the *Gartenberg* court confirmed that Title VII does not impose liability on the defendant for failing to censor these "instances of pure speech by pro-Palestinian members of Cooper Union's community that, as pleaded, were reasonably designed or intended to contribute to an ongoing debate regarding the Israeli-Palestinian conflict."  *Gartenberg II*, 2025 WL 602945, at *3.

Sufficient allegations of actionable harassment – including "physically threatening or humiliating conduct and repeated acts of antisemitic vandalism" – remained, however, leading the Court to conclude that the plaintiffs had plausibly pled a hostile environment claim.  *Gartenberg II*, 2025 WL 602945, at *4.   The court relied primarily on two incidents.  First, plaintiffs' complaint chronicled a harrowing event where a "mob of protestors forced

15

their way past campus security guards" and surrounded a campus library. *Gartenberg I*, 765 F. Supp.3d at 272. The mob banged on the library's doors and floor-to-ceiling glass windows "shouting 'let us in!'" and "directed [chants] at the visibly Jewish students [trapped] inside." *Id*. Second, the complaint alleged incidents of discriminatory vandalism on campus, including the tearing down of Israeli hostage posters and graffiti "written in a font commonly associated with *Mein Kampf*." *Id.* at 273-74. Not only did these allegations involve actionable harassment (as opposed to pure political speech), but, together, they plausibly demonstrated a severe or pervasive hostile environment. *Id.* at 273.

*Gartenberg* involved a hostile educational environment claim brought by a group of Jewish students against their college under Title VI. *Gartenberg I*, 765 F. Supp.3d at 270. Here, the parties – and the Court – agree that the same First Amendment analysis applies in the Title VII context. (Def. Mem. at 10; Opp. at 8-9 & n.7; *see also* Statement of Interest at n.3.) *See Kopmar v. Association of Legal Aid Attorneys*, No. 24-CV-5158, 2025 WL 1939048, at *6 (S.D.N.Y. July 15, 2025) (applying *Gartenberg* in Title VII case). Accordingly, both Garrett and CUNY adopt the dividing line articulated in *Gartenberg* between actionable "physically threatening or humiliating conduct and repeated acts of antisemitic vandalism," on the one hand, and, on the other, non-actionable "pure speech on matters of public concern" expressed through "generally accepted methods of communication" and "reasonably designed or intended to contribute to public debate."[7]

---

[7] In its reply brief, CUNY constricts the standard of what is actionable to that which is "physically threatening or violent" or "used in repeated acts of vandalism," eliding speech or conduct that is humiliating. (Reply at 6, 9.) Actionable harassment, however, often consists of targeted speech that is neither physically threatening nor an act of vandalism. *See, e.g., National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 120, 122 S. Ct. 2061, 2076 (2002) ("To support his hostile environment claim, [plaintiff] presented evidence from a number of other employees that managers made racial jokes, performed

16

*Gartenberg II*, 2025 WL 602945, at *3-4.  (Def. Mem. at 10-13; Opp. at 12-15; Reply at 1.)

## DISCUSSION

CUNY moves to dismiss Garrett's hostile work environment claim under Rule 12(b)(6), arguing that the alleged discriminatory conduct (1) constitutes non-actionable "political speech on the Israel-Palestine conflict"; (2) cannot be imputed to CUNY; and (3) was not "prompted by [Garrett's] membership in a protected class."  (Reply at 2; *see also* Def. Mem. at 5.)  CUNY contends that any remaining incidents of actionable harassment, even when taken together, are not sufficiently severe or pervasive to support a hostile work environment claim.  (Def. Mem. at 13.)

The following discussion proceeds in four parts.  First, the Court addresses the extent to which the conduct alleged in the Complaint is actionable under Title VII.  Second, the Court analyzes the extent to which any actionable conduct can be imputed to CUNY.  Third, the Court considers whether the actionable conduct that can be imputed to CUNY is sufficiently severe or pervasive to support a hostile work environment claim.  Finally, the Court addresses CUNY's argument that none of the alleged conduct was prompted by Garrett's religion.

### A.    Some, But Not All Alleged Incidents Are Actionable Harassment

A good deal of what Garrett complains about is speech that involves matters of public concern and falls outside the scope of Title VII.  In making this determination, the

---

racially derogatory acts, made negative comments regarding the capacity of blacks to be supervisors, and used various racial epithets"); *Desardouin v. City of Rochester*, 708 F.3d 102, 106 (2d Cir. 2013) ("Though not threatening, … repeated solicitation of sexual relations in a vulgar and humiliating manner suffice to warrant a trial" on hostile work environment claim).

17

Court need not circumscribe the heavily contested boundary between sincere political debate on the Israel-Palestine conflict and expressions of religious or ethnic hatred. That question is better left for others. The First Amendment's sweep is broad, and the application of Title VII can be resolved without opining on these issues.[8] *See Gartenberg I*, 765 F. Supp.3d at 271 ("Regardless of whether this expression is better characterized as righteous protest in support of a noble cause, as the vulgar celebration of terrorism and antisemitism, or as something in-between, it is not a proper basis on which to impose civil liability on Cooper Union"); *Newman v. Point Park University*, No. 20-CV-204, 2022 WL 969601, at *25 nn.16-17 (W.D. Pa. March 31, 2022) (noting First Amendment interests extend to both sides of the "highly contentious" debates surrounding Israel, antisemitism and its definition, and the Boycott, Divestment, and Sanctions movement).

### 1.    Campus Protests

The Complaint alleges "constant harassing [and antisemitic] protests" on Hunter's campus following October 7, 2023. (Compl. ¶ 63.) In general, "exposure to" peaceful protests on matters of public concern – regardless of their offensive content, disruptive nature, or technical "violat[ion of] … campus rules" – "without more, does not amount to harassment." *Landau*, 2025 WL 1796473, at *9 (observing "one goal of public protests is to stir strong feelings on the part of passersby"); *see Jones v. Parmley*, 465 F.3d 46, 58 (2d Cir. 2006) (noting the constitutional tradition of permitting "energetic, even raucous,

---

[8] The Court's analysis should not be understood as discrediting any emotional distress that Garrett has experienced as a Jewish person at CUNY. (*See, e.g.,* Compl. ¶¶ 16, 125.) Political speech can be ugly and painful but remain protected under the First Amendment and outside the scope of Title VII. *See Snyder*, 562 U.S. at 460-61 (the First Amendment sometimes immunizes "hurtful speech on public issues [from liability] to … [avoid stifling] public debate").

protest[s which] annoy or anger audiences, [and] … inconvenience pedestrians"); *Gartenberg I*, 765 F. Supp.3d at 270 (finding not actionable a "walkout" and protest where demonstrators, many with their faces covered, chanted controversial anti-Israel slogans). This includes the "anti-Israel protest[s]" in the Faculty Senate and unspecified protests in other unauthorized campus locales. (*See* Compl. ¶¶ 9, 64.) The Faculty Senate protests, for example, were reasonably directed toward public debate, especially considering the Faculty Senate is CUNY's principal governance body and, thus, an "obvious center for protest." *Adderley v. State of Florida*, 385 U.S. 39, 49, 87 S. Ct. 242, 248 (1966) (Douglas, J., dissenting).

