P9GAGarO

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   LEAH GARRETT,

 4                 Plaintiff,

 5          v.                          24 Civ. 9710 (VSB)(RWL)

 6   CITY UNIVERSITY OF NEW YORK,
                                        Oral Argument
 7
                 Defendant.
 8
     ------------------------------x
 9                                      New York, N.Y.
                                        September 16, 2025
10                                      9:33 a.m.

11   Before:

12                    HON. ROBERT W. LEHRBURGER,

13                                      U.S. Magistrate Judge

14                          APPEARANCES

15   ALSTON & BIRD LLP.
          Attorneys for Plaintiff
16   BY:  ALAN MENDELSOHN
          MICHAEL HEFTER
17        SETH COHEN

18   THE LAWFARE PROJECT
          Attorneys for Plaintiff
19   BY:  ZIPORAH REICH

20   NYS OFFICE OF THE ATTORNEY GENERAL
          Attorneys for Defendant
21   BY:  SHAINA SCHWARTZ
          ALISSA WRIGHT

22

23

24

25
```

P9GAGarO

```
 1              (Case called)

 2              THE DEPUTY CLERK:  Attorneys, please state your name

 3    for the record.  Starting with plaintiff.

 4              MR. HEFTER:  Good morning, your Honor.

 5              Michael Hefter from Alston & Bird on behalf of the

 6    plaintiff, Leah Garrett.

