UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

LEAH GARRETT,

          Plaintiff,          New York, N.Y.

       v.           24 Civ. 9710 (VSB)(RWL)

CITY UNIVERSITY OF NEW YORK,

        Defendant.

------------------------------x      Conference

                             December 16, 2025

Before:

            HON. ROBERT W. LEHRBURGER,

                      U.S. District Judge

APPEARANCES

ALSTON & BIRD, LLP
    Attorneys for Plaintiff
BY:  MICHAEL C. HEFTER
    SETH M. COHEN
    ALAN M. MENDELSOHN


THE LAWFARE PROJECT
    Attorneys for Plaintiff
BY:  ZIPORAH REICH


LETITIA JAMES
    Attorney General of the State of New York
BY:  SHAINA SCHWARTZ
  ALISSA SCHECHTER WRIGHT
    Assistant Attorney General

THE COURT: All right. We are here for Garrett v. City University of New York, 24CV9710, for a discovery conference.

Counsel, please put in your appearances, starting with plaintiff.

MR. HEFTER: Your Honor, hi. Can you hear me all right?

THE COURT: Yes. I can hear you fine.

MR. HEFTER: Thank you, your Honor.

This is Michael Hefter, from the law firm of Alston & Bird. I am here with my colleagues Seth Cohen and Alan Mendelsohn. And also with us our co-counsel Ziporah Reich.

With that introduction, your Honor, I know -- I will let defense counsel introduce themselves; but, respectfully, Mr. Mendelsohn will be handling the argument today, if that's okay with you, Judge.

THE COURT: Of course. That will be perfectly fine.

And who is on for the defense.

MS. SCHWARTZ: Good morning, your Honor. Shaina Schwartz, with the Office of the Attorney General, for CUNY, along with my colleague Alissa Wright, also with the Office of the Attorney General.

THE COURT: All right. So we are here specifically to address Alston & Bird's desire for documents pertaining to incidents of anti-Semitism or at least complaints about them

and the follow-up from October 7, 2023 to the present.  And CUNY opposes, basically saying the incidents about which the plaintiff was not aware or did not implicate her are not relevant and not proportional such as would justify their production in discovery.

I have a question for -- starting with Mr. Mendelsohn.  And, again, as usual, I like to ask some questions that are on my mind; and if you want to say other things, I have no problem with that.

So the CUNY makes a point and seizes upon a statement or a part of my R & R on the motion to dismiss that referred to the need for a nexus between incidents that did not specifically involve the plaintiff and the —— I don't know whether to call them examples or cases that I mentioned were -- if it was something she overheard, you know, it was about someone else; it is something that was about her that she heard from someone else; something that she observed, but it didn't involve her.  There all different ways that that could come into play.

But CUNY argues that incidents that don't fall into any of those categories are not germane.  And I would like to get your view on that.  And also, I think specifically within that, I am curious——I haven't really looked into it that much, but I do have some background in it——whether harassment and hostile environment are two different things such that —— or

harassment may be a subset of hostile environment.  I don't know.  But the point being that harassment may be different enough in kind that you need a closer nexus than you might for a hostile environment claim where cases have mentioned the need to have concern for the totality of circumstances in the environment in which plaintiff operates.

So, I said a mouthful.  Mr. Mendelsohn, what can you tell me about that subject.

MR. MENDELSOHN:  Sure, your Honor.  Thank you.

We cited a few —— several cases establishing a few critical and well-established points of law that are addressing the scope of discovery in the discrimination context, employment discrimination context.

First, relevance, for purposes of discovery generally, is extremely broad concepts, as your Honor is aware.

THE COURT:  I don't need the -- I don't need the general points.

MR. MENDELSOHN:  The concept is particularly broad in the employment context and, even within that, further, even more broad within the context of hostile work environment claim of the sort our client is alleging here.

And the cases that CUNY relies on——it is principally two cases——they do not support the proposition that discovery should be narrowed in the manner they suggest.  In the *Guzman*

case, the plaintiff sought the production of all complaints concerning any discrimination, harassment, or retaliation on the base of gender, race, color, or national origin against anyone in plaintiff's work environment.  That is far broader than the discovery we are seeking, where we are seeking only discovery related to one type of harassment, which bears a direct nexus to the harassment that our client experienced within --

THE COURT:  Let me --

MR. MENDELSOHN:  -- her work environment.

THE COURT:  -- just stop you because you are speaking in terms of harassment, and that is what I am trying to understand.  Is harassment the same thing as hostile work environment or are they two different things?

MR. MENDELSOHN:  No, I think they --

THE COURT:  (indiscernible)

MR. MENDELSOHN:  -- are not --

THE COURT:  Go ahead.