As the court in *Gartenberg* observed, however, even once-peaceful protests may deteriorate into actionable harassment when, for example, protestors begin targeting individuals with "threatening or humiliating conduct." *Gartenberg I*, 765 F. Supp.3d at 272-73. The Court will now consider whether any of the CUNY protests did so.

First, accepting all allegations as pled and drawing all reasonable inferences in Garrett's favor, the anti-Hillel protest plausibly crossed the line into targeted harassment. President Kirschner described the protest as "reach[ing] a new level of aggression by targeting Hillel" and "personal[ly] targeting Jewish students." (Compl. ¶ 89.) Many students – as well as Garrett – felt "compelled" to leave campus. (*Id.* ¶ 88.) While protestors are free to criticize Hillel, or any campus organization for that matter, with strong and even offensive language, antidiscrimination law does not permit an employer to stand idly by when, as here, protestors "isolated or targeted individual[s]" in the protected class. *Landau*, 2025 WL 1796473, at *9. To be sure, discovery may show the protest did not involve threatening or humiliating targeted conduct. But given President

Kirschner's own description of the event as "personal[l]y targeting" Jewish students and reaching a "new level of aggression" that compelled students and Garrett to leave campus, the Court concludes that Garrett has, at this early stage, plausibly pled actionable harassment from the Hillel protest.[9]

Garrett's effort to liken CUNY's "Day of Rage" protest to the *Gartenberg* library incident, on the other hand, is unavailing. (*See* Opp. at 18.) Though the protest's title and CUNY's response (suspending campus activity) demonstrate the protest's "inflammatory and potentially dangerous nature," the Complaint is devoid of allegations regarding what, if any, actionable discriminatory conduct ensued at the protest. (Compl. ¶ 91.) Contrary to Garrett's suggestion, Title VII cannot be interpreted as requiring CUNY to preemptively "shut[] down" a lawful protest based on its professed viewpoint. (Compl. ¶ 92.) *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 112 S. Ct. 2538, 2542 (1992) ("The First Amendment generally prevents government from proscribing speech or even expressive conduct because of disapproval of the ideas expressed") (internal citations omitted); *Street v. New York*, 394 U.S. 576, 592, 89 S. Ct. 1354, 1366 (1969) ("It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers"); *University of Maryland Students for Justice in Palestine v. Board of Regents of the University System of Maryland*, No. 24-CV-2683, 2024 WL 4361863, at *10 (D. Md. Oct. 1, 2024) (public

---

[9] Generally, a plaintiff cannot transform political speech into actionable harassment by alleging, in a conclusory fashion, that the protected expression was targeted or otherwise actionable. *See Gartenberg,* 765 F. Supp.3d at 271 ("conclusory suggestion that [certain] speech included [actionable] 'threats of violence' ... does not plausibly allege that any of this expressive conduct constituted" harassment); *Iqbal*, 556 U.S. at 678. Here, however, the Complaint relies on Hunter President Kirschner's own account of the event.

university's viewpoint-based decision to revoke pro-Palestinian group's permission to hold a peaceful demonstration on October 7, 2024, was likely unconstitutional "even if [the university] … did anticipate on-campus turbulence").

The Complaint also seeks to impose liability on CUNY for specific conduct which occurred at unspecified campus protests.

First, Garrett alleges a student was "physically assaulted, as his pro-Israel sign was forcibly taken from him" at one protest.  (Compl. ¶ 63.)  This allegation is actionable because the "First Amendment does not protect violence."  *NAACP v. Claiborne Hardware Co*., 458 U.S. 886, 916, 102 S. Ct. 3409, 3427 (1982).

Second, the Complaint describes protestors wielding signs with threatening and violent imagery, including "blood dripping from the Star of David and other Jewish symbols."  (Compl. ¶ 63.)  The signs – like almost any message distilled to the size of a protest placard – may have several meanings, intended or not.  The Star of David with blood dripping, for example, may express the notion that Israel, whose flag includes the symbol, has proverbial "blood on its hands."  Alternatively, blood dripping from a Star of David could be "construed as a genuine threat targeting" Jews, including Garrett, who identify with the symbol.[10]  *Landau*, 2025 WL 1796473, at *4.

---

[10] At oral argument, counsel for Garrett suggested the signs may amount to incitement and thus "fall outside the First Amendment rubric altogether."  (September 16, 2025 Hearing Transcript at 20:01-20:06.)  Not only is this argument – being "raised for the first time at oral argument" – waived, but it also has no merit.  *Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp.3d 335, 369 (S.D.N.Y. 2022) (internal quotations and citation omitted) (subsequent history omitted).  The First Amendment incitement doctrine is narrow, encompassing only speech which "is directed to inciting or producing imminent lawless action and is likely to" do so.  *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S. Ct. 1827, 1829 (1969) (distinguishing incitement from "mere advocacy" of illegal conduct, including violence against racial minorities); *see Million Youth March, Inc. v. Safir*, 63 F. Supp.2d 381, 391 (S.D.N.Y. 1999) ("messages of hate and [calls for violence] conveyed

At the same time, the mere display of signs at a public protest is a "generally accepted method of communication," suggesting it cannot constitute harassment. *Gartenberg I*, 765 F. Supp.3d at 265; *see also R.A.V.*, 505 U.S. at 432 & n.4 (distinguishing between "cross burning … directed … to a single African-American family trapped in their home …, a crude form of physical intimidation" and "[b]urning a cross at a political rally [which] would almost certainly be protected expression") (Stevens, J., concurring).  In her opposition, Garrett notes that *Gartenberg* found actionable certain "[s]igns denigrating Jews in Israel."  (Opp. at 13.)  The actionable signs in *Gartenberg*, however, "defac[ed] the windows of a main [Cooper Union] building" and were thus an example of the "extremely serious" graffiti and vandalism which covered the school's campus.  *Gartenberg I*, 765 F. Supp.3d at 274.  When demonstrators "displayed some of the same signs" at a peaceful protest "on the sidewalk outside the [same Cooper Union building]," *Id.* at 255, the *Gartenberg* court held that the protest was ***not*** actionable harassment.  *Gartenberg II*, 2025 WL 602945, at *1.  The same principle applies here.