 7              THE COURT:  Good morning.

 8              MR. HEFTER:  Good morning.

 9              MR. MENDELSOHN:  Your Honor, Alan Mendelsohn from

10    Alston & Bird on behalf of the plaintiff.

11              THE COURT:  All right.  Good morning.

12              MS. SCHWARTZ:  Good morning, your Honor.

13              Shaina Schwartz with the Office of the Attorney

14    General for the defendant CUNY.

15              MS. WRIGHT:  Good morning.

16              Alissa Wright from the Attorney General's Office for

17    CUNY.

18              THE COURT:  Good morning, all.

19              Just a logistical issue, I believe my deputy asked you

20    to use the podium because we have wires under the desk that, if

21    they get kicked, create interference.  However, I'm going to be

22    asking some questions that may have sort of quick back and

23    forth between the two parties on a particular issue I want to

24    focus on.  It's fine with me if you stay at the desk and talk

25    from there, unless you feel more comfortable at the podium.
```

P9GAGarO

1    And if the wires do become a problem, then we'll default to the

2    podium.

3            All right.  So, first off, I have read everything very

4    closely, and obviously it presents very important issues that

5    some courts have addressed within the past year or so, but it's

6    still sort of young ground, I would say, in terms of the

7    confluence between the First Amendment and Title VII or Title

8    VI harassment claims, so we've got some work to do in terms of

9    figuring that out.

10           But before we get into the substance, I do have a

11   question for the plaintiff regarding the state law claims.  I

12   think you had indicated that those would be voluntarily

13   dismissed, but I don't see that that's happened at this point.

14   Can you tell me what the status is, please.

15           MR. HEFTER:  Your Honor, I believe that we are

16   intending to voluntarily dismiss those claims.  I don't believe

17   that we have done so yet, but that would be our intention.

18           THE COURT:  And when will that happen?

19           MR. HEFTER:  We can do that fairly quickly, your

20   Honor.

21           THE COURT:  Okay.  All right.  Because I am going to

22   assume then in the opinion that I need not address those.

23           Is that correct?

24           MR. HEFTER:  That's correct, your Honor.

25           THE COURT:  All right.  So let's talk about protests a

P9GAGarO

1    little bit.  And my approach to this is I'm going to talk about

2    types of incidents to begin with, and there are particular

3    things I do want to focus on.  Try to keep focus on that.  If

4    there are things that you want to say that you haven't had the

5    chance to say after we've gone through my list, I will open the

6    door and you can tell me whatever you want to tell me.  But I

7    want to try to keep on track for some of this.

8         So as I think both parties acknowledge, *Gartenberg* set

9    out a framework for determining what may qualify as actionable

10   harassment under Title VI/Title VII, and that which essentially

11   is protected by the First Amendment.

12        Now, I want to comment on the framework and I'll want

13   your input on this, too.  Some of the way I talk about it will

14   be in terms of being protected by the First Amendment.  As I

15   understand it from *Gartenberg* and others -- and I think again

16   the parties have acknowledged, the way the case is harmonized,

17   the First Amendment and harassment are hostile environment

18   claims -- is to say that a reasonable person would not perceive

19   certain speech or conduct as aimed at them, but rather aimed at

20   the public addressing general issues of concern, and,

21   therefore, would distinguish that from actionable harassment.

22        If you disagree with any of that, let me know when you

23   answer my question.  But my question really is, and I'm going

24   to start with CUNY on this, if the protest, let's say some of

25   these protests that occurred, what if they had specifically

P9GAGarO

1    called out Professor Garrett?  In other words, they were still

2    the same messages about antisemitism or commenting about Israel

3    and Palestine, but those signs, for instance, specifically

4    referenced Professor Garrett.  Would you agree that that could

5    turn then into actionable harassment?

6          MS. SCHWARTZ:  Thank you, your Honor.

7          First, I would like to make clear that there are no

8    such allegations in the complaint that any of the protests were

9    directed at the plaintiff in the way that your Honor's

10    hypothetical is.

11          THE COURT:  I agree.

12          MS. SCHWARTZ:  Okay.  And, second, we would not agree

13    that that would cross the line into actionable discriminatory

14    harassment in the way that *Gartenberg* lays out.  Because in

15    *Gartenberg*, the conduct that crossed the line into

16    discriminatory harassment was directed at a specific group of

17    students and it was physically threatening to the students who

18    had barricaded themselves in the library.  And it was not --

19    part of the *Gartenberg* test is that it's delivered in a

20    generally accepted method of communication.  And that is where

21    the *Gartenberg* -- the conduct in *Gartenberg* crossed the line,

22    specifically, with respect to the incident in the library was

23    that banging on floor to ceiling windows, shouting at a

24    specific group of students, physically at them, not just

25    generally about them during a peaceful protest but physically

P9GAGarO

1    screaming at them while they were sort of separated by -- they

2    were in their line of vision, they were banging on the glass.

3    The students felt physically threatened and had to lock their

4    doors and hide behind desks I think.

5         THE COURT:  I understand.

6         But are you saying then that protests that may address

7    these issues of public concern, but specifically called out a

8    particular person, could not ever cross the line into harassing

9    conduct that would be actionable?

10        MS. SCHWARTZ:  I'm not saying it could never cross the

11   line, your Honor.

12        THE COURT:  Okay.

13        MS. SCHWARTZ:  I think we would need to know more

14   about the specific facts of the hypothetical, specifically

15   whether it was physically threatening.  And a little bit more

16   about the --

17        THE COURT:  You say physically threatening, but didn't

18   *Gartenberg* also say that its threatening or humiliating?

19        MS. SCHWARTZ:  Yes, *Gartenberg* does say that, your

20   Honor.  And I suppose, in theory, if we knew more about the --

21   if we knew more about the facts of the hypothetical that

22   indicated it was humiliating to that specific person, I think

23   there would be a chance.  But I think on the limited -- so

24   we're not saying it could never cross the line.  But I think on