MR. MENDELSOHN:  They are not necessarily the same thing in the sense that a hostile work environment claim is often based on harassment that you are experiencing in the environment, but you could also have a discrimination claim rooted in harassment that is not necessarily a hostile work environment claim.  So I think that there could be a different type of employment discrimination case based on harassment

that isn't a hostile work environment claim.

Ours is a hostile work environment claim because it is not —— there is a distinguished —— there is a distinction between a situation where the plaintiff is alleging that their supervisor harassed them, discriminated against them, whatever the case may be, where it is an individual plaintiff and sort of one wrongdoer.  Here, we are not saying there is one wrongdoer.  We are saying there is a culture, a toxic hostile work environment that is pervasive, that isn't targeted at one defendant -- isn't targeted at one defendant or one wrongdoer.  That, I think, is the critical distinction that makes the hostile work environment context particularly broader in terms of the discovery that courts allow.

THE COURT:  Okay.  I mean, I will say, though, just to push back just a little bit, that you can have a hostile environment claim that is based on one wrongdoer.  But I understand that the allegations in this case go well beyond that, and it does seem that in some of the cases that have recognized the propriety of evidence beyond just what the individual plaintiff experienced are instances where the alleged conduct was a broad level of conduct and not just one individual.

Anyways, that was just something that was on my mind.

Is there anything else you want to mention before I go to —— and ask some questions of CUNY?

MR. MENDELSOHN:  I would like to address the one other case that CUNY relies on --

THE COURT:  Sure.

MR. MENDELSOHN:  -- because, again, I think that the overwhelming weight of authority on this issue is in our favor.  And we cited a number of cases on this, including cases where the plaintiff sought to —— the defendant sought to exclude witnesses at trial from testifying at trial on the basis that those defendants were wanting to testify about their experience with harassment or discrimination in the workplace.  They weren't the plaintiff.  They were a nonparty. The plaintiff wanted to call them to support the hostile work environment claim, and the Court ruled that it was relevant to the claim even though they were obviously not the plaintiff and their experience was something separate from what the plaintiff experienced.

The one other case that CUNY relies on is the *Spina* decision, where the plaintiff sought to compel discovery into the termination of another employee based on speculation that that discovery could support her Title VII claim.  We are not seeking discovery with the hope that they —— that the discovery we seek turns up something relevant.  We are seeking discovery that we say is inherently relevant.  So that case doesn't support their position either.

They cite only two cases, and neither of them support

what they are urging here.

THE COURT:  Okay.

All right.  Let me turn over to CUNY.

One thing I would like some insight on from your side is this so-called central complaint system——what that is what, it contains, and what it does not contain.

MS. SCHWARTZ:  Thank you, your Honor.

With respect to the central complaint system, my understanding -- I'm not sure exactly what it —— the central complaint system, as I understand it, funnels into -- they are forwarded by e-mail, so folks can submit complaints to this central complaint system.  And then it is my understanding that those are funneled to the e-mail inboxes of the relevant campus personnel.  So I believe at Hunter College it would be John Rose's —— he is the chief —— he is the Dean of Diversity, the ODC, at Hunter College, and so my understanding is that those get funneled into his e-mail inbox.

THE COURT:  And it is seemed that you were distinguishing between other types of complaints that may not be in there.  Can you just tell me what you have in mind that those may be?

MS. SCHWARTZ:  I'm not sure I understand your Honor's question.

THE COURT:  Well --

MS. SCHWARTZ:  If I made that distinction, I

apologize.  I'm not really sure --

THE COURT:  Oh, no, no, no, no.

MS. SCHWARTZ:  -- I understand.

THE COURT:  No, no.  It's maybe something that I inferred.  But, let me see.  Yes.  Your letter says that "plaintiff's request is not limited to complaints located in the centralized reporting system.  Instead, she seeks the complaints, investigation files."  I guess you were making the point that it goes beyond the complaints.

MS. SCHWARTZ:  Yes.

THE COURT:  I thought maybe you were distinguishing some other type of complaint.  Okay.  I get it.

MS. SCHWARTZ:  That is correct.

THE COURT:  And I don't know if you have looked into it, but in terms of burden and proportionality, I am kind of curious.  What quantity of information are we talking about?  Are we talking about hundreds of complaints that would fall within the scope of the anti-Semitism and Israel and related subjects that the plaintiff has asked for or are we talking about something that may be in the scores or the tens or less?

MS. SCHWARTZ:  Well, your Honor, I don't have the exact figures in front of me, but I can tell you that, in doing the doc review that —— in reviewing the documents that CUNY -- or the review that CUNY has —— of documents that we have agreed to produce, I have seen some of these other

complaints.  And while plaintiff is claiming that they are inherently relevant to their claim, I can tell you, from reviewing some of these documents that have come up in our searches, there is really no nexus to plaintiff whatsoever.