Both CUNY, and the Government in its Statement of Interest, observe that CUNY could, consistent with the First Amendment, prohibit substantially disruptive speech on campus, possibly by enforcing CUNY's public order policies.  (*See* Reply at 8; Dkt. 28 at

---

by several of the speakers at last year's rally" unlikely to amount to incitement, regardless if the rally did, hours later, descend into disorder); *DoorDash, Inc. v. City of New York*, No. 21-CV-10347, 2025 WL 1827699, at *10 (S.D.N.Y. June 30, 2025) (describing the categories of unprotected speech, including incitement, as "well-defined and narrowly limited") (internal quotations and citation omitted).  The Complaint, which fails to elaborate on the context in which the signs were displayed, includes no suggestion that the signs meet the *Brandenburg* standard.  *See Hess v. Indiana*, 414 U.S. 105, 108-09, 94 S. Ct. 326, 329 (1973) ("since there was no evidence or rational inference from the import of the [challenged] language, that his words were intended to produce, and likely to produce, imminent disorder, those words could not be punished" as incitement).

9 (citing *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S. Ct. 733 (1969)).) That observation, even if correct,[11] is beside the point; there is a distinction "between what … [an] employer ***can*** do to [to suppress certain speech] and what the government can ***force*** the employer to do." *Volokh* at 1817 (emphasis added); *see also Gartenberg II*, 2025 WL 602945, at *3 ("the fact that schools have ways of addressing harassment … does not mean that such expression is unlawful harassment in the first place"). Certainly, there are instances where a university – acting as an employer under Title VII – may have a responsibility to enforce its policies and act on disruptive speech because of its hostile or abusive nature; that does not mean, however, that the speech is harassing or shorn of First Amendment protection merely because it is disruptive or violates a university policy.[12]

---

[11] *See Radwan v. Manuel*, 55 F.4th 101, 117 (2d Cir. 2022) (noting *Tinker* may have limited application in higher education); *Students for Justice in Palestine v. Abbott*, 756 F. Supp.3d 410, 424-26 (W.D. Tex. 2024) (recognizing *Tinker* ***may*** permit universities to curtail speech which would create a "substantial disruption in a university environment," but noting the speech restrictions cannot be unnecessarily viewpoint-based).

[12] University policies – such as time, place, or manner restrictions on protest – may be probative of whether a means of communication is "generally accepted," and thus what a reasonable person would understand as harassment. An employer's policy alone, however, does not define the boundaries of Title VII.

Here, with the exception of the demonstrations addressed above (*see, e.g.,* Compl. ¶¶ 64 (alleging protestors violated Faculty Senate rules), 88 (alleging Hillel protest at campus entrance violated school's Public Order Policy), Garrett's description of protests at Hunter that violated campus policy regarding demonstrations are conclusory and undifferentiated. (*See e.g.*, Compl. ¶ 8 ("Regularly, Plaintiff faced an onslaught of antisemitic protests conducted in blatant defiance of CUNY Hunter's policies governing demonstrations").) The Court cannot extrapolate or reasonably infer from these generalized allegations that every, or any specific, demonstration among the "constant harassing protests" was conducted in a non-generally accepted manner and constituted harassment. (Compl. ¶ 63.) *See Gartenberg I*, 765 F. Supp.3d at 271 (declining to find actionable harassment where general allegations included "no factual support for its assertion that any of [the protest] messages were intended to target particular Jewish students, as opposed to efforts to communicate a political message to the Cooper Union

2.    *Israelism* **And The History Club**

The screening of a film and a student group's decision to read "works of known antisemitic writers" are not actionable. (Compl. ¶¶ 70-75.) These episodes involve the expression of viewpoints through conventional forms of academic and political discourse. *See Gartenberg I*, 765 F. Supp.3d at 275 (requiring students to attend a speech criticizing Israel's "weaponization of language" is "unquestionably a protected exercise of [the university's] academic freedom").

Garrett's allegations concerning the treatment of the rabbi at the *Israelism* screening require closer scrutiny. The rabbi was invited to campus as a "pro-Israel speaker … [to] participate in [the film's] post-screening discussion." (Compl. ¶ 73.) In other words, the rabbi was invited to participate in a debate on a matter of public concern. A professor's demand that the rabbi answer a question that he professed he could not answer, and the crowd's disagreement, even if rudely expressed, are reasonably understood as contributing to that debate. *See Rodriguez*, 605 F.3d at 710 ("doubt[ing] … college professor's expression on a matter of public concern, directed to the college community, could ever constitute unlawful harassment and justify the judicial intervention"). Disagreement on an issue of public concern in an academic setting – even if emphatically expressed – is not actionable harassment. *See id.*; *Landau*, 2025 WL 1796473, at *3 ("Even if offensive and received by some as antisemitic, the lecture was

community at large"); *Washington v. Garage Management Corp.*, No. 11-CV-3420, 2012 WL 4336163, at *16 (S.D.N.Y. Sept. 20, 2012) (dismissing Title VII claim premised on conclusory allegations of "'constant' harassment" which failed to specify "how [or when plaintiff] was [actually] harassed"); *see generally Monastra v. NYNEX Corp.*, No. 99-CV-8917, 2000 WL 1290596, at *7 (S.D.N.Y. Sept. 12, 2000) (Court cannot "extrapolate a set of reasonable inferences in favor of plaintiff without sufficient factual allegations from which to draw these inferences").

pure speech criticizing Israel directed at the general public" and outside the scope of federal antidiscrimination law).

However, the Complaint also alleges that a student grabbed a microphone from the rabbi's hand, and that the rabbi was "led away ... for his safety with security by his side" as the "crowd ... hurl[ed] abuse at him" following the panel. (Compl. ¶¶ 74-75 (describing the incident as a "mob attack"); *see also* Opp. at 1 (describing the rabbi being "accosted" by students).)   Making all reasonable inferences in Garrett's favor, the rabbi's treatment at CUNY went beyond political disagreement.   The use of physical force by a student to take the microphone from the rabbi and the need for security to escort the rabbi from the auditorium for his safety is suggestive of actionable harassment.  *Cf. Gartenberg I*, 765 F. Supp.3d at 272 (finding "mob" attack on library actionable where there was "compelling support for [plaintiffs'] allegation that this incident was threatening or humiliating," including that some Jewish students were escorted away from the scene by security).

### 3.    Flyers, Open Letters, Mass Emails, And Social Media Posts

The dissemination of flyers, open letters, mass emails, and social media posts on matters of public concern that were not targeted at any particular individual qualify as core political speech outside the scope of Title VII.    *See McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 347, 115 S. Ct. 1511, 1519 (1995) ("handing out leaflets in the advocacy of a politically controversial viewpoint[ ]is the essence of First Amendment expression" and "core political speech"); *Rodriguez*, 605 F.3d at 710 (finding "racially-charged emails" sent to college distribution list were non-actionable speech and "the effective equivalent of standing on a soap box in a campus quadrangle and speaking to all within earshot; not conduct targeted by harassment laws"); *Landau*, 2025 WL 1796473,

at *4 ("Peaceful distribution of political materials [on a college campus] is a standard method of political expression directed at the public"); *see also Kopmar*, 2025 WL 1939048, at *6 ("Resolution [criticizing Israel with intense and provocative rhetoric] constitutes pure political speech" outside the scope of Title VII).