25   the limited set of facts of just a poster saying something, I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P9GAGarO

1    would say that no, under *Gartenberg* is still -- it would also

2    have to be -- this is important -- a message intended to

3    further a matter of public concern.  So it would somehow have

4    to be something that calls out a specific person, but in a way

5    that is intended to further a matter of public concern.

6            THE COURT:  And I recognize that there are contexts

7    where targeting a specific professor could be an issue of

8    public concern.  Maybe that professor did something or said

9    something that the others or students want to comment upon.  So

10   there could be reason to call out a professor.  But given

11   *Gartenberg*'s focus on targeting, and there really is the

12   distinction between targeting an individual versus sort of the

13   audience writ large, I was concerned about where we draw the

14   line.

15           And where I'm going is Hillel, the Hillel protest.

16           MS. SCHWARTZ:  Sure.

17           THE COURT:  So the Hillel protest is focused on

18   Hillel.  Hillel, at least -- I'm sorry, the Jewish population,

19   at least according to the numbers that the parties have

20   provided, at CUNY is something like roughly 10 percent.  I

21   think it was 9 percent for undergraduate and 16 percent for

22   graduates, something like that.

23           So targeting Hillel is already targeting a

24   subpopulation of students.  Let's say 10 percent.  That's a

25   couple thousand, I guess, if we're talking about CUNY Hunter.

P9GAGarO

1    But maybe I have the numbers wrong.

2              And then Hillel is a subset of that.  Not every Jewish

3    person participates in Hillel.  So I'm trying to figure out

4    where we get to the point of what targeting crosses the line.

5    Is it one people?  Is it two people?  Is it a group of people?

6    How do we distinguish that?

7              MS. SCHWARTZ:  Your Honor, I think a couple of

8    important things about what your Honor just asked, and I think

9    the most important, for purposes of this case, is that that

10   particular protest, what you're talking about, where they were

11   speaking about Hillel, that's not about the plaintiff.

12   Plaintiff is -- does not allege that she's a member of Hillel.

13   She is, I'm not sure -- she doesn't allege that she was at that

14   protest.  That's not targeting the plaintiff.  That was talking

15   about Hillel and the actions of the organization.

16             Now, that is a completely different set of facts than

17   your Honor's hypothetical where a protest we're talking about

18   plaintiff, which is not the fact of the allegation here.  So

19   that is a very important distinction to draw and to remember

20   that that's not an allegation about targeting plaintiff.

21             And with respect to the remainder of the question,

22   it's still, pursuant to *Gartenberg* would need to be a matter --

23   or intended to further a matter of public interest and directed

24   to the community at large, which that particular protest was.

25   It was intended to further the conversation about the conflict

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P9GAGarO

1  between Israel and Palestine, and it was directed to the

2  community at large via a reasonable -- a reasonably accepted

3  method of communication, which is peaceful protests standing

4  outside --

5      THE COURT:  And that is one way to think about it.

6  But what about what President Kirschner said when he described

7  the anti-Hillel protest as reaching "a new level of aggression"

8  and "personally targeting" jews.

9      Is that an admission that the protest was not somehow

10  insulated by the First Amendment, but rather was a targeting of

11  a very specific group in a personal way, to use Kirschner's

12  words.

13      MS. SCHWARTZ:  I don't think President Kirschner's

14  statement should be taken as an admission that, pursuant to the

15  framework in *Gartenberg*, this should be non-actionable as

16  discriminatory harassment.

17      And, again, specifically because it really has nothing

18  to do with the plaintiff in this case.  It was talking about

19  Hillel.  Not plaintiff.

20      THE COURT:  Well, are you saying then that in the

21  workplace statements about -- that are, let's say, racially

22  charged and discriminatory that aren't aimed at any particular

23  person, aren't actionable?

24      MS. SCHWARTZ:  The case law indicates that statements

25  that are racially charged but not directed at the specific

P9GAGarO

<table>
<tr><td>1</td><td>plaintiff can be considered in a hostile work environment</td></tr>
<tr><td>2</td><td>claim.  However, they are not as -- they are not as -- what's</td></tr>
<tr><td>3</td><td>the word I'm looking for?</td></tr>
<tr><td>4</td><td>          They are not to be considered as heavily as statements</td></tr>
<tr><td>5</td><td>that are directed towards the specific plaintiff.</td></tr>
<tr><td>6</td><td>          THE COURT:  Okay.  But if they're considered in part,</td></tr>
<tr><td>7</td><td>or perhaps not as strong as other things, then wouldn't a</td></tr>
<tr><td>8</td><td>protest like the Hillel protest be of that nature?</td></tr>
<tr><td>9</td><td>          MS. SCHWARTZ:  There would still need to be some</td></tr>
<tr><td>10</td><td>conduct directed at the plaintiff, specifically in order to get</td></tr>
<tr><td>11</td><td>past -- in order to have an actionable claim.  And then other</td></tr>
<tr><td>12</td><td>conduct can be considered for the purposes of -- it can be</td></tr>
<tr><td>13</td><td>considered generally, but you still need a main piece of -- or</td></tr>
<tr><td>14</td><td>several main pieces of conduct or one specific piece of conduct</td></tr>
<tr><td>15</td><td>that is sufficiently severe or pervasive to carry over the line</td></tr>
<tr><td>16</td><td>that was specifically directed at the plaintiff.</td></tr>
<tr><td>17</td><td>          THE COURT:  I'm still having trouble with that last</td></tr>
<tr><td>18</td><td>part.  I'm not saying I disagree with you necessarily, but I've</td></tr>
<tr><td>19</td><td>been troubled by envisioning a workplace that's hypothetical</td></tr>
<tr><td>20</td><td>where -- and I don't know what the number of workers would be.</td></tr>
<tr><td>21</td><td>But there are some group that is standing during a break every</td></tr>
<tr><td>22</td><td>day in the work space, chanting racial epithets, not at any</td></tr>
<tr><td>23</td><td>particular person, just in general.</td></tr>
<tr><td>24</td><td>          How does that not create a hostile work environment?</td></tr>
<tr><td>25</td><td>Particularly if it's occurring, let's say, every day.</td></tr>
</table>

P9GAGarO

```
 1            MS. SCHWARTZ:  That is, your Honor, a separate

 2   question from the Gartenberg question, because we couldn't

 3   contend that racial epithets in that specific example that you

 4   just gave, I don't think are intended to further a

 5   conversation --

 6            THE COURT:  But what about antisymmetric epithets in

 7   that context?