Some of these complaints include things like a student believes that their professor misgraded them due to anti-Semitism or somebody wore a T-shirt with a slogan supporting Palestine that somebody felt was inappropriate. But these are in departments that are not plaintiff's departments.  These are not necessarily overlapping individuals with the individuals who are involved in the conduct that the Court determined supported plaintiff's hostile work environment claim.  And so there really is no nexus to plaintiff's claims whatsoever.

There is -- you know, like, we are in discovery to determine what plaintiff was subjected to and how CUNY responded to those incidents of anti-Semitism.  A student complaining about her professor in another department, if plaintiff wasn't aware of it, if —— contemporaneously, if plaintiff didn't witness it, if it wasn't directed at plaintiff, that really has absolutely no nexus to plaintiff whatsoever.

And so while I don't have the exact volume in front of me, I can tell you, from doing the doc review, it really crystallizes the fact that these complaints have no relevance

to plaintiff's claims, which is specifically what she experienced and how CUNY responded to the incidents that she experienced or incidents that she was aware of contemporaneously.

THE COURT:  Are there complaints that go into that central complaint system from professors?

MS. SCHWARTZ:  I believe it would include professors, although I am not positive on that.  But I do believe, as well, that there —— that complaints can be submitted directly to ODC outside of the system --

THE COURT:  Okay.

MS. SCHWARTZ:  -- either by e-mail or otherwise.

THE COURT:  So if other professors had concerns about anti-Semitism or had a complaint, they could file it there and --

MS. SCHWARTZ:  I believe --

THE COURT:  -- you would expect to find (indiscernible).

MS. SCHWARTZ:  -- that's true, your Honor.

THE COURT:  Okay.

MS. SCHWARTZ:  I believe that's true, your Honor.  I believe that is true, although I am not positive.  But, again, I believe they funnel into the e-mail, so it would all, I believe, be in the e-mail.

THE COURT:  Okay.  On the issue of relevance, let me

go back to where I started because I think you were just making the point that it is only relevant —— an incident is only relevant if it is something that the plaintiff was involved in or witnessed or heard about in some way.  And I go back to cases that the plaintiff cited, and some others, that expressly say that incidents in which the plaintiff was not involved——and I am talking about single plaintiff cases, not class actions, not groups——are fair came.  And a couple of these, as Mr. Mendelsohn points out, occur in the context of trial and the Court saying the evidentiary issue is whether the person who experienced it can appear and present it first hand, in other words, someone else can't retell it.  But the fact that it involved a different plaintiff didn't impede in any way or reduce its relevance or propriety.

Let me just refer to what I was looking at.  You know, one quote from *Perry*, from the Second Circuit in 1997, "Evidence of the harassment of women other than Perry, if part of a pervasive or continuing pattern of conduct, was surely relevant to show the existence of a hostile environment at Beacon Allen," the employer, "and could have been found probative of the company's notice of that environment within the period that the district court viewed as relevant."  So that certainly seems an endorsement of the type of material that the plaintiff is looking for.  And in fact the *Perry* —— hold on.  Never mind.

And then there are the cases that were cited by the plaintiff in addition to that.  Oh, and there is the Second Circuit case, from 2009, *DeMarco*.  *DeMarco* -- and it says, "DeMarco is correct that harassment experienced by other employees is relevant to hostile work environment claims, but the evidence must be firsthand.  But DeMarco was certainly entitled to put witnesses on the stand and elicit testimony of their experiences with harassment to support their claim."

So, in light of that case law, how can we ⸺ you say that it should be limited to what you are saying it should be limited to?

MS. SCHWARTZ:  Well, your Honor, with respect to your Honor's question about the nexus, I believe it is the *Leibowitz* case, which makes very clear that, if plaintiff wasn't aware of it, it doesn't -- it cannot be included in the "severe and pervasive" analysis.

THE COURT:  Well, then, is the case law at odds with each other?  Is there a divide?

MS. SCHWARTZ:  I don't think the case law is at odds with each other, your Honor.  I would need to refresh my recollection on *Perry*.  But I believe that they were in either the same department or, if there is an overlapping nexus of individuals, for example, right, if person plaintiff complains about supervisor A and somebody else also has a complaint about supervisor A, you could see how, even if plaintiff

wasn't aware of that or, you know, there was no relevant nexus to plaintiff in the way that we have been discussing it, you know, they weren't aware of it contemporaneously, they didn't witness it, or it wasn't directed at them, you could see how that would put employer potentially on knowledge with respect to that specific person or with respect to that specific department. Right? There is a nexus of —— there is some nexus and some overlapping piece of information there.