The following thus do not constitute actionable harassment even though the content may be antisemitic and hateful: social media posts by student organizations which, *inter alia*, purported to "debunk[] mass rape by Hamas on October 7th" and called on followers to "escalate by any means necessary"; an open letter "praising the … Hamas terror attack"; unspecified "antisemitic stickers" found on campus; and, flyers which supported the Boycott, Divestment and Sanctions movement and claimed "Israel is a state built to put Jews over all others."  (Compl. ¶¶ 53-59.)  *See Gartenberg*, 765 F. Supp.3d at 271 (allegations about protest slogans, flyers, and other expressions related to the ongoing Israeli-Palestinian conflict were not actionable because the complaint "offers no factual support for its assertion that any of these messages were intended to target particular Jewish students, as opposed to efforts to communicate a political message to the [university] community at large"); *Landau*, 2025 WL 1796473, at *4 (finding not actionable communications calling for the "dismantling of the apartheid settler colonial state of Israel, by all means necessary").

### 4.    Individualized Harassment

The Complaint plausibly alleges three episodes in which individual Jewish professors, including Garrett, and students at CUNY were subject to targeted antisemitic commentary:  the Lecturer's in-class question singling out a Jewish student about how she felt "about 'the genocide in Gaza'" (Compl. ¶ 69); Professor Soyer's remark questioning Garrett's faith and mentioning "rich Jews" to two colleagues (Compl. ¶ 67);

and a student's email to a Jewish professor comparing Jews to "Satan worshipers" (Compl. ¶ 99).  Each of these incidents falls within the zone of targeted speech that may be deemed harassment rather than protected political speech.[13]  *See, e.g.*, *Novio v. New York Academy of Art*, 286 F. Supp.3d 566, 577 (S.D.N.Y. 2017) (offensive "comments in class directed at [student]"); *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (co-worker "singl[ing] out" and making antisemitic comments to Jewish colleague); *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (colleague's discriminatory comments "relayed to [plaintiff]"); *Doe v. City of New York*, 583 F. Supp.2d 444, 450 (S.D.N.Y. 2008) ("discriminatory comments … through email").

The student group's email making a "false and defamatory" claim that Garrett "potentially disseminated decontextualized clips of students … to deliberately portray [them] as antisemites" is similarly actionable.  (Compl. ¶ 98.)  CUNY correctly points out that the email was directed to the community at large through a generally accepted method of communication and was not physically threatening.  (Reply at 6.)  However, other aspects of the communication suggest targeted harassment.  First, the email specifically mentions Garrett and, given the wide distribution, could well be humiliating.  That alone, however, would likely be insufficient:  the First Amendment provides speakers with latitude to criticize others, particularly authority figures, in the context of a genuine public debate.  *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52, 108 S. Ct. 876, 880 (1988) ("political debate encouraged by the First Amendment is bound to produce

---

[13] A professor's discussion and questioning of students about controversial subjects, including asking what they think about genocide and what they may consider genocide, may well be perfectly appropriate and protected academic fodder.  Here, however, the Complaint insinuates that the Lecturer singled out a Jewish student in an accusatory manner.

speech that is critical of … public figures").  Garrett's allegations, however, go one critical step further.  Although couched in terms of what "potentially" happened, the student group's statement about Garrett was allegedly "false and defamatory," thus diminishing the constitutional protection it might otherwise receive and exacerbating its humiliating effect.[14]  *See Landau*, 2025 WL 1796473, at *11 ("outlandish claim that [student-plaintiff's statement] … was a contributing factor to the tragic shooting of a Palestinian Haverford student" made in widely-circulated document was actionable under Title VI); *Jew v. University of Iowa*, 749 F. Supp. 946, 961 (S.D. Iowa 1990) ("Free speech and academic freedom considerations might preclude Title VII liability if the … rumors [that a professor was having a sexual affair with her department head] were true"); *see generally Hustler Magazine*, 485 U.S. at 52 ("False statements of fact are particularly valueless" to public debate and may, in certain circumstance, give rise to civil liability).

Put another way, circulating false accusations about an employee that implicate a protected characteristic can be actionable harassment.  *See, e.g., Noviello v. City of Boston*, 398 F.3d 76, 93 (1st Cir. 2005) ("the case law recognizes that false accusations of misconduct can contribute to the creation of a hostile work environment"); *Richardson v. Buckheit*, No. 19-CV-8505, 2020 WL 5802291, at *10 (S.D.N.Y. Sept. 29, 2020) (addressing whether supervisor's "two false accusations" regarding Black employees committing theft and other actions created a hostile work environment under Title VII);

---

[14] The Complaint fails to specify exactly how the student group's caveated accusation was "false and defamatory."  (Compl. ¶ 98.)  For instance, did Garrett not disseminate clips of students?  Did she disseminate clips without the necessary context?  Or, perhaps discovery will show that the statement was not false at all.  Still, for purposes of the instant motion, the Court must accept the allegations contained in the Complaint as true and make all reasonable inferences in Garrett's favor.

*Obergantschnig v. Saw Creek Estates Community Association, Inc.*, No. 12-CV-5911, 2013 WL 5676328, at *6 (E.D. Pa. Oct. 18, 2013) ("The spreading of false rumors about a woman's sexual affairs, which impugn the integrity of her job performance, may also be the basis of a [Title VII] hostile work environment claim"), *aff'd*, 573 F. App'x 213 (3d Cir. 2014); *Dube v. Hadco Corp.*, No. 87-SD-554, 1999 WL 1210885, at *5 (D.N.H. Feb. 4, 1999) ("Most decisions examining the issue have indicated that rumors can create a hostile work environment").

The same conclusion does not extend, however, to the photographs of Garrett published by the student group on social media. The Complaint fails to describe the nature of or context surrounding the photographs. (*See* Compl. ¶ 98 (alleging only that "[t]he group also published photographs of Plaintiff on social media").) Were the photographs posted in connection with commentary? If so, what was the content of that commentary? How was Garrett depicted in the photographs? Were the photographs altered in any way? Without that context, the Court lacks a basis to reasonably infer the social media post or posts were targeted harassment, an expression on matter of public concern, or something else altogether. Such vague pleading does not suffice. *See Twombly*, 550 U.S. at 555-56.

5.    **Swastika Graffiti, Event Security, And Menorah Lighting**

CUNY does not contest that the swastikas graffitied on posters commemorating Jewish hostages in Gaza are actionable under Title VII. (Def. Mem. at 14.) *See, e.g., T.E. v. Pine Bush Center School District*, 58 F. Supp.3d 332, 357 (S.D.N.Y. 2014) ("anti-Semitic graffiti, including swastikas, … so ubiquitous" on school campus supports antidiscrimination claim); *Smith-Crockett v. CT Technical High School*, No. 3:18-CV-1640, 2019 WL 13293209, at *5 (D. Conn. Sept. 24, 2019) (teacher plausibly alleged

hostile work environment claim premised, in part, on swastikas "left regularly on another teacher's desk").  Similarly, CUNY does not contest the actionability of its refusal to provide security at Garrett's events or to permit the school's Jewish community to light menorahs on campus.  (Def. Mem. at 14.)