 8            MS. SCHWARTZ:  Still, it doesn't sound like those are

 9   intended to further --

10            THE COURT:  I see.

11            MS. SCHWARTZ:  -- a conversation about -- right, the

12   question of whether something is not actionable as

13   discriminatory harassment comes first.  And you have to

14   determine which conduct is actionable as discriminatory

15   harassment and then it can -- and then you take the remaining

16   conduct, almost like a funnel.

17            You take the remaining conduct and evaluate it under

18   the regular framework for a hostile work environment, severe

19   and pervasive, you know, prompted by plaintiff's membership in

20   a protected category, and imputable to the employer.  So first

21   is whether it's actionable as discriminatory harassment or its

22   protected speech.  And then the remainder of the conduct goes

23   if there is any -- the remainder of the conduct goes through

24   the hostile work environment framework.

25            THE COURT:  All right.  Thank you.
```

P9GAGarO

1              Let me ask if plaintiff wants to respond to anything

2    he's heard so far.

3              MR. HEFTER:  I do, your Honor.

4              So I think your Honor started out with an observation,

5    a good one, your Honor -- again, Michael Hefter for the record

6    from Alston & Bird -- about the interplay between the First

7    Amendment and Title VII.

8              And I think Judge Cronan put it extremely well in

9    *Gartenberg* where he said how do we deal with the collision, I

10   think he used that express word "collision" between the First

11   Amendment and the case law under Title VI or Title VII.

12             And I think that's a great place to start.  I'm going

13   to key off your hypothetical, your Honor.  And that is -- and

14   I'll be blunt about it.  You have a workplace.  It's factory.

15   And in the water cooler station, there is a poster that's put

16   up of the Ku Klux Klan, and it says bring back the Ku Klux

17   Klan.  And the employer has African American employees.  I

18   don't think under the case law that that particular poster gets

19   protection from the First Amendment.  And that in and of itself

20   can create a hostile work environment.

21             THE COURT:  Right.  But that might be a situation

22   where the defendant has said, and might agree -- I'm not saying

23   they would, but might agree -- that that speech would not be

24   reasonably seen as contributing to public debate.  And,

25   therefore, actionable.

P9GAGarO

1              MR. HEFTER:  That's a fair point, Judge.  But that's

2       no different than the swastika on the poster outside on campus

3       on CUNY Hunter.

4              THE COURT:  No, I'm not talking about the swastika

5       right now.  I'm talking about just protests.

6              MR. HEFTER:  Okay.  So let's take the Hillel

7       situation.  And your Honor had a hypothetical, and I believe

8       counsel in response to the hypothetical said -- and your

9       hypothetical was what if Professor Garrett's name was on a

10      placard.

11             THE COURT:  Not just name, but, again, targeted in

12      some way in connection with all these other messages.

13             MR. HEFTER:  Right.  Again, what we saw in CUNY

14      Hunter's briefing was, the best way I would describe it, is

15      triangulation of each particular item that we alleged in the

16      complaint, as opposed to looking totality of the circumstances.

17             THE COURT:  But didn't Judge Cronan look at each

18      incident in isolation?

19             MR. HEFTER:  He looked at everything in isolation, but

20      he also looked at the totality of the circumstances.

21             THE COURT:  Well, didn't he really just -- he filtered

22      out what was, in his view, pure speech and not actionable.  And

23      then took what remained and looked at it as to whether it was

24      severe or pervasive.

25             Do I have that wrong?

P9GAGarO

1          MR. HEFTER:  No, you have that right, your Honor.

2          THE COURT:  Okay.

3          MR. HEFTER:  But in terms of looking at a harassment

4     claim, the Supreme Court says you need to look at the totality

5     of the circumstances, and you can't look at every single item

6     in isolation.  That said, in terms of an analysis of what

7     happened here, there may be things that, under the *Gartenberg*

8     and Judge Cronan's precedent, would be considered pure speech.

9     We disagree with that, Judge.  But under the *Gartenberg*

10    analysis, and then he parsed out around four different things,

11    and I believe counsel mischaracterized the case as only

12    focusing on the banging on the library.

13          THE COURT:  No, they focused on that, but I think they

14    would agree that there was at least another incident or two.

15          MR. HEFTER:  There were multiple incidents, including

16    the -- however you call it, the German graffiti in the

17    bathroom.  And he looked at all those circumstances.

18          But going back to your question about protests, the

19    *Gartenberg* decision lays it out very well.  In fact, he says,

20    and that's Judge Cronan, he says "speech on a matter of public

21    concern, directed to the college community, will generally fail

22    to constitute unlawful harassment."  Citing the *Rodriguez* case.

23          But then he goes on to say, and I apologize "this

24    approach is consistent with the objective standard that courts

25    use to assess the hostility element of federal harassment

P9GAGarO

claims.  A reasonable person should understand that speech on

matters of public concern directed to the community at large,

through generally accepted methods of communication, is very

different than targeted personal harassment aimed at a

particular person."

So you can have in the protest situation, harassment

targeted at a particular person, or you can have a situation

where the protesters are not using generally accepted methods

of communication.  And both of those situations are satisfied

in our case based on what we have alleged.

THE COURT:  How do we decide what's a generally

accepted method of communication?

MR. HEFTER:  Well, Judge Cronan also wrote on that.

Which is a good question, your Honor.  And I would add in,

responding to your hypothetical, I believe counsel said we

would need to know a little bit more about the facts.  And

we're here on a motion to dismiss, your Honor.  Discovery is

not complete.  And that's a really, really key point because a

lot of these well-pled allegations that we have made, we

believe satisfy *Iqbal*, *Twombly*, and the Rule 12(b)(6) standard

clearly.  But we're not here on summary judgment, and we're not

here on a directed verdict, and we're not here on trial.

THE COURT:  But, so, again, in *Gartenberg*, Judge

Cronan, filtered out certain incidents that he said were not

actionable.  And, essentially, as I read it, as dismissing

P9GAGarO

1    those incidents from the complaint.  At least in terms of what

2    is actionable.  It might be relevant to intent or other things,

3    I don't know.  But at least in terms of being actionable, he

4    didn't seem to think that there were facts that would develop

5    that would somehow change that.

6          No?  Yes?

7          MR. HEFTER:  That's my reading of *Gartenberg*, too,

8    Judge.

9          THE COURT:  Okay.

10          MR. HEFTER:  But I would like to get back to your

11    question about how do we determine what is generally accepted

12    methods of communication.

13          And so, you know, Judge Cronan actually, in the next

14    paragraph, says:  By the same token, a reasonable person should

15    perceive offensive political speech communicated through

16    generally accepted means.

17          And then in parenthetical he said:  During a debate in

18    the breakroom or in a flyer pinned to a bulletin board,

19    differently to offensive messages conveyed in a matter that

20    does not conform to reasonable social expectations, for

21    instance, by vandalizing a hallway.

22          And I would point your Honor to, in our complaint, we

23    cited any number of different policies that CUNY Hunter have,

24    which were violated in many of the various protests that were

25    conducted on campus during the events after October 7th.

P9GAGarO

1          So what is a generally accepted means?  Perhaps, your

2     Honor, that needs to be decided by a jury.

3          THE COURT:  Okay.  CUNY, let's come back to that,

4     because that is a question I would like your thoughts on.  Why

5     isn't the question of whether it's reasonably acceptable means

6     or generally acceptable means a question for a jury?

7          And, you know, *Gartenberg* and some other cases talk

8     about pure political speech.  Got to be careful there.  Pure

9     speech is just that.  Speech.  There are usually, and almost

10    always is, conduct that goes along with speech.  And the

11    Supreme Court says you can't necessarily distinguish the two.

12         So I look at it, there's a spectrum here.  You could

13    just have a person articulating something in their normal

14    voice, and just as a passer-by, people pass by, fine.  Then you

15    could go to the level of a group or chanting.  You can have

16    them have signs.  You can have them making certain formations.

17    You could have them operating at certain decibel levels.  You

18    could do all sorts of things that are conduct, that presumably

19    at some point could cross the line into actionability.  And,

20    again, those seems like questions of fact.

21         What do you think?

22         MS. SCHWARTZ:  Well, your Honor, as you mentioned

23    earlier, the Court in *Gartenberg* was able to determine that

24    certain instances of conduct were not actionable as

25    discriminatory harassment based on the allegations in the

P9GAGarO

1     complaint and no further discovery on those instances was

2     needed.  And so too here, almost all of the conduct alleged in

3     the complaint, you can tell from the way that the plaintiff has

4     alleged it, falls within the *Gartenberg* framework of protected

5     political speech.  And I would like to go back to something

6     else that you talked about with plaintiff's counsel, which is

7     that in the decision on reconsideration, Judge *Gartenberg* --

8               THE COURT:  Judge Cronan.

9               MS. SCHWARTZ:  Judge Cronan.  Excuse me.  Judge Cronan

10    reaffirmed his decision that certain pieces of conduct were in

11    fact non-actionable as discriminatory harassment.  And the very

12    first one is:  A demonstration by pro-Palestinian students on a

13    public sidewalk --

14              THE COURT:  Slow down for the reporter.

15              MS. SCHWARTZ:  I apologize.