So I don't think the case law is —— I don't think the case law is inconsistent, but I do think that the need for a nexus is constant throughout. If, for example —— plaintiff hasn't limited this to be targeted to the people who are —— who subjected her to what she claims is hostile, harassing, discriminatory conduct. Right? There --

THE COURT: Well, but if the -- they are saying -- they are challenging at the high level, right, and —— which include as variety of incidents. As the complaint shows, there is a variety of incidents of which she was aware or that she has alleged. I don't think there has necessarily been a statement that she is not aware of others. I understand they are not necessarily pled. But when you are saying that the administration as a whole essentially is tolerating a hostile work environment, that seems to me to implicate a broader swath than if you are just talking about a particular supervisor. No?

MS. SCHWARTZ:  Well, your Honor, it —— the question of whether CUNY is tolerating, there are so many people at Hunter College.  The volume is just gigantic.  I think there are over 20,000 students.  I don't know the exact figure of faculty.  But this is one thing, your Honor.  If, hypothetically speaking, CUNY acted improperly with regards to a hundred complaints of anti-Semitism -- I'm not saying that happened.  I'm just giving a hypothetical.

THE COURT:  Right.  I understand.

MS. SCHWARTZ:  If they responded improperly or with negligence to a hundred complaints of anti-Semitism that have no nexus to plaintiff whatsoever, but they respond appropriately to plaintiff's -- I think we have seven or eight or nine complaints of anti-Semitism that are actionable as discriminatory -- potentially discriminatory harassment in this case, after the motion to dismiss.  If they responded appropriately to those ten pieces of conduct, the fact that they responded potentially with negligence or inappropriately to these other hypothetical hundred complaints is really of no matter.

It is not —— it is how CUNY responded to plaintiff's complaints of harassing and discriminatory conduct which she alleges.  These hundred complaints, again, you could argue and you could see how perhaps if there was an overlapping individual, for lack of a better term, perpetrator but, like,

an overlapping individual, which is what you often see in hostile work environment claims, right, the same supervisor or somebody in the same department, and it is not just that you can scale that up to be the entire campus.

There is a continuity of individuals that are creating the hostile work environment that creates the nexus, even if you are not —  even if plaintiff is not aware or they were not directed at her.  That continuity of individuals is what -- plaintiff hasn't asked for that.  She asked for it with respect to Michaela Sawyer, and CUNY represented that there are no other formal complaints of anti-Semitism with respect to her.  So CUNY responded to that request.  And there is no nexus.

Plaintiff asked -- just asked for all complaints of anti-Semitic conduct.  Whether CUNY responded appropriately to the student who felt that their grade was, you know, tinged by an anti-Semitic professor really has no, like —— just no bearing on whether CUNY responded appropriately to the conduct which plaintiff —— which underlies plaintiff's hostile work environment claim.

THE COURT:  Okay.  Mr. Mendelsohn, do you want to respond?

MR. MENDELSOHN:  I would, your Honor.  Thank you.

The university is arguing what it wants the law to be as opposed to what the law is.  I addressed the Guzman and

*Spina* cases.  Ms. Schwartz mentioned the *Leibowitz* case.  I'm looking at your -- I will read you, your Honor, a quote from it:  "We recognize that evidence of harassment directed at other coworkers can be relevant to an employee's own claim of hostile work environment discrimination."  It proceeds to state, "Remarks made outside of plaintiff's presence can be relevant to a hostile work environment claim."  And it proceeds to say that "things that are said behind the plaintiff's back could reasonably be found to support a hostile work environment claim."

THE COURT:  But aren't those statements that they are talking about in regard to the plaintiff?

MR. MENDELSOHN:  Not necessarily.  I mean, I think that it could be the same type of hostile work environment.  It is the same type of harassment.  So if —— in our case we are claiming that our client is aware, in her position as the Director of Jewish Studies, of a number of complaints about anti-Semitism being reported to the university and the university failing to act, and this being reported back to our client because she's got students and faculty members coming to her and saying that the university is failing to address things that we are raising.

She's got this —— a claim, and she's got —— she has the right to discovery into how the university responded when others within the community raised these issues and the

university failed to address it.  It is —— there is a nexus between those complaints, which all arise from October 7. This is not just random, you know, discrimination.  This is -- we are talking about a specific issue that has arisen on college campuses and at CUNY Hunter around the campus unrest following October 7 and how the university handled it.

But I would like to pivot to the burden and address that.  This is not a scenario where we are asking CUNY to expand the scope or universe of documents that it is reviewing.  The university provided us with a list of search terms which we provided input on, and we believe is sufficient to bring in the right universe of documents relating to anti-Semitism, whether it specifically relates to our client or not.