In sum, the following incidents, as alleged, are actionable in the sense that they are within the reach of Title VII and not merely political speech protected by the First Amendment:  the Hillel protest; assault of a pro-Israel counter-protestor; mistreatment of the rabbi; three incidents of antisemitic comments directed to Jewish individuals, one of whom is Garrett; the false and defamatory email; swastika graffiti; denial of or failure to provide event security; and, denial of permission for the menorah lighting.

The next section considers whether any of those actionable incidents can be imputed to CUNY.[15]

### B.    Some Actionable Allegations Can Be Imputed To CUNY

To survive a Rule 12(b)(6) motion to dismiss her Title VII claim, Garrett must sufficiently plead a specific basis for imputing the conduct creating the hostile work environment to her employer.  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002); *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 153 (2d Cir. 2014) ("It is the plaintiff's burden to

---

[15] Although the Court finds some of the incidents and conduct, as alleged by Garrett, do not qualify as actionable harassment or, as discussed below, imputable to CUNY, that does not mean they disappear from the case.  First, those events, particularly depending on CUNY's response or lack of response to them, may still be probative of discriminatory intent.  *See Gartenberg I*, 765 F. Supp.3d at 267; *see generally Wisconsin v. Mitchell*, 508 U.S. 476, 489, 113 S. Ct. 2194, 2201 (1993) ("The First Amendment … does not prohibit the evidentiary use of speech … to prove motive or intent").  Second, discovery or amended pleading may provide information that would transform a non-actionable or non-imputable event into one that is actionable and imputable.

establish that the discriminatory conduct may be imputed to the employer"). The requisite showing depends on whether the harasser is a supervisor. *Vance v. Ball State University*, 570 U.S. 421, 424, 133 S. Ct. 2434, 2439 (2013). The Supreme Court has interpreted the term "supervisor" narrowly to include only employees who are "empowered by the employer to take tangible employment actions against the victim." *Id.* Tangible employment actions are those which result in "a significant change in employment status, such as hiring, firing, failing to promote, [or] reassignment with significantly different responsibilities." *Id.* at 429 (internal quotations and citation omitted).

Employers are presumptively liable for the actions of a supervisor. *Id.* at 424; *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 103 (2d Cir. 2010) ("When … the alleged harasser is in a supervisory position over the plaintiff, the objectionable conduct is automatically imputed to the employer" subject to affirmative defenses). Where the harasser is not a supervisor but rather a co-worker or non-employee, a negligence standard applies. *See Summa*, 708 F.3d at 124. That is, the non-supervisor's conduct may be imputed to the employer where "the employer's own negligence permits or facilitates [the] discrimination." *Menaker v. Hofstra University*, 935 F.3d 20, 39 (2d Cir. 2019) (internal quotations and citations omitted). To show negligence, a plaintiff "must demonstrate that the employer failed to provide a reasonable avenue for complaint or that it knew [or should have known] about the harassment yet failed to take appropriate remedial action." *Summa*, 708 F.3d at 124 (internal quotations and citation omitted). In assessing whether an employer took appropriate remedial action, courts "look to whether the response was immediate or timely and appropriate in light of the circumstances." *Id.* at 124 (internal quotations and citation omitted). In cases involving the discriminatory

31

conduct of a non-employee, a plaintiff must additionally show that "the employer exercises a high degree of control over the behavior of the [third party]." *Menaker*, 935 F.3d at 39.

Of the actionable incidents alleged, only those related to event security and the menorah lighting are attributable to supervisors, President Kirschner and Dean Rose, respectively.[16] (*See* Compl. ¶¶ 76, 79.) Those allegations thus are imputable to CUNY. The remaining allegations – the Hillel protest, assault of a pro-Israel counter-protestor, mistreatment of the rabbi, three incidents of individualized harassment of Jews on campus, false and defamatory email, and swastika graffiti – involve the conduct of Garrett's co-workers, CUNY students, and third parties, and thus are governed by the negligence standard. *See Menaker*, 935 F.3d at 39.

Garrett's allegations regarding the Lecturer, Professor Soyer, the antisemitic email to a Jewish professor, and the Hillel protest are imputable to CUNY, because the University's response to Garrett's complaints regarding these incidents was plausibly negligent. *Summa*, 708 F.3d at 124. Specifically, the Complaint alleges administrators promised to investigate all these claims but failed to take any action against the individuals responsible while providing minimal explanation for their failure to do so. (Compl. ¶¶ 67, 69, 88, 99.) *See Vance*, 570 U.S. at 449 ("fail[ure] to respond to complaints" is indicative of a deficient response). Underscoring this conclusion are the multiple allegations recounting systemic deficiencies in CUNY's process for investigating and addressing

---

[16] The Complaint does not describe who at CUNY had the authority to take tangible employment actions against Garrett. *See Vance*, 570 U.S. at 429. The Court, however, finds it reasonable at this stage to infer that President Kirschner and, though a closer question, Dean Rose, are supervisors for the purpose of Title VII. (*See* Compl. ¶ 74 (suggesting President Kirschner and Dean Rose are two of Hunter's "most senior administrators").)

complaints of discrimination. (*See, e.g.,* Compl. ¶¶ 83-85, 101-03, 105-111.) Additionally, CUNY plausibly exercised sufficient control over the non-employee student who sent the antisemitic email and the students at the Hillel protest. *See Summa*, 708 F.3d at 124 (finding it "apparent that the University … had high degree of control over the behavior of its student football players"); *Halkitis v. New York City Department of Education*, No. 19-CV-11753, 2022 WL 392911, at *4 (S.D.N.Y. Feb. 9, 2022) (applying the negligence standard where "teacher … alleged harassment by … students") (citing cases).

The student group's false and defamatory email and the mistreatment of the rabbi are imputable for substantially the same reasons. The CUNY student group is, at least plausibly, just that: a group of CUNY students over which CUNY exercises control. *See Summa*, 708 F.3d at 124. And, while it is certainly debatable what an appropriate or reasonable response to the defamatory email would have been, the Complaint alleges "no action was taken to protect Plaintiff[]" after she reported the email, forcing her to cancel her class out of fear for her safety. (Compl. ¶ 98.) Similarly, the Complaint alleges CUNY's "most senior administrators … were in attendance [at the *Israelism* panel yet] did nothing to stop the most heinous treatment of [the rabbi by CUNY students]." (Compl. ¶ 75.)