16         A demonstration by pro-Palestinian students on a

17    public sidewalk adjacent to the foundation building concerning

18    the Israeli Palestinian conduct.

19         So we are talking here about protests.  I know we sort

20    of veered off topic into some other things, but we're talking

21    about protests.  And Judge Cronan in his decision on

22    reconsideration affirmed that this very piece of conduct, the

23    protest, which ultimately devolved into the scene in the

24    library, which targeted a specific group of students, they were

25    yelling, they were banging, they were looking at a group of

1    students that were fearful for their own physical safety such

2    that they were texting friends, they were calling people to

3    help them.

4         THE COURT:  I know the details of that, and of course

5    that's the easy event to sort of focus on.  It's the other

6    things that are less clear I would say.  And because I don't

7    think that event itself is definitive of what has to happen for

8    there to be actionable harassment, and that's why I do want to

9    go obviously beyond the protests and talk about a couple other

10   things.

11        But, yeah, let me go to violent imagery, and let me

12   ask the plaintiff about this to start.

13        So, as I understand it, one of the incidents or items

14   that you say is actionable as harassment are signs that have

15   violent imagery.  In this case, the one you call out is a Star

16   of David with blood dripping from it.

17        Are there cases that have held that signs are

18   actionable?  And in *Gartenberg*, there were signs that were --

19   he put in the vandalism side I think, where they were defacing

20   the windows and whatnot.  But here I'm just talking about the

21   content of something like this.

22        MR. HEFTER:  Your Honor, I'm not -- to answer your

23   question directly, I'm not sure.  I'm not saying there are and

24   I'm not saying there aren't cases that have said merely a sign

25   is actionable.

P9GAGarO

1          I would respectfully submit that there could be signs

2     that have violent imagery that fall outside of the First

3     Amendment rubric altogether, if they're insightful.  And they

4     are, and Judge Cronan actually, you know, says, a litany of

5     things that fall outside of First Amendment protection

6     whatsoever, call for violence, they're insightful.

7          THE COURT:  Sure.  Sure.  Calls of violence.

8          MR. HEFTER:  Right.

9          THE COURT:  But this is an image.  It's an image --

10    actually doesn't it have multiple interpretations?  One

11    interpretation could be Israel has blood on its hands for its

12    conduct, not threatening any jews on campus, but simply saying

13    Israel has blood on its hands.  I'm sure there are many other

14    interpretations.  But given all these different

15    interpretations, how is that actionable?

16         MR. HEFTER:  Your Honor, if you're suggesting or your

17    hypothetical is just take the poster itself, without any other

18    context in which the --

19         THE COURT:  You can include the context of this

20    dispute about Palestine and Israel.  There's a lot going on in

21    the protest, sure.  So you're saying that the context

22    necessarily defines it to be a message of violence?

23         MR. HEFTER:  Correct, your Honor.  And that's the way

24    we've alleged it.  And I just want to pick up another thing

25    that counsel for CUNY said in connection with her description

P9GAGarO

1    of the facts in *Gartenberg*.  And your Honor said, you know, you

2    were aware of those facts.  And I believe that there is a false

3    premise to the state's argument here.  And that is, there

4    are -- there have been college courses ever since I was in

5    college, the Arab/Israeli conflict.  I'm sure every single

6    major undergraduate university has some type of class in that

7    regard.

8              THE COURT:  I took a class in college that had that as

9    one of four conflicts that were studied.

10             MR. HEFTER:  Fair, Judge.  So did I.

11             And when describing what took place at Cooper Union,

12   counsel said, they were just there talking about the

13   Palestini/Israeli conflict.

14             Respectfully, I don't think that is what's happening

15   and we have not alleged that.  This was not a debate in a

16   classroom where people are discussing the issues that your

17   Honor said.

18             THE COURT:  No.  It was boisterous.  It was loud.  It

19   was disruptive.  As many protests are, no?

20             MR. HEFTER:  That's true.  But then you add the

21   message, what's being conveyed.  If we're just talking about --

22   if we're just talking about that poster, but if you add things

23   like "globalize the intifada," which is a clarion call for the

24   death of jews.  Or if you include "from the river to the sea,"

25   which is a message which says that the Jewish people should be

P9GAGarO

1    eradicated from the Jordan River to the Mediterranean.

2            THE COURT:  Wasn't that one of the messages in

3    *Gartenberg* that Judge Cronan said was not actionable?  I could

4    be wrong.  I'm just --

5            MR. HEFTER:  Actually, I don't think that's correct.

6            THE COURT:  Okay.

7            MR. HEFTER:  Your Honor, I think that there were other

8    things he said that were not actionable.

9            But if you add all those things up, and then you add

10   the blood dripping from the Star of David, you're now outside

11   the realm of looking at the -- that hypothetical that your

12   Honor gave.  And you have to look at all the circumstances of

13   what happened, what was shouted.  Were there rules violated,

14   meaning CUNY Hunter's own rules, for example, the megaphone

15   interrupting class, what was being conveyed.  And that is the

16   touchstone of what the atmosphere was like, and that fits

17   within the rubric of Title VI or Title VII.

18           And, again, I want to reiterate this point, your

19   Honor, we're here on a motion to dismiss.  And I think that's

20   very important.

21           THE COURT:  I agree.  But, again, both sides have

22   endorsed *Gartenberg* essentially.  And, again, Judge Cronan uses

23   this sort of filtering exercise.  He didn't just say all of

24   this remains potentially actionable.  He said some of it does.

25   So but I understand what you're saying.

P9GAGarO

1          Let me ask you, and I'll allow CUNY to address the

2     sign in a minute.  But the e-mail that Professor Garrett claims

3     is defamatory to her, I believe the allegation is that students

4     or somebody sent an e-mail referring to her making, or stating,

5     or suggesting that she had somehow portrayed students as

6     antisemitic when they weren't.  And your allegation is that's

7     false and defamatory.

8          If that statement is true, not saying it is, but if it

9     were true, would you still say it's actionable?  In other

10    words, are you relying on the fact that it's false and

11    defamatory to say it's actionable?

12          MR. HEFTER:  No, Judge.  Even if it were true, and I

13    don't believe it is, respectfully, but even if it were true,

14    you would need to look at the entire context in which that

15    student wrote that e-mail and what that student's intent was or

16    that student -- student-run groups, what their intent was to

17    convey to some third party about Professor Garrett.

18          THE COURT:  And she is a figure on campus.  She is the

19    head of the Jewish Studies Department.  She has this role of

20    director involving Jewish studies or Jewish life on campus.  In

21    an educational institution, aren't students supposed to be

22    given latitude in being able to comment truthfully upon their

23    faculty?

24          MR. HEFTER:  Yeah.  I don't --

25          THE COURT:  Okay.

P9GAGarO

1          MR. HEFTER:  I don't disagree with that statement.

2          THE COURT:  Okay.  All right.  Let me let CUNY respond

3     to anything you've said about the signs and violent imagery or

4     the defamatory e-mail.

5          MS. SCHWARTZ:  Thank you, your Honor.

6          The first thing that I would like to point out is

7     that, as your Honor mentioned, the statements, the phrases, the

8     slogans that plaintiff's counsel said should be actionable,

9     such as "globalize the intifada," and "intifada revolution,"

10    those phrases, as your Honor indicated, were said at the

11    protest in *Gartenberg*, which the Court held prior to the

12    escalation in the library, prior to that, the Court held that

13    that was non-actionable discriminatory harassment, despite the

14    fact that those very same phrases that plaintiff's counsel just

15    proffered were stated and that is made very clear in *Gartenberg*

16    and in the decision on reconsideration.

17         So I just wanted the record to be clear on that.

18         THE COURT:  Okay.

19         MS. SCHWARTZ:  And with respect to something else that

20    plaintiff's counsel said.  You know, even if it's offensive, it

21    can still be protected political speech.

22         THE COURT:  Of course.

23         MS. SCHWARTZ:  *Rodriguez* makes very clear, it almost

24    celebrated the fact that offensive speech -- not celebrated,

25    but it talked at length about the fact that offensive speech is

P9GAGarO

1  sometimes the very -- the speech that deserves the most

2  protection.

3          THE COURT:  Of course.  But at some point, offensive

4  crosses the line to threatening.  I don't necessarily know

5  where that line is, but I believe there's a line at some point.

6  Don't you?

7          MS. SCHWARTZ:  Yes.  And I think, I think there is a

8  line.  Your Honor is correct.  And I think some of that is the

9  conduct around the speech itself.  And that is why *Gartenberg*

10  was talking about physically threatening speech or physically

11 threatening conduct that is --

12         THE COURT:  Or humiliating.

13         MS. SCHWARTZ:  Or humiliating, correct, your Honor.

14 Physically threatening or humiliating as how -- which is why

15 it's not delivered in the ordinary course of what's reasonably

16 expected for communication.

17         So things like protests, I think everybody would agree

18 that a protest, as you envision it, you know, people are,

19 people are speaking, people can be speaking in louder voices,

20 there might be a bull horn.  That is reasonably accepted and

21 even if the statements are offensive, as *Gartenberg* tells us,

22 it is still protected political speech.  Offensive is not the

23 standard.

24         THE COURT:  Okay.  Let me ask you this.  So I didn't

25 see much in your moving papers about the swastika or a couple

P9GAGarO