The issue is that CUNY is taking the position, that to the extent they come across documents using those search terms that relate to anti-Semitism but not the incidents in our complaint, they are just not going to produce them.  So their issue —— there is no legitimate burden argument here because we are not saying they have to expand substantially the universe of what they are reviewing.  And Ms. Schwartz said she already, you know, came across these types of documents as she was doing her review because the search terms, again, were broad enough to bring those in.  CUNY has chosen to increase their burden by attempting to parse which documents

concern issues in the complaint as opposed to —— or not.  That was their choice.  But this is not a situation where we are forcing them to expand the search.

THE COURT:  All right.

So, Ms. Schwartz -- provide an example of a student who complained that she thought her grade was influenced by anti-Semitism in some way but just her grade.  Do you really think that that is something that is relevant to and would be even admissible in regard to the claims that plaintiff has?

MR. MENDELSOHN:  If the discovery reflects that the university failed to address it and did not take adequate measures to respond and there is other evidence that they systematically failed to undertake appropriate measures to respond to incidents of anti-Semitism on campus, I would respectfully submit that that all would be highly probative of the university's intent and handling of these types of matters and are probative of whether the university allowed a hostile work environment to exist for Jewish students and faculty.

THE COURT:  All right.  Ms. Schwartz, any last words you want to say?

MS. SCHWARTZ:  Yes, your Honor.  I would like to respond to what plaintiff said about CUNY's production.

If plaintiff was aware of other complaints of anti-Semitism, which are not alleged in the complaint, for example, if she forwards those e-mails to CUNY administrators,

plaintiff —— those -- CUNY has agreed to produce those documents, and in fact CUNY has produced several of those documents.  We are not limiting this to just the four corners of the complaint.  If we see an e-mail that plaintiff has forwarded a complaint to a CUNY administrator or a student has come to plaintiff or a professor has come to plaintiff with a complaint of anti-Semitism, CUNY has already agreed to produce those documents because those complaints contain the requisite nexus to plaintiff.  It is clear she was aware of them contemporaneously and that can in fact be part of her hostile work environment complaint.  That's what *Leibowitz* says.  We are not arguing that plaintiff needed to see them or be the direct recipient of them.  We are only arguing that they must contain the relevant nexus.  She needed to be aware of them contemporaneously.  She needed to hear about them.  So if they are not alleged in the complaint but she knew about them and that's clear from the documents because she is forwarding them to Hunter College administrators, CUNY's agreed to produce that.

CUNY's also agreed to produce third-party complaints about the conduct alleged in the complaint.  So if somebody is complaining about the February 28 protest and it is not plaintiff——it is a student, a professor, a parent, somebody from the university——CUNY's agreed to produce that as well.  So it is not —— it is not accurate at all to say that CUNY is

not willing to produce documents outside the four corners of the complaint because if plaintiff was aware of incidents of anti-Semitism and we see that in the documents, we are willing to produce that.

Moreover, your Honor, we have been having these conversations with plaintiff's counsel for months. You know, had plaintiff come to us and said, look, here are another ten incidents that I was aware of contemporaneously, we could have considered that. But that's not what she is asking for. She is not in any way excepting or limiting this to complaints that would have some actual nexus or probative value to her hostile work environment claim, which really is based on complaints of anti-Semitism that she was aware of, were directed at her, that she saw or witnessed, or that she was aware of contemporaneously. That is what forms the basis of the severe and pervasive piece of the hostile work environment claim.

And with respect to Mr. Mendelsohn's idea that CUNY's handling of the student's complaint of her grade, how —— that doesn't demonstrate in any way whether or not CUNY responded with negligence to plaintiff's complaints of anti-Semitism. They could have been -- and, again, this is a hypothetical. They could have been completely negligent with respect to another complaint of anti-Semitism that plaintiff wasn't aware of, that doesn't form the basis of her hostile work

environment complaint.  But without a requisite nexus to plaintiff, without any connection because it was the same individual, or without it being something that she was aware of or witnessed or experienced herself, there really is no nexus.  That just doesn't demonstrate whether or not CUNY was reasonable in responding to her complaints of anti-Semitism or complaints that she was aware of.

THE COURT:  Mr. Mendelsohn, actually I do have a follow-up question.  Is there any limiting principle you can impose that would narrow in any way what you are seeking?

MR. MENDELSOHN:  Well, I think that we have worked with CUNY to do just that.  I mean, we have discussed search terms.  CUNY agreed to the search terms.  So, again, I go back to my prior point.  There is no legitimate burden argument that is at issue here.  Notably, Ms. Schwartz, you know, and CUNY has made an argument about the burden, there is no ——

THE COURT:  Well, put that aside.  Put that aside.

My question is, is there —— what would be a limiting principle that might be applied here?  For instance, complaints only from professors, not students; the complaints only about incidents during a lesser time frame, rather than to the present; complaints only about the type of things that —— well, this is discovery.  I think CUNY has already said it is producing complaints by others about the same incidents alleged in the complaint.