The swastikas graffitied on campus by an unknown vandal pose a slightly more difficult question. CUNY did take remedial action. According to the Complaint, however, approximately five hours elapsed between the time the swastikas were reported and when they were covered by school officials. (Compl. ¶ 60.) Garrett alleges that administrators were initially unresponsive to her request, suggesting they dragged their

feet during the five-hour period.  (*Id.* ¶ 60; *see also* April 24, 2025 Hearing Transcript at 13.)  CUNY also took no steps to identify the perpetrator "[a]s far as Garrett is aware." (Compl. ¶ 60.)  CUNY, however, explained that they had to "follow proper protocols and wait for the NYPD to arrive and assess the situation."  (*Id.* ¶ 96.)  The Complaint neither credits nor challenges CUNY's explanation.[17]  (*Id.*)

The Complaint does not provide a basis to impute the anonymously-drawn swastikas to CUNY.  First, even having made all reasonable inferences in Garrett's favor, CUNY met its "remedial obligation" by "end[ing] the harassment" within hours of learning of it.[18]  *Summa*, 708 F.3d at 125 (that school employee "took action at once – completed within just days … – speaks to the appropriateness of the University's response"); *see Davis v. Monsanto Chemical Co.*, 858 F.2d 345, 349-50 (6th Cir. 1988) ("[Employer] took quick and appropriate measures … [when the racially derogatory] graffiti was painted over the next day"); *Davis v. New York Department of Corrections*, 256 F. Supp.3d 343, 353 (S.D.N.Y. 2017) (finding that employer acted reasonably in painting over graffiti "within 24 hours," and stating, "[i]n the context of racist graffiti, when graffiti is reported to the employer and the employer promptly removes the offending language, the employer has taken appropriate remedial action") (internal quotations and citation omitted) (citing

---

[17] Hunter's "Graffiti Protocol" states:  "If the graffiti is possibly a hate crime because it uses racial slurs, derogatory remarks about an individual or group's identity, or a hate symbol, that graffiti or sticker, is reported to NYPD in accordance with their procedures which includes having them come to campus and awaiting their direction."  *Graffiti Protocol*, CUNY    HUNTER,    https://hunter.cuny.edu/public-safety/policies/graffiti-protocol/ [https://perma.cc/P9KV-LAFY] (last visited Oct. 9, 2025).

[18] Though Garrett fails to plausibly allege that CUNY's response to the swastika graffiti was negligent for purposes of imputation under Title VII, evidence that CUNY resisted or delayed acting on the swastikas may be relevant to demonstrating discriminatory intent.

cases); *Williams v. County of Nassau*, No. 15-CV-7098, 2019 WL 2270518, at *7 (E.D.N.Y. May 28, 2019) (employer acted reasonably in, *inter alia*, removing racist etchings "within 2-3 hours [of] Plaintiff's report" and after taking photographs), *aff'd*, 806 F. App'x 75 (2d Cir. 2020); *Borom v. United Scaffolding, Inc*., No. 07-CV-3833, 2009 WL 1856058, at *7 (S.D. Tex. June 29, 2009) (employer took appropriate action in painting over offensive graffiti "within five hours of [plaintiff's] initial complaint" even though employer did not conduct a subsequent investigation to identify the perpetrator); *see generally Leroy v. Delta Air Lines*, No. 21-267, 2022 WL 12144507, at *4 (2d Cir. Oct. 27, 2022) (summary order) (affirming dismissal under *Menaker* at pleading stage); *Ball v. Marriott International, Inc.*, 627 F. Supp.3d 296, 321 ("A response may be reasonable even if an employer could have taken more drastic action"); *cf. Gartenberg I*, 765 F. Supp.3d at 277 (noting some of the graffiti was "left up for over a week despite complaints").

Second, the Complaint does not suggest CUNY negligently permitted or facilitated the drawing of the swastikas, especially considering the vandalism was an isolated incident of which CUNY had no warning.  *Ball*, 627 F. Supp.3d at 319.  Nor does the Complaint provide a basis to infer CUNY exercised a "high degree of control" over the behavior of the unidentified miscreant.[19]  *Menaker*, 935 F.3d at 39; *see Troeger v. JetBlue*

---

[19] Garrett notes that *Gartenberg* permitted a Title VI claim premised, at least in part, on conduct by trespassers on Cooper Union's campus.  (*See* Opp. at 24-25.)  However, because Title VI requires a showing of deliberate indifference to hold a school liable, *Gartenberg* did not apply the *Menaker* imputation test.  *See* 765 F. Supp.3d at 270.  And, unlike here, the complaint in *Gartenberg* described how the third parties may, notwithstanding their trespasser status, have been subject to the control of Cooper Union.  *See, e.g., id.* at 255 (describing how campus security and administrators contemporaneously knew of, but failed to stop, the trespassers during the library incident).

*Airways Corp.*, No. 23-CV-10859, 2024 WL 5146185, at *9 n.4 (S.D.N.Y. Dec. 17, 2024) (finding, on motion to dismiss, allegations are not actionable because plaintiff failed to "allege that [defendants] exercised control, let alone a 'high degree' of it, over [harassing third parties]"); *Heuser v. City of Glen Cove*, No. 21-CV-2018, 2023 WL 11852409, at *9 (E.D.N.Y. June 30, 2023) (similar), *R&R adopted*, 2025 WL 373636 (E.D.N.Y. Feb. 3, 2025); *Caro v. LJB Facilities Management, LLC*, No. 23-CV-3513, 2024 WL 5508201, at *6 (S.D.N.Y. Nov. 4, 2024) (dismissing at pleading stage Complaint "devoid of any facts to plausibly infer that Plaintiff's employer … exercised a high degree of control over the behavior of the [harasser] or that [the employer] was negligent or facilitating the [harasser's] behavior towards Plaintiff"), *R&R adopted*, 2025 WL 1419516 (S.D.N.Y. May 16, 2025).

The Complaint similarly provides no detail regarding the perpetrator or circumstance of the alleged assault of a pro-Israel counter-protestor. The Complaint summarily states, "[a]t least one student was physically assaulted, as his pro-Israel sign was forcibly taken from him." (Compl. ¶ 63.) Nothing in this allegation, alone or in context, provides a "specific basis for imputing" the assault to CUNY; the Complaint does not

---

At oral argument, plaintiff's counsel suggested that discovery could reveal that a student or faculty member was responsible for the graffiti. (September 16, 2025 Hearing Transcript at 34:05-35:06.) Perhaps so. But counsel's speculation – unsupported by any allegation in the Complaint – does not satisfy the *Twombly-Iqbal* standard and does not provide a "specific basis" for imputing the underlying conduct to CUNY. *Summa*, 708 F.3d at 124; *see also*; *Greenman-Perdesen, Inc. v. Berryman & Henigar, Inc.*, No. 09-CV-167, 2009 WL 2523887, at *7 (S.D.N.Y. Aug. 18, 2009) (argument "based on conclusory, speculative allegations which are not contained in the complaint … are not sufficient to defeat a motion to dismiss").

plausibly allege that CUNY personnel were aware of – or should've been aware of – that particular incident.[20]  *See Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir. 1998).