```
 1    other events.  Is CUNY conceding that any particular incident
 2    that was charged in the complaint is in fact actionable, at
 3    least at the motion to dismiss stage?
 4              MS. SCHWARTZ:  That any --
 5              THE COURT:  Any of the ones that have been alleged or
 6    described in the complaint.
 7              MS. SCHWARTZ:  That they are --
 8              THE COURT:  That they are in fact actionable and would
 9    survive a motion to dismiss?
10              MS. SCHWARTZ:  No.  That is -- we are not.  I'm sorry
11    if I'm misunderstanding your Honor's question.  But our motion
12    is that most of them are not actionable.
13              THE COURT:  You said most.  I'm talking about are
14    there some?
15              MS. SCHWARTZ:  Sorry.  Yes.  Thank you, your Honor.  I
16    was misunderstanding your question.
17              THE COURT:  Okay.
18              MS. SCHWARTZ:  I'm sorry.
19              So, yes, CUNY concedes there are a handful of pieces
20    of conduct.
21              THE COURT:  Stop there.
22              MS. SCHWARTZ:  Yes.
23              THE COURT:  Well, first, which ones?  Let's start with
24    that.
25              MS. SCHWARTZ:  Yes, your Honor.  The antisemitic
```

P9GAGarO

1    graffiti.  And I think this is all laid out in the second part

2    of the motion.  The antisemitic graffiti, there is a statement

3    by plaintiff about a professor.  Plaintiff's request for -- or

4    there is an allegation about a request to put up a Menorah

5    during Hanukkah.  And there was a request for additional

6    security.

7            So, in part, because some of those are not political

8    speech at all.

9            THE COURT:  Right.

10           MS. SCHWARTZ:  But some of them, for example, the

11   request for security and the request for a Menorah, are not

12   harassment in the sense that we would think of as

13   discriminatory harassment.  But those pieces of conduct that

14   remain are then to be evaluated under the normal hostile work

15   environment framework of is it severe and pervasive.

16           THE COURT:  Right.  And you say it's not, I

17   understand.

18           Let me ask you this:  If I were to find that there

19   were some incidents that, taken together, were imputable to

20   CUNY and severe and pervasive, and it's based on some handful

21   of them.  It seems to me that would provide a basis to deny the

22   motion to dismiss.  Would I necessarily need to address or

23   analyze other incidents that may, in the Court's view, be

24   closer and more difficult to figure out?  Or do I need to

25   analyze all of them?

P9GAGarO

1          MS. SCHWARTZ:  Well, your Honor, I think you would

2    need to analyze at least some of them, or probably most of

3    them.  Because the conduct that remains is not sufficiently

4    severe or pervasive to sustain a hostile work environment.

5          THE COURT:  No, I understand.  But what I'm saying, if

6    you get to the point and hypothetical.

7          MS. SCHWARTZ:  Sure.

8          THE COURT:  I don't know which way it's going.  But if

9    I found that there was a group of incidents that met all the

10   elements to get by, that's basically sufficient to get by and

11   deny a motion to dismiss.  Do I necessarily need to evaluate

12   other incidents that may be closer to the line, from the

13   Court's view?

14         MS. SCHWARTZ:  I suppose not, your Honor.  But what I

15   would say is that not only is the conduct -- and I'll call it

16   the advocacy conduct, because as you mentioned, your Honor

17   wanted to talk about sort of categories of conduct.

18         The advocacy conduct is both -- and this is laid out

19   in CUNY's motion.  It is both protected political speech, but

20   it is also -- it has to be prompted by plaintiff's membership

21   in a protected class.  And as CUNY's motion to dismiss makes

22   clear, that conduct is not prompted by her membership in a

23   protected class.  She doesn't allege it really, nor could she.

24   So even if you didn't want, if you found a couple of pieces

25   were not --

P9GAGarO

1              THE COURT:  Yeah.  I'm going to disagree with you on

2      that one, I have to say.

3              But let me ask this.  If I were to apply the analysis

4      that Judge Cronan did in *Gartenberg*, and I said here are a

5      number of incidents that, at least as alleged, don't cut it.

6      They're not actionable.  Would you leave the door open that --

7      or at least acknowledge the possibility that discovery could

8      develop facts that would make those incidents actionable?  Or

9      are you saying that they're not actionable regardless of what

10     may develop during discovery?

11             MS. SCHWARTZ:  I would say that they are not -- that

12     they are most likely not actionable despite what develops

13     during discovery because the facts are fairly well-pled.  And

14     presumably, if plaintiff was physically present or physically

15     threatened during any of these situations, she would have

16     alleged so.

17             And so it would be very difficult to see how something

18     would come up in discovery that would unearth something that

19     would move it from the category of not actionable as

20     discriminatory harassment, to physically threatening directed

21     at plaintiff, such that she didn't allege it during the

22     complaint.

23             THE COURT:  Okay.

24             MS. SCHWARTZ:  And when I say well-pled, I mean they

25     are -- it is descriptive.  Not that it sustains a hostile work

P9GAGarO

1    environment claim.

2            THE COURT:  All right.  Let me ask plaintiff if they

3    want to respond to anything.

4            MR. HEFTER:  Yeah, your Honor, in a few different

5    ways.

6            And, you know, we do have this debate as to what

7    happened in *Gartenberg*.  It's written there on the page so your

8    Honor can read it.  But I do want to point to Judge Cronan's

9    decision in *Gartenberg*.  One, where on the issue of whether

10   there was animus towards jews, he does decide and determine

11   that the phrases like "long live the intifada," "resistance is

12   justified in its right to rebel," the Court agrees that such

13   phrases support at least the plausible inference of animus

14   towards jews.

15           So, therefore, going to your Honor's question, even if

16   you were to decide that there may be one or two of our

17   allegations that constitute pure speech, we would still be able

18   to use those instances to show motive, intent, the failure to

19   respond, and, very importantly, animus towards jews.  So

20   discovery, in our view, would encompass those episodes anyway.

21           And then I want to raise, your Honor, a practical

22   issue here, which is that, respectfully, Judge Cronan is a

23   district court judge.  That decision may go up to the Second

24   Circuit, in which case the Second Circuit could determine that

25   those instances where Judge Cronan decided were pure political

P9GAGarO

1    speech, were not.

2           THE COURT:  And may decide a different analysis should

3    apply.  Who knows.

4           MR. HEFTER:  That's correct.  And now we have this

5    case in front of your Honor.  So even if you were to decide

6    that there were certain things that were pure political speech,

7    which we disagree with, we would ultimately, depending on how

8    this case resolves itself --

9           THE COURT:  Of course.

10          MR. HEFTER:  -- have an appeal to the Second Circuit.

11          THE COURT:  Sure.

12          MR. HEFTER:  So given the fact that those issues will

13   touch upon issues regarding intent, animus towards jews, we