Right, Ms. Schwartz?

MS. SCHWARTZ:  That is correct, your Honor.

THE COURT:  Okay.  So that is what I am sort of searching for, Mr. Mendelsohn, or wondering about.  Because you can imagine —— well, actually, if you have already produced and are producing complaints about the same incidents, then you are —— that itself, such as the protests, could well lead to quite a number of complaints from various people.  Maybe there are one-offs on something else, but I can't really determine their significance at the moment.

Another limiting principle, obviously, is if there was any connection with the plaintiff, as Ms. Schwartz has said.

But is there any type of limiting principle that you think would be reasonable?

MR. MENDELSOHN:  Well, we definitely disagree with Ms. Schwartz that there has to be a specific nexus to plaintiff to the point where only incidents that she experienced are relevant.  I mean, that is just not supported by the law.  There are plenty of cases where a plaintiff was the victim of sexual harassment and the experiences of others within the environment who were victims of other sexual harassment that didn't involve plaintiff are deemed relevant.  That is borne out in multiple cases we have cited.

But there —— you know, we have alleged, as an example,

disruptions in the lobby of the building at CUNY Hunter, like that, if there are other students who experienced the same type of harassment that plaintiff alleges in the complaint, that would fall within -- that would certainly satisfy a nexus.  I mean, if plaintiff is claiming that she had to experience protests  in the entryway to the building and others complained about  it, the university's handling of that would definitely fall within.

Another point that your Honor made --

THE COURT:  Well, but that's the type of incident, isn't it, that she said she is producing because --

MR. MENDELSOHN:  Well --

THE COURT:  -- it involves the same incident?

MR. MENDELSOHN:  My understanding is that, to the extent that Ms. Schwartz can -- draw some connection between the incident and plaintiff, she is producing it.  But I don't know that she is taking a position that any complaint about protests in the lobby of the building and the university's handling of the same would be produced.  But I will have to let Ms. Schwartz answer that.

But another point that your Honor made in the decision on the motion to dismiss is, you know, the security, the request by plaintiff for security for events.  If there are other students and faculty who requested security for events and it was not provided, all of the communications and

documents around that, I believe, would be fair game.

There are other instances in your Honor's decision that your Honor found actionable.  I think that if there are complaints about similar type of experiences, you know, for example, the -- if someone else complained about the menorah lighting or someone else complained about the *Israelism* film screening, other incidents that are alleged in the complaint, but there are complaints about -- by other students and faculty about either those incidents or similar ones, we think that would be fair game, as well.

THE COURT:  Okay.  Well, I think, Ms. Schwartz—and you can correct me if I am wrong—you said you were producing ones -- complaints that were about the same incidents even if it wasn't specific to plaintiff.  Is that right?

MS. SCHWARTZ:  That is correct, your Honor, and that includes all of the complaint —— all of the conduct alleged in the complaint, even the conduct that your Honor concluded was not actionable as potentially discriminatory harassment.  We have not limited that to just the nine remaining incidents.

THE COURT:  Right.  So, in other words, you have produced or will be producing complaints by any other student or professor regarding the same events about which the complaint describes and alleges as being an incidence supporting her case.  Is that right?

MS. SCHWARTZ:  Yes.  To the extent they are captured

in our agreed-upon --

THE COURT:  Yes.

MS. SCHWARTZ:  -- search universe, that is correct, your Honor.

THE COURT:  Right.

So, Mr. Mendelsohn --

MR. MENDELSOHN:  There is, your Honor --

THE COURT:  Yes.

MR. MENDELSOHN:  There is one other issue, too, which we haven't addressed, which is the ongoing nature of this. There are ongoing issues at CUNY Hunter.  Our complaint alleges that these things have been continuing.  Obviously, we haven't filed an amended complaint that includes all of the most recent allegations.  But if there are ongoing protests of the kinds that we have alleged in the complaint, ongoing events, anti-Israel type of events, where there are similar types of protests and people are raising concerns about those, and categorically, they fall into the same category of the incidents that we have alleged in our complaint, we believe the university's handling of those would be just as relevant.

THE COURT:  Well, understood, but Ms. Schwartz has already indicated that she would be supplying records for -- I'm going to go to the timing issue in a minute of other complaints about the incidents that have happened.  But what you just described is, as Ms. Schwartz pointed out, something

that the Court has deemed nonactionable.  So getting more discovery about further incidents that would fall into a similar category of nonactionable claims, arguably, would not be -- would not make sense.

But, Ms. Schwartz, let me ask you something.  What is your position, what are you doing with respect to continuing -- any continuing complaints?