Thus, the allegations that, as pled, are both actionable harassment and imputable to CUNY are the following:  the Hillel protest, mistreatment of the rabbi, CUNY's refusal and failure to provide security at Garrett's events; CUNY's denial of students' request to host menorah lightings on campus; the Lecturer's comment to a Jewish student; Professor Soyer's remarks regarding Garrett; a student's email to a Jewish faculty member; and the student group's false and defamatory email about Garrett.

## C.    The Remaining Allegations Plausibly Establish A Severe Or Pervasive Hostile Work Environment

For "harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment."  *Meritor Savings Bank*, 477 U.S. at 67.  To determine if discriminatory conduct rises to the level of "severe or pervasive," courts consider the totality of the circumstances.  *Patane*, 508 F.3d at 113.  The most relevant factors in the analysis include the conduct's frequency, severity, threatening and humiliating nature, and "whether it unreasonably interferes with an employee's work performance."  *Harris*, 510 U.S. at 23.  "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'"  *Alfano*, 294 F.3d at 374 (citation omitted).  However, there is no magic

---

[20] Garrett's conclusory recital that CUNY "knew or should have known about all incidents of antisemitism described [in the Complaint]" is not a plausible, much less specific, basis for imputing knowledge of the alleged assault to the University.  (Compl. ¶ 125.)  *See Iqbal*, 556 U.S. at 678; *Duff v. Pristine Services, Inc.,* No. 19-CV-10423, 2021 WL 663981, at *8 (S.D.N.Y. Feb. 19, 2021) (dismissing Title VII hostile work environment claim where plaintiff plead "no facts to support [the] conclusory statement" that his employer was "aware of should have been aware" of particular harassment which he never reported).

"number of incidents that a plaintiff must endure in order to establish a hostile work environment." *Id.* at 379. Indeed, a single "extraordinarily severe" incident is sufficient to create a claim. *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010).

Relevant discriminatory conduct may also include incidents the plaintiff did not witness or that targeted others. *See Schwapp*, 118 F.3d at 111 (witnessing or learning "second-hand of a [discriminatory] comment or joke by a fellow employee or supervisor also can impact the work environment"); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (Sotomayor, J.) ("a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim"). Still, a plaintiff must establish some nexus between the discriminatory conduct and their subjective experience in the workplace. *See Leibovitz v. New York City Transit Authority*, 252 F.3d 179, 190 (2d Cir. 2001) (defendant entitled to directed verdict on Title VII hostile work environment claim where plaintiff was not "a target of the alleged harassment, was not present when the harassment supposedly occurred, and did not even know of the harassment while it was ongoing"); *Barney v. H.E.L.P. Homeless Services Corp.*, No. 19-CV-5959, 2021 WL 4267629, at *13 (S.D.N.Y. Sept. 20, 2021) (plaintiff "must [at least] demonstrate that he had some awareness that these [harassing] comments were being made at the time" to rely on them in a hostile environment claim).

Here, some of the remaining incidents of actionable harassment are only marginally probative of a severe or pervasive hostile environment, at least when each is viewed in isolation. The Lecturer's comment, the mistreatment of the rabbi, the Hillel protest, and the student's email to a Jewish professor were not personally experienced

by Garrett. *See Leibovitz*, 252 F.3d at 190 ("harassing conduct directed at someone other than plaintiff, while relevant, does not have the same impact"); *Woodard v. TWC Media Solutions, Inc.*, No. 09-CV-3000, 2011 WL 70386, at *12 (S.D.N.Y. Jan. 4, 2011) ("where Plaintiff was not the direct recipient of harassing or threatening comments, they are far less persuasive"), *aff'd sub nom. Lawless v. TWC Media Solutions, Inc.*, 487 F. App'x 613 (2d Cir. 2012) (summary order).

CUNY's refusal to permit a menorah lighting on campus, while plausibly discriminatory considering the administrators' differential treatment of a large Ramadan event, does not evince the sort of individualized "intimidation, ridicule, and insult" commonly associated with Title VII claims. *Papelino v. Albany College of Pharmacy of Union University*, 633 F.3d 81, 89 (2d Cir. 2011); *see also Thior v. JetBlue Airways, Inc.*, No. 13-CV-6211, 2016 WL 5092567, at *4 (E.D.N.Y. Sept. 19, 2016) ("Hostile work environment claims tend to involve personal attacks and harassing comments").

Professor Soyer's remark to two other professors – the only actionable allegation specifically targeting Garrett with antisemitic language – was experienced second-hand. *See Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 71 (2d Cir. 2000) ("second-hand comments are of less probative value than comments perceived by a plaintiff directly"); *Tavares v. Sam's Club*, 178 F. Supp.2d 96, 102 (D. Conn. 2001) (dismissing case where "Plaintiff has not alleged that any … derogatory statements were ever made to her or in her presence"); *Gerzhgorin v. Selfhelp Community Services, Inc.*, No. 18-CV-4344, 2022 WL 912523, at *5 (E.D.N.Y. Mar. 29, 2022) (similar), *aff'd,* No. 22-808, 2023 WL 2469824 (2d Cir. Mar. 13, 2023) (summary order).

CUNY's repeated denial of Garrett's requests for security and the false and defamatory email are more severe, especially considering they plausibly "interfere[d] with [Garrett's] work performance."  *Harris*, 510 U.S. at 23.  (*See* Compl. ¶¶ 11, 81, 92 (the denial of security "forced [Garrett] to [cancel class and] transition her programming to Zoom … which undermined the in-person connection and community-building [her] events were intended to achieve"); *id.* ¶ 98 (noting Garrett cancelled class after the defamatory email was circulated).)  Worse yet are the allegations that CUNY assured Garrett that security would be provided at certain events but failed to provide it, leaving Garrett – and her guests – unexpectedly exposed to "potentially dangerous" protests. (Compl. ¶¶ 79-81, 91, 145.)