14   believe that they should stay in the case and this should be

15   fair game.

16          On top of that, I believe your Honor, in looking at

17   some of these phrases that are used, again, one would need to

18   look at the context and the conduct that surrounded those

19   statements.  And, in that regard, the complaint alleges, with

20   quite particularity, the fact that there were megaphones.

21   There were people barricading the entrance to the college.

22   There were people who were protesting within the halls of CUNY

23   Hunter screaming and yelling some of these epithets, in my

24   view.

25          And so pure speech, in this case, may not be pure

P9GAGarO

1    speech at all.  It may be outside of the -- it may be

2    completely outside of the First Amendment rubric.  Or even if

3    it's in, it wasn't delivered in a generally accepted manner.

4           And so our position, Judge, is that -- and one of the

5    episodes that I do want to comment on is the attacks on the

6    rabbi who was invited to campus to provide a counterpoint to

7    whoever else was speaking on behalf of the Palestinian cause.

8    And that's a perfect example of that was a situation where, in

9    normal circumstances, if two sides sat down to have a debate,

10   that would fall within the First Amendment, educational

11   benefits and the like, but that turned into a mob that attacked

12   a Jewish person, a rabbi, who was brought there, invited there,

13   by -- at the suggestion of Professor Garrett.

14           THE COURT:  Well, the complaint alleges mob and

15   attack, but it doesn't allege physical attack.  It doesn't

16   allege -- actually, there is one physical act that is alleged

17   with respect to the rabbi, which is the student grabbing the

18   microphone from his hand, which might be akin to taking the

19   sign from the student at the protest that you also allege.

20           MR. HEFTER:  Right.

21           THE COURT:  But, you also challenge the showing of the

22   movie to begin with.  Is it your position, though, that you can

23   distinguish between certainly the movie part and then what

24   happened afterwards?

25           MR. HEFTER:  I think you can distinguish that, your

P9GAGarO

1  Honor.  And with respect to what happened afterward, that

2  falls, in my view, into a different paradigm.

3          However, one of our points about the movie is that it

4  shows discrimination that the college was more than willing to

5  show the Israelism movie, and I won't comment on the movie

6  itself, but refused, after years of -- to putting a Menorah up

7  on campus, which, in our view, demonstrates discrimination

8  between the treatment of one group and treatment of jews on

9  campus.

10         THE COURT:  I see.  Okay.  I'm going to ask you about

11  the swastikas and then I'll go back to the defendant on any of

12  these issues.

13         Conduct can be imputed to an employer under different

14  circumstances, and it depends on who the actor is.  If it's the

15  supervisor, it's computable.  If it's a third party, it's

16  negligence and control, et cetera.

17         And so for any one event, you could allege, plaintiff

18  could allege, that either CUNY was responsible for the act when

19  it occurred and that that constituted harassing conduct that is

20  imputed to CUNY, and/or that their response to the incident is

21  imputable to CUNY.

22         With respect to the swastikas on the pictures of the

23  hostages, or the victims, is your position -- which of those

24  two are you alleging is imputable to CUNY?  Before, after, or

25  both?

P9GAGarO

1          MR. HEFTER:  Both, your Honor.

2          THE COURT:  How before?  How is CUNY responsible for a

3    third party that, without any notice, put swastikas over those

4    pictures?

5          MR. HEFTER:  Again, your Honor, and I don't mean to

6    beat a dead horse, but we've alleged it, and those facts may

7    come out in discovery in terms of who defaced the picture of

8    the hostages.  Who defaced it?  Was it a member of a student

9    group?  We've seen a number of things that we've alleged in the

10   complaint.  We had -- and I believe in our opposition brief, or

11   the complaint itself, I'm forgetting which one, your Honor, but

12   we have screenshots.  There's a student group apparently called

13   CUNY for Palestine.

14         We anticipate that discovery will -- we will be able

15   to determine, we hope, of who defaced the poster.  And so,

16   therefore, at this stage, it's entirely possible that it was a

17   student who was in control by -- or could have been disciplined

18   by the university.  And we would need to know a lot more about

19   the facts of where that poster was.  I mean, we're not

20   talking -- and this is a point I want to make with respect to

21   CUNY Hunter.  You know, we're not talking like a campus like

22   Harvard or University of Pennsylvania, or University of

23   Michigan.  We're talking about a city school that has a, you

24   know, buildings and a lot of protests and flyers were, you

25   know, inside the buildings.  And so we may determine that, in

P9GAGarO

1    fact, the person who defaced the hostage posters was a student

2    or faculty member, a staff member, or somebody related to the

3    school.

4           And so I think that's a very fact-intensive question

5    that you've asked.  And then with respect to the latter part of

6    it, you know, based on their lack of response --

7           THE COURT:  Well, they took care of it five hours.  I

8    understand the allegations are they were not sufficiently

9    responsive and they were putting Professor Garrett off.

10   Although, I think you also allege that they, CUNY, said that

11   they needed to call the police and have them come and go

12   through certain channels and figure things out and that takes

13   some time.  And I actually didn't see in your complaint that

14   you claim that to be false.  In other words, you allege that's

15   what they said.  You didn't actually allege that it's not true.

16          But, again, five hours.  Are you aware of any cases

17   that have found, even at the motion to dismiss stage, that

18   allegations of a response like that within five hours, not

19   days, which there are cases that say even days may be enough.

20   But as a matter of law, really that you haven't alleged that

21   they haven't sufficiently responded.

22          MR. HEFTER:  Well, the way I would respond to that,

23   Judge, is I'm not aware of a case that has, as sitting there

24   right now, that is, you know, at five hours there's some

25   touchstone that says, you know, you go beyond that timeframe or

P9GAGarO

1    not.  I would tend to think that that's probably not the

2    analysis under Title VI or Title VII in terms of some number of

3    hours it takes.

4         And then, you know, as we allege, you know, the

5    response was, you know, it's not that simple.  You know,

6    standing here today, I can't imagine why it was not so simple

7    to take down a swastika on a flyer on campus given everything

8    that it connotes.  So we don't at this point, but discovery

9    will show why, behind the scenes, it was not so simple.

10        But, to be fair, because we wouldn't put something in

11   our complaint that we believed was untrue, we allege that it

12   took them five hours to take them down.  But we also allege

13   that it was only because of Professor Garrett that they did so.

14   If there was not someone like Professor Garrett, who was there

15   knocking on the president's or the administration's door, if it

16   weren't for her, who knows how long that swastika would have