MS. SCHWARTZ:  Well, your Honor, our document review, you know, the collection of documents was up to a certain date of collection.  But, again, if plaintiff had come to us and said, look, I was on campus, I have this additional, you know, incident, CUNY could certainly take that under advisement. She has not done so.  She has not done so with respect to any additional incidents outside of what she has alleged in the complaint.  You know, if plaintiff's counsel came to us and said, look, here are ten additional incidents that plaintiff was aware of contemporaneously and she just forgot about them or didn't include them in the complaint because we thought the complaint was fulsome enough or, you know, they happened since the date, CUNY could certainly take that under advisement. She has not done that.  And, you know -- and without any sort of limiting factor, it is just significantly overly broad and there is no nexus to plaintiff's complaint of a hostile work environment.

And also, your Honor, I would like to circle back to

one thing Mr. Mendelsohn said.  CUNY is not saying that the incidents need to be something that plaintiff herself experienced.  She needed to at least know of them contemporaneously, and I want to make sure that that -- that if we are using the term experience colloquially, we understand that that --

THE COURT:  No, I understand that.

MS. SCHWARTZ:  Okay.

THE COURT:  Because that is one of the categories of examples of where a nexus exists that I think was described in the R & R.

Let me ask, Mr. Mendelsohn, are there additional incidents of which plaintiff is aware from the time that she has been there that are not included in the complaint either because they just weren't included at the time, because you provided examples, or because they happened after the complaint?

MR. MENDELSOHN:  There --

THE COURT:  And, if so, what quantity are we talking about?

MR. MENDELSOHN:  There are absolutely examples -- unfortunately, there are absolutely examples on an ongoing basis up until, you know, this week.  On an ongoing basis we hear from our client about what is going on.  We are happy to -- I don't have all the details right in front of me, but

we are happy to -- my colleague Ziporah probably does have a number of them.  But we are happy to provide that information.  They are -- a lot of them are things that happened since the complaint was filed.  My understanding is that at the time that the complaint was filed we did our best to try to limit it to incidents that we believed would potentially support a claim.  So are there other allegations or other incidents that happened at the time that we chose to not put in the complaint, yes, but most of the allegations of things that we believe would be relevant that fall outside the complaint would be things that are since the complaint was filed.

THE COURT:  All right.  Well, here's what we are going to do.  I do have some concerns that just saying all of it is up for grabs, any complaint touching upon anti-Semitism, touching upon Jews in some way, any complaint by a Jewish student, anything could be very far-ranging, and a lot of it would prove not particularly relevant in the long run.

On the other hand, we are in discovery.  This is not a decision about what is admissible in any way.  This is discovery.

But I think what does make sense, surely plaintiff is on alert as to things that are happening and particularly in her position.  And if there are additional incidents that she now believes further support her claim, either because they have been previous to the complaint during the relevant time

frame or they have occurred since, then I would ask that the plaintiff provide that list to -- you don't need to do a full set of allegations, you know, you don't need to create a complaint or an amended complaint, just provide a list of dates and incidents and those should be produced.

So that's what I think an appropriate way to resolve this is at the moment.  I don't know if Ms. Schwartz and CUNY will say that something in there is just so out of bounds that it shouldn't be, but I think that it is fair for the plaintiff to provide a list.  It sounds like there is going to be a number of things that will provide some more fulsome discovery.  So let's go with that, and that should take care of it.

Any questions?  Any questions from the plaintiff?

MS. REICH:  Your Honor, I was wondering if I could just have a moment to shed some light on the grade, the student that complained, for example, about anti-Semitism and not getting a grade and how there might be -- very well be a nexus between there -- what happened there and our plaintiff. And I only say this because I have had the benefit of dealing with dozens and dozens of very similar situations.

So I would say probably 99 percent of the time the allegation of a bad grade based on anti-Semitism goes back to the student was pro-Zionist or writing a paper that was not following the anti-Zionist narrative/genocide narrative of the

professor and as a result they got a bad grade, and I can tell you from my own personal experience, once we raise that on appeal, most of the time the grades get changed.  I mean, that is what is happening.

And our plaintiff is complaining that there is harassment based on anti-Zionism, anti-Israel harassment, which your Honor knows, in *Gartenberg*, as *Gartenberg* pointed out, the *Gartenberg* decision, is not permissible. Discrimination based on -- you are allowed to be anti-Zionist, but discrimination based on anti-Zionism --

THE COURT:  Sure.

MS. REICH:  -- is harassment per OCR, per the law. And we are saying that that is very relevant here because the nexus is that it goes to show how the school is dealing with discrimination that is based on Zionism.  Unfortunately, many of the schools believe that they can allow that kind of discrimination.  And so these are very, very relevant and the only way we would know that these are even going on is by getting those -- that information in discovery.  I think it is vital that we get that because that helps, you know, prove what it is that we need to prove, and that is something the fact-finder should know when they are making any kinds of decisions as to whether or not CUNY was negligent in how they were dealing with the anti-Semitism which is of the same nature that our plaintiff is complaining of.