Even the less severe antisemitic incidents take on greater gravity when considered together and in the context of events following October 7, 2023.  *See Deters v. Lafuente*, 368 F.3d 185, 189 (2d Cir. 2004) ("[Second Circuit] precedent allows a combination of seemingly minor incidents to form the basis of [hostile working environment] once they reach a critical mass") (internal quotations and citation omitted).  The Second Circuit "has repeatedly cautioned against setting the [severe or pervasive] bar too high."  *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003).  Having plausibly plead discriminatory incidents of varying severity over the course of approximately one year, Garrett is entitled to proceed past the pleading stage.  *See Gartenberg I*, 765 F. Supp.3d at 273 (describing the mild "verbal taunting that courts in this District have deemed sufficient to state a plausible claim for a hostile environment"); *Harding v. Dorilton Capital Advisors LLC*, 635 F. Supp.3d 286, 301 (S.D.N.Y. 2022) ("determining whether conduct is severe or pervasive … is generally inappropriate … at the pleadings stage"); *Fiss v. California*

*College of the Arts*, No. 24-CV-3415, 2025 WL 91181 (N.D. Cal. Jan. 14, 2025) (declining to dismiss a complaint alleging fewer incidents of antisemitic conduct).[21]

Specifically, Garrett's hostile work environment claim is plausibly premised on CUNY's rejection of the menorah lighting; Professor Soyer's remark about Garrett and "rich Jews"; the Lecturer's singling out of a Jewish student; the email to a Jewish professor commenting that "Satan worshippers are better than Jews"; the email falsely accusing Garrett of circulating "decontextualized clips of students;" students' mistreatment of the rabbi at the *Israelism* screening; the aggressive and targeted Hillel protest; and CUNY's repeated failure to provide security for Garrett's events.  Making all reasonable inferences in Garrett's favor, this case – like many of the cases relied on by CUNY – ought to proceed to discovery.  (*See* Opp. at 18 & n.12.)

**D.    CUNY's No-Nexus Argument Is Without Merit**

CUNY asserts that the alleged conduct – actionable or otherwise – was not "prompted by plaintiff's religion" and "instead rooted in the conflict between Israel and Hamas."  (Def. Mem. at 6-8.)  That argument is unconvincing, as CUNY's own cases demonstrate.

The final element of a Title VII hostile workplace claim requires the plaintiff to allege that the environment was hostile because of her protected characteristic.  *Patane*, 508 F.3d at 114.  *Krasner v. HSH Nordbank AG* – a case on which CUNY relies – is an

_____

[21] In determining if the alleged conduct created a severe or pervasive hostile work environment, the *Fiss* court relied on, *inter alia*, multiple allegations which likely constitute non-actionable speech, including social media content "showing pro-Palestinian march and a sign reading 'DECOLONIZATION IS NOT A DINNER PARTY.'"  *Fiss*, 2025 WL 91181, at *1.  The parties in *Fiss* did not brief – and the court did not address – the extent to which the First Amendment informs the reach of Title VII.  Thus, the Court cites *Fiss* only for its "severe or pervasive" analysis.

instructive example of a Title VII claim dismissed by the court because the alleged harassment was not "because of" the plaintiff's protected characteristic. 680 F. Supp.2d 502 (S.D.N.Y. 2010). There, a male plaintiff, Krasner, alleged that the workplace environment demeaned women and that his superior's affair with a junior co-worker resulted in preferential treatment for the co-worker. The court ruled, however, that Krasner, as a male, could not establish a hostile work environment claim based on conduct discriminatory to women. *Id.* at 514. As the court explained, Krasner did "not contend that he was disparaged or badly treated or subjected to an unpleasant work atmosphere in any way because he is a man." *Id.* And, "[e]ven if Krasner's disapproval of [his superior's] affair was the true animus behind the harassment, it was a motivation that did not rely upon Krasner's gender and, as such, it is not within the ambit of Title VII's protections." *Id.* at 518 (citing *Ellert v. University of Texas*, 52 F.3d 543, 546 (5th Cir.1995) (internal brackets and quotation marks omitted).

*Leizerovici v. HASC Center, Inc.*, another case cited by CUNY, makes the same point. In *Leizerovici*, the plaintiff brought a hostile work environment claim based on remarks about "the length of his hair" and "his girlfriend's and his brother's girlfriend's status in a protected class." No. 17-CV-5774, 2018 WL 1115348, at *5 (E.D.N.Y. Feb. 27, 2018). The court determined that plaintiff's long hair and other people's protected characteristics were not protected characteristics of plaintiff and thus could not support a Title VII claim. *Id.*

*Brown v. Henderson*, the final case on which CUNY relies in making this argument, is similarly inapposite. There, a plaintiff repeatedly testified that her mistreatment in the workplace was the outgrowth of a "bitterly contested ... union election." 257 F.3d 246,

249 (2d Cir. 2001).  The Second Circuit ruled that, given the "hostility toward [the plaintiff] was grounded in workplace dynamics unrelated to her sex and that … [no harassment] reflect[ed] an attack on [plaintiff **as a woman**," there can be no Title VII violation.  *Id.* at 256.  Notably, the *Brown* court acknowledged that harassment which is discriminatory on its face (e.g., the use of racial slurs) may "suffice[] to support the inference that there was a [discriminatory] character to the course of conduct," satisfying the final element of a Title VII claim.  *Id*.

Garrett's allegations bear little resemblance to the facts of *Krasner*, *Leizerovici*, or *Brown*.  The Complaint clearly, repeatedly, and plausibly alleges that the challenged conduct was hostile and discriminatory to Garrett (and other Jews) because of her religion, and "reflected … attack[s] on [Garrett] **as a [Jew]**."  *Id.*  (*See, e.g.,* Compl. ¶¶ 2 (alleging CUNY "has allowed antisemitism to fester, subjecting Plaintiff to relentless hostility and unequal treatment because of her Jewish identity"), 11-15, 104.)  *See also Gartenberg I,* 765 F. Supp.3d at 269-270 (finding similar alleged conduct was, at least plausibly, "particularly offensive to Jews and intended to provoke their reaction as Jews") (internal quotations, citation, and brackets omitted).  For example, CUNY's refusal to permit a menorah lighting on campus, "a cherished Jewish tradition," while permitting a Ramadan event, as well as its failure to provide security for Garrett's events on Jewish culture, would be uniquely offensive and plausibly discriminatory to Garrett and other Jews at CUNY who hoped to celebrate their religion and heritage.  (*See* Compl. ¶¶ 12, 76.)  And, obviously, antisemitic remarks directed at or regarding Garrett and other Jewish faculty members, and swastikas graffitied across campus created an environment that was hostile "because of" Garrett's protected characteristic.  *Patane*, 508 F.3d at 113.

43

(*See, e.g.,* Compl. ¶¶ 60 (swastikas), 67 (Soyer remarks), 98 (defamatory email), 99 (student email).)  Put simply, this is not a case like those cited by CUNY.  Rather, as alleged, Garrett's distressing experience and treatment in her workplace was because of her religion.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss should be DENIED.  To the extent not discussed herein, the Court has considered all of the parties' arguments and determined them to be either moot or without merit.

## PROCEDURES FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation.  Any party shall have fourteen (14) days to file a written response to the other party's objections.  Any such objections and responses shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Vernon S. Broderick, United States Courthouse, 500 Pearl Street, New York, New York 10007, and to the Chambers of the undersigned, at United States Courthouse, 500 Pearl Street, New York, New York 10007.  Any request for an extension of time for filing objections must be addressed to Judge Broderick.  **Failure to file timely objections will result in a waiver of the right to object and will preclude appellate review.**

RESPECTFULLY SUBMITTED,

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:  October 10, 2025
        New York, New York

Copies transmitted this date to all parties.