17   been standing up on the --

18        THE COURT:  Yeah, but speculation doesn't make an

19   actionable complaint.  So we only have the facts as are

20   alleged.

21        MR. HEFTER:  Fair enough, Judge.  But I would also say

22   that, again, looking at every one of these things in isolation,

23   we've also alleged a number of different complaints that

24   Professor Garrett made that were never responded to.  We allege

25   that there was an antisemitic e-mail from Professor Soyer I

P9GAGarO

1    believe his name was.  That the school said, well, we're going

2    to investigate it.

3            However, the case law is pretty clear, if you

4    investigate something but you don't follow up on anything, it's

5    just as bad as you didn't do anything in the first place.

6            THE COURT:  Right.  They used it as a teaching moment

7    as I remember.

8            MR. HEFTER:  Right.  Right.

9            So when you look at the totality of the circumstances

10   of CUNY's failure to respond, you know, it does satisfy, at the

11   pleading stage for sure, deliberate indifference to the hostile

12   work environment that Professor Garrett and other jews at CUNY

13   Hunter were facing.

14           And she also requested security, which I believe has

15   been conceded at this point, which they -- that they never

16   followed through on.

17           THE COURT:  Okay.  All right.  Let me hear from CUNY

18   on what we've been discussing since the last time you spoke.

19           MS. SCHWARTZ:  Yes, your Honor.  Thank you very much.

20           I would like to respond.  I have a couple different

21   points to bring up.

22           THE COURT:  Sure.

23           MS. SCHWARTZ:  First, I would like to point out again

24   that this is a single plaintiff hostile work environment claim.

25   Single plaintiff.  She is not bringing a claim on behalf of a

P9GAGarO

1    class of people.

2              THE COURT:  No.

3              MS. SCHWARTZ:  It is her.  It is what she alleges that

4    she experiences.  So I think that is important to remember here

5    is that that is the nature of the claim that she has brought.

6              Moreover, as your Honor mentioned, and I don't want to

7    carry this too far down the road, but as your Honor mentioned

8    with respect to the antisemitic graffiti, plaintiff,

9    plaintiff's allegations concede that CUNY had to call the NYPD

10   to determine if a hate crime had occurred.  That is her own

11   allegation.  So you know that --

12             THE COURT:  Yeah.  But why isn't it a question of fact

13   about whether CUNY's response was reasonable?

14             MS. SCHWARTZ:  Well, your Honor, in CUNY's motion to

15   dismiss, we provide I think one case, there may be more, but at

16   least one case that demonstrates that within a couple of hours,

17   taking action within a couple of hours --

18             THE COURT:  Well, there are actually many cases, but

19   they're at the summary judgment stage, or a later stage.

20             Are you aware of any at a motion to dismiss stage?

21             MS. SCHWARTZ:  I don't recall off the top of my head,

22   but if we find out in discovery that it did in fact take a

23   couple hours, as plaintiff has alleged, there's no need to go

24   through discovery.  Her own allegations demonstrate the same

25   length of time the Courts have held as a matter of law is an

P9GAGarO

1    appropriate and reasonable response.

2              Moreover, your Honor, something to consider is that it

3    would need to first reach, before imputing to CUNY, would need

4    to first reach the level of severe and pervasive.  And while of

5    course antisemitic graffiti has no place anywhere, a single

6    instance, there are also cases that demonstrate a single

7    instance is not sufficient to sustain a hostile work

8    environment claim.

9              THE COURT:  Okay.

10             MS. SCHWARTZ:  And the other thing I would like to

11   mention is I think that -- I'm not sure, the statement made by

12   the other professor about plaintiff, I think there was a

13   different allegation that was the teachable moment.  I think

14   the --

15             THE COURT:  Okay.  Sorry.

16             MS. SCHWARTZ:  I think the allegation in the complaint

17   demonstrate that there was an investigation a little bit later

18   in time if I -- I just wanted to --

19             THE COURT:  I appreciate that.  There are a couple

20   other events.  Perhaps it was the questioning of the Jewish

21   student.  I don't remember.

22             MS. SCHWARTZ:  I believe that is correct.

23             THE COURT:  All right.  I have addressed the questions

24   I wanted to ask.  If the parties have anything else they want

25   to tell me, I invite that.  You don't need to, but if you do,

P9GAGarO

 1    feel free.

 2              So anything from the plaintiff at this point?

 3              MR. HEFTER:  Just on that last point, your Honor,

 4    about this being a single plaintiff case.  I mean, I'll repeat

 5    it that I don't believe that's relevant to your analysis.  I

 6    would just add that if you look at the allegation, the

 7    well-pled allegations in the complaint, they clearly state a

 8    claim for harassment under the federal law.

 9              And the only last point, your Honor, is that, sort of

10    a corollary to that.  I just wanted to point out a few cases to

11    you.  One is the *De Silva* case, 1997 U.S. Dist. LEXIS 9532.

12    The *Butta-Brinkman* case, 164 F.R.D. 475.  And then Chow, I

13    believe, versus NYU Downtown Hospital, 2004 U.S. Dist. LEXIS

14    16751.  And those cases stand for the proposition that even in

15    a single plaintiff harassment claim, the Court can look at, and

16    discovery can look at the manner in which the employer deals

17    with similar claims with respect to other members of the

18    community or the employment community.

19              THE COURT:  Okay.  So give me a moment.

20              Okay.  CUNY, anything else from you?

21              MS. SCHWARTZ:  Yes, your Honor.

22              One of the reasons or the reason that we have repeated

23    several times that this is a single plaintiff employment law

24    claim is that not necessarily for the purpose of distinguishing

25    what is or is not discoverable.  But for the purpose of

P9GAGarO

1    reminding the Court that many of the allegations in the

2    complaint really have nothing to do with the plaintiff.  You

3    know, the incident with the rabbi following the film screening

4    of Israelism, the plaintiff is not that rabbi.  She is not

5    bringing a claim on behalf of other people.  She doesn't even

6    allege that she was there.

7            So the student that your Honor referenced, the

8    professor who asked the student to question -- a question in

9    class that was offensive, that also was not about plaintiff.

10           And many, almost all of the allegations, fall -- have

11   that same flaw.  That they are not about plaintiff.  It was not

12   conduct that was directed at plaintiff.

13           And so it's important to remember here, not for the

14   purpose of what is discoverable or what can be considered her

15   intent, but what is actionable and whether plaintiff has pled

16   that she herself was subjected to a sufficiently severe or

17   pervasive hostile work environment claim.

18           THE COURT:  Okay.  Thank you.

19           Thank you for the excellent briefs and for the

20   wonderful arguments.  I will get to work, to the extent I

21   haven't already, and try to get something out as soon as

22   possible.

23           We are adjourned.  Thank you.

24           (Adjourned)

25