THE COURT:  Ms. Schwartz?

MS. SCHWARTZ:  If I may, your Honor.

First of all, Ms. Reich's hypothetical is based on absolutely no -- she has no basis to make that argument with --

THE COURT:  Well --

MS. SCHWARTZ:  -- respect to the example that I have given.

THE COURT:  She may not with respect to whatever -- it is not an unknown phenomenon, what she has described.  Put it that way.

MS. SCHWARTZ:  Yes, your Honor.  That is true.  And so -- but I want to focus on something that she said.  How they are dealing -- and we discussed this before, how CUNY is dealing with anti-Semitism as whole is really not relevant to how CUNY responded to plaintiff's -- the seven pieces of actionable conduct or nine pieces, I apologize, of actionable conduct that support plaintiff's hostile work environment claim.

CUNY could have responded appropriately or inappropriately to all of these other complaints of anti-Semitism -- and I say "all of these other" hypothetically.  I don't know the volume.  They could have responded appropriately or inappropriately to those and it would have no bearing on how -- the appropriateness of how

they responded to plaintiff's complaints, the complaints that underlie plaintiff's hostile work environment claim.

This is a classic fishing expedition.  Plaintiff doesn't -- she doesn't know that -- what these incidents are, she doesn't know who perpetrated them, she doesn't know who they were against, she doesn't know what their nature is, but she wants to know about them because she thinks that they are relevant in some, like, very vague sense, but this is the classic fishing expedition, your Honor.  She had to be -- in order for them to support the "severe and pervasive" portion, prong of their complaint, she had to be aware of them, they had to have a nexus.  And in order to demonstrate whether those pieces of conduct can be imputed to CUNY, there also has to be a nexus to plaintiff, an overlapping perpetrator perhaps.  Something that we have seen in these cases before is often the overlapping perpetrator that puts CUNY on notice that this particular person or this particular department is causing a problem.  But that's not here.  We don't have that here.  Plaintiff is just saying, I think there was a lot of anti-Semitism and I don't know what they are, but I want to know what they are.  And without any nexus to plaintiff, they really have no bearing on her hostile work environment complaint.

MS. REICH:  And if I might respond to that, just a quick point, and that is that how CUNY responds to situations,

like the bad grade or any other anti-Semitism, especially as it relates to anti-Zionism, has everything to do with plaintiff's environment, hostile environment because if the school continues to, again and again and again, allow teachers and students to create hostile environments for specific people, then they do that again and again and again and then plaintiff has the experience of that same hostile environment. That the student is not stopped when they want to do something that, you know, is overtly anti-Zionist and they are discriminating based on that, then it signals to the student that they can do that again and again and the student does do that again and again and eventually the plaintiff gets to experience a similar situation because the school did not stop it.

I mean, if you think about sexual harassment, that's the way it works. If an environment is permissible of, you know, a supervisor sexually harassing, you know, one of the people on their team, even if another team knows nothing about it, the fact that the work allowed that, you know, continued to allow that kind of harassment, gives permission for the next person to do it and the next person to do it, and eventually whoever the plaintiff is in the case experiences that because the school refused to stop it when they should have stopped it. It absolutely is relevant.

THE COURT: All right. Putting aside how relevant, I

actually was going back and looking at the cases while you were speaking——I was multitasking——and, to me, the Second Circuit cases and the district court cases that are cited by the plaintiff, at least some of them, are clear in their language that other incidents are indeed potentially relevant and it does not necessarily have to have a direct nexus to the plaintiff for it to even come into evidence. I am not saying it will come into evidence here. It would depend on each given situation. But it is now just discovery. And, frankly, within the language in those cases and what they held and given that the plaintiff has not demonstrated any burden, particular burden, undue burden in producing the material that is sought, I am convinced that my earlier ruling was too narrow, and I am granting the motion to compel. That is that.

Anything else we need to deal with? Anything from the plaintiff?

MR. MENDELSOHN:  No, thank you.

MR. HEFTER:  No, your Honor.  Thank you.

MS. REICH:  Thank you, your Honor.

THE COURT:  Anything from the defense?

MS. SCHWARTZ:  No.  Thank you, your Honor.

THE COURT:  All right.  We are adjourned.  Thank you.

(Adjourned)

C E R T I F I C A T E


I, Kristen J. Carannante, certify that the transcript of the digital audio recording of the proceedings in the above-entitled matter is a true and accurate transcription.


Signature    /s/ *Kristen J. Carannante*
             KRISTEN J. CARANNANTE, RPR, RMR, FCRR
             (848) 459-3124
             kjcarannante@gmail.com

Date:        January 6, 